**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION**

| | | |
|---|---|---|
| **SCOTT D. LAWSON and** | § | |
| **STEVEN LAWSON,** | § | |
| | § | |
| **PLAINTIFFS,** | § | |
| | § | |
| **VS** | § | **CV 2:07cv356-MHT** |
| | § | |
| **SWIFT TRANSPORTATION** | § | |
| **CO., INC. and** | § | **JURY DEMAND** |
| **FREDRICK S. MARTIN, JR.,** | § | |
| | § | |
| **DEFENDANTS.** | § | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR**
**PARTIAL SUMMARY JUDGMENT**

COME NOW the Plaintiffs, Scott D. Lawson and Steven Lawson, and

in response to the Motion for Partial Summary Judgment filed by Fredrick S.

Martin, Jr., and Swift Transportation Co., Inc., present the following points

of fact and law:

**I. STATEMENT OF FACTS**

This case is a result of a wreck involving a commercial tractor-trailer

and a passenger vehicle. See Complaint. The wreck occurred on the evening

of March 15, 2007. (Plaintiffs' Exhibit 1)  The wreck occurred in the

eastbound lanes of travel on Highway 84 in Andalusia, Alabama. (Plaintiffs'

Exhibit 1)  Highway 84 is a four-lane highway. (McGowin pg. 18) In

addition to the two eastbound lanes of travel, there is also a turning lane,

which permits vehicles to travel in the northbound direction. (Plaintiffs'
Exhibits 1, 2, 3) The weather conditions at the time of the wreck were
described as rainy, overcast and nasty. (Scott Lawson pgs. 60, 64)  The roads
were wet. (McGowin pg. 18)

Defendant Frederick Martin is a driver for Defendant Swift
Transportation. (Martin pg. 10) Defendant Martin has testified that he was
driving the Swift Transportation tractor-trailer at the time of the wreck.
(Martin pg. 52) Defendant Martin was accompanied by another Swift
Transportation employee-trainee, Jose Pagan. (Martin pg. 45) For the most
part, Mr. Pagan had driven up until the time of the wreck. (Martin pg. 50) As
Mr. Pagan and Defendant Martin made their way into the town of Andalusia
on March 15, 2007, they looked for the location of the place where they
would make their pick up the following morning. (Martin pgs. 47, 48) At
some point, they realized they were not headed in the right direction, so they
stopped their vehicle along Highway 84. (Martin pgs. 47-51) Jose Pagan
stopped the vehicle for four reasons; he was tired, nearly over the federally
permitted hours, headed in the wrong direction and was going to switch
driving positions with Defendant Martin. (Martin pgs. 50-52)

Defendant Martin took over the driver's seat and before leaving they completed their logbooks. (Martin pgs. 51-53) According to the logbook entry, they remained stationary for thirty minutes. (Plaintiff's Exhibit 4)

Defendant Martin decided he was going to turn the tractor-trailer around, go back into town and find a place to park for the night. (Martin pgs. 53, 54) Defendant Martin tried to complete a U-turn from the far right lane. (Martin pg. 57,58) To complete such a U-turn, Defendant Martin would have traveled from the far right lane, across the inside lane, across the turning lane and into the median. (Plaintiffs' Exhibits 2, 3) According to Defendant Martin, he made a conscious decision to make a U-turn from the far right lane because he needed the room. (Martin pg. 58) According to Defendant Martin, at the time of the wreck it was pitch black. (Martin pg. 45) The wreck occurred on an area of road where lighting is poor. (McGowin pg. 14) According to Defendant Martin, the weather and light conditions were so bad, 'I could see nothing." (Martin pg. 48)

Traveling behind Defendant Martin were the Plaintiffs, Scott Lawson and Steven Lawson. See Complaint. The plaintiffs are brothers. (Scott Lawson pg. 57)  Scott Lawson was driving a Chevy Lumina. (Scott Lawson pgs. 25, 61) Steven Lawson was sitting in the front passenger seat. (Steven Lawson pg. 23)

Slightly before the wreck, the Plaintiffs were traveling in the far right lane going in an eastbound direction on Highway 84. (Scott Lawson pg. 61, McGowin pg. 17) The Lawsons had on their headlights and windshield wipers. (Steven Lawson pg. 21) As the Lawson's crested a hill, Scott Lawson spotted the Swift Transportation tractor-trailer in the right lane. (Scott Lawson pg. 64; McGowin pg. 18) The tractor-trailer appeared to be stopped in the right lane or moving only 1 mile per hour. (Scott Lawson pg. 64)

Upon seeing the stationary tractor-trailer in the roadway, Scott Lawson immediately signaled that he was changing lanes. (Scott Lawson pg. 61) Scott Lawson switched to the inside lane. (Scott Lawson pg. 64) As Scott Lawson approached the side of the Swift Transportation trailer, Defendant Martin "gunned" it, steering the tractor trailer from the outside lane across the inside lane. (Scott Lawson pg. 65, 66) Before making the sudden turn, the driver of the Swift tractor-trailer did not signal that he was going to turn. (Scott Lawson pg. 65; Steve Lawson pgs. 22, 23, 26) Scott Lawson locked up his brakes and his vehicle slid. (Scott Lawson pg. 67) The Lawsons collided with the trailer as it passed in front of them. (Scott Lawson pg. 66) The Lawson vehicle traveled under the Swift Transportation trailer. (Scott Lawson pg. 67). The impact occurred just over the crest of the

hill. (McGowin pg. 18) The actual impact was within 500 feet of the crest of the hill. (Plaintiffs' Exhibit 1) At the time of impact, the Swift tractor was in the median. (Martin pg. 58) The Swift trailer was taking up the turning lane, the inside lane and part of the outside or right lane. (Martin pg. 58)

## II. <u>APPLICABLE LAW</u>

In considering a motion for summary judgment, the Court should consider the facts in the light most favorable to the non-moving party. <u>Adkickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1987). Summary judgment is improper if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the plaintiffs. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). If a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the Court should refuse to grant summary judgment. <u>Samples v. City of Atlanta,</u> 846 F.2d 1328, 1330 (11th Cir. 1988).

Alabama Code § 6-11-20(b)(3) defines wantonness as "conduct which is carried on with a reckless or conscious disregard of the rights or safety of others." Proof of wantonness does not require proof than any defendant entertained a specific design or intent to injure a plaintiff. <u>K.M. v. Alabama Department of Youth Services,</u> 360 F.Supp.2d 1253, 1263 (M.D.Ala.2005)

*citing* Alfa Mutual Ins. Co. v. Roush, 723 So.2d 723 So.2d 1250, 1256 (Ala. 1998). What constitutes wanton conduct depends on the facts presented in each case. Tolbert v. Tolbert, 903 So.2d 103, 114 (Ala. 2004) (citing Central Alabama Electric Cooperative v. Tapley, 546 So.2d 371 (Ala. 1989)).

The Alabama Supreme Court has defined recklessness as part of the wantonness statute as careless, heedless, inattentive, indifference to consequences. Berry v. Fife, 590 So.2d 884 (Ala. 1991). The question of "wantonness should be submitted to the jury unless there is a total lack of evidence from which the jury could reasonably infer wantonness." Monroe v. Brown, 307 F.Supp.2nd 1268, 1271-72 (M.D. Ala. 2004).

Evidence that defendant left parking area outside southbound lanes of four-lane highway and entered lane nearest to him and that, after entering outside lane and traveling short distance, defendant cut across inside lane in front of approaching southbound motorist while attempting to make sharp U-turn would have justified finding that defendant acted wantonly. See Turkett v. Wedgeworth, 266 So.2d 265 (Ala.1972)

Alabama Code § 32-5A-130 (b) The driver of a vehicle intending to turn left shall approach the turn in the extreme left-hand lane lawfully available to traffic moving in the direction of travel of such vehicle. Whenever practicable the turn shall be made to the left of the center of the

intersection and so as to leave the intersection or other location in the extreme left-hand lane lawfully available to traffic moving in the same direction as such vehicle on the roadway being entered.

Alabama Code § 32-5A-131 (b) No vehicle shall be turned so as to proceed in the opposite direction upon any curve, or upon the approach to or near the crest of a grade, where such vehicle cannot be seen by the driver of any vehicle approaching from either direction within 500 feet.

Alabama Code § 32-5A-133 (a) No person shall turn a vehicle or move right or left upon a roadway unless and until such movement can be made with reasonable safety nor without giving an appropriate signal in the manner hereinafter provided.

Alabama Code § 32-5A-133 (b) A signal of intention to turn right or left when required shall be given continuously during not less than the last 100 feet traveled by the vehicle before turning.

## III. ARGUMENT

The Motion for Partial Summary Judgment as to the wantonness count should be denied. Plaintiff has put forth sufficient evidence from which a jury could reasonably conclude wantonness on the part of the defendants. First, Defendant Martin allowed a large commercial vehicle to be stationary or nearly stationary in the right hand lane of Highway 84. From this

7

stationary position, Defendant Martin made a sudden, illegal turn from the outermost lane across the innermost eastbound lane through the turn lane and into the median. Defendant Martin knew he was turning from the outermost lane. This maneuver was made without warning and without signal. This maneuver blocked all lanes of travel for the eastbound direction. This illegal maneuver was made during the rain in what has been described as "nasty" conditions. The roads were wet. The maneuver was made within 500 feet of the crest of a hill. Visibility and lighting conditions were poor. Additionally, this maneuver was made in violation of at least four statutory provisions. A jury could conclude from these facts that Defendant Martin acted in reckless disregard for the safety of those on the public highway.

The Alabama Supreme Court in the *Turkett* decision, overturned a rendered judgment in favor of a defendant regarding a wantonness count. The Alabama Supreme Court concluded that a jury could infer wantonness on the part of the defendant when such defendant made a U-turn from the outside lane in front of an approaching motorist. The Court additionally noted that the weather conditions were rainy and the roads were wet. Turkett at 107.

This case, in comparison to the *Turkett* case, involves several additional facts from which a jury could conclude wantonness on the part of

the defendants. This case involves a commercial vehicle that is much heavier and longer than any passenger vehicle. This case involves a commercial vehicle that completely became stationary on a public highway. This case involves a commercial vehicle that did not signal its abrupt move across the highway. This case involves a commercial vehicle which completely obstructed all lanes of travel in an area that had limited sight just over the crest of a hill. This case involves a commercial driver that made a turn knowing that conditions were so poor that he could not see anything. The facts of this case build upon a level proof already acknowledged as acceptable by the Alabama Supreme Court in *Turkett* to support allowing a jury to conclude whether or not wantonness conduct existed.

Defendants have cited two decisions to this Court in support of their position that summary judgment should be granted.  In essence, defendants argue that because the operator of the tractor trailer did not see the plaintiffs prior to turn, summary judgment should be granted. They argue that in order for the plaintiffs to prevail on this issue, the plaintiffs must demonstrate that he actually was aware that a car was behind him and that his turn would likely result in an injury to the plaintiff.  Proof of wantonness however does not require proof that any defendant entertained a specific design or intent to injure a plaintiff. <u>Alfa Mutual</u> at 1256.

Conduct in this case on the part of Defendant Martin was more than mere inadvertence, but rather reckless in nature. Defendant Martin was a trained operator of commercial. His knowledge and appreciation of the need to operate a commercial placed him in a position where he was actually training a new employee on the day in question. As a trained commercial driver, the requisite inquiry is whether he knew or should have known that bringing a commercial vehicle to a complete stop in a lane of travel, on the other side of the crest of hill, in hazardous conditions and then subsequently making an abrupt U-turn across multiple lanes, while completely obstructing traffic on a wet surface, could result in an injury to others operating on the same roadway. A jury could easily conclude the answer to be in the affirmative. As the Middle District of Alabama has noted, the question of wantonness should be submitted to the jury unless there is a total lack of evidence from which the jury could reasonably infer wantonness. Monroe at 1271, 72. Plaintiffs have clearly offered sufficient evidence to meet this standard.

WHEREFORE THESE PREMISES CONSIDERED, Plaintiffs respectfully ask this Honorable Court to deny the Motion for Partial Summary Judgment as to the Wantonness count.

Respectfully submitted,
s/R. Matt Glover (ASB-7828-A43G)
**Prince Glover Law**
1 Cypress Point
701 Rice Mine Road North
Tuscaloosa, Alabama 35406
(205) 345-1234
(205) 752-6313 facsimile
mglover@princelaw.net


s/Stacy Bryan Brooks(ASB-9087-C66B)
**Jones & Jones, P.C.**
530 East Three Notch Street
Andalusia, Alabama  36420
(334) 222-3161
(334) 222-3163 facsimile
joneslaw@andycable.com

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Done this the 13th day of March, 2008.

s/R. Matt Glover
Of Counsel

Lea Richmond, IV, Esquire
Brandi Kellis, Esquire

11

Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION**

| | | |
|---|---|---|
| **SCOTT D. LAWSON and** | § | |
| **STEVEN LAWSON,** | § | |
| | § | |
| **PLAINTIFFS,** | § | |
| | § | |
| **VS** | § | **CV 2:07cv356-MHT** |
| | § | |
| **SWIFT TRANSPORTATION** | § | |
| **CORPORATION, INC. and** | § | |
| **FREDRICK S. MARTIN, JR.,** | § | |
| | § | |
| **DEFENDANTS.** | § | |

## <u>AFFIDAVIT OF STEVEN FRANCIS MCGOWIN</u>

Before me, the undersigned authority, personally appeared Steven Francis McGowin, who being duly sworn, deposes on oath as follows:

My name is Steven Francis McGowin. I have first hand knowledge of the contents of this affidavit. I am an officer with the City of Andalusia Police Department. I have investigated over 150 traffic accidents. I have had accident reconstruction training. Additionally, I have a Class A CDL.

I was the officer that investigated the traffic accident between a Swift Transportation commercial vehicle driven by Fredrick Martin and a passenger vehicle driven by Scott Lawson. The wreck occurred on March 15, 2007, in the eastbound lane of Highway 84 in Covington County. There are two eastbound lanes, as well as turning lanes, in the area of the wreck. The wreck occurred within 500 feet of a crest of a hill.

As an officer, I have training regarding the Alabama Rules of the Road. The Rules are found in Title 32 of the Alabama Code. I use these rules daily in my profession.

As part of my investigation, I interviewed Mr. Martin at the scene of the wreck. After showing Mr. Martin the location of his trailer tandums and the position of the rear of his trailer, he acknowledged that he had, in fact, began his turn from the outside east bound lane. This driving maneuver made by Mr. Martin and the Swift Transportation commercial vehicle was in violation of Alabama Code Sections 32-5A-130(2) and 32-5A-131(a). Further, if the maneuver was made without using a turning signal, such maneuver would be made in violation of Alabama Code Section 32-5A-133.

Further affiant sayeth not.

STEVEN FRANCIS MCGOWIN

STATE OF ALABAMA
COUNTY OF COVINGTON

Sworn to and subscribed before me, a Notary Public, in and for said County and State on this _12_ day of _March_ 2008.

Notary Public

My commission expires: _9-12-10_

Exhibit 3



Exhibit 4



**DRIVER'S DAILY LOG**    (One calendar day - 24 hours)

ONE TRIP,
ONE ENVELOPE
EVERY TRIP

L O G S W F T 4

03-15-07
DATE (MONTH/DAY/YEAR)

491
TEAM MILES

11
DRIVER MILES

300741
TRACTOR NUMBER

130312
DRIVER CODE

**SWIFT TRANSPORTATION CO., INC.**
COMPANY

**2200 SOUTH 75th AVE.    PHOENIX, AZ 85043**
MAIN ADDRESS

JOSE BAÑOS
CO-DRIVER NAME

249151
CO-DRIVER CODE

VLB0592
SWIFT TRIP #

533430/5266
TRAILER #

| | TOTALS |
|---|---|
| 1: OFF DUTY | 1.50 |
| 2: SLEEPER BERTH | 21.00 |
| 3: DRIVING | .50 |
| 4: ON DUTY (Not Driving) | 1.00 |
| | 24 |

Hours Worked Last 7 Days
1. 0
2. 0
3. 0
4. 0
5. 0
6. 0
7. 0

Total Hours

70 Hours Less
Total Hours
Equals Hours Available Today

Hours Worked Today
Yesterday

If Hours Worked Today Exceeds Hours Available, You Are in Violation. Your Reason Must Appear in "Remarks."

Total MUST add up to 24 Hours.
.25 = 1/4 hr
.5 = 1/2 hr
.75 = 3/4 hr

NUMBER OF OFF-DUTY DAYS STARTING TODAY

Show when and where each change of duty status occurred. Use time standard of home terminal.

REMARKS

PACCAR
INVESTIGATION
Break

**DRIVER'S DAILY VEHICLE INSPECTION REPORT**

**(COMPLETE AT END OF EACH WORK DAY)**
CHECK IF ANY DEFECTIVE ITEM AND GIVE DETAILS UNDER DEFECTS. IF NO DEFECTS CHECK BOX AT RIGHT

I HAVE EXAMINED THE VEHICLES INDICATED ABOVE INCLUDING THE PARTS AND ACCESSORIES NOTED TO THE LEFT    ☑ Vehicle condition satisfactory

| POST TRIP | ITEM | POST TRIP | ITEM |
|---|---|---|---|
| | SERVICE BRAKE INCLUDING TRAILER BRAKE CONNECTION | | HORN - WINDSHIELD WIPERS - SEAT BELT |
| | PARKING (HAND) BRAKE | | REAR VISION MIRRORS - OTHER GLASS |
| | STEERING MECHANISM | | COUPLING DEVICES |
| | LIGHTING DEVICES AND REFLECTORS | | TRAILER AND LOAD |
| | TIRES - WHEELS AND RIMS | | EMERGENCY EQUIPMENT |

I CERTIFY I HAVE REVIEWED THE PREVIOUS D.V.I.R.

DEFECTS:

DRIVER SIGNATURE

SIGNATURE OF DRIVER REVIEWING REPAIRS

SIGNATURE OF MECHANIC MAKING REPAIRS

SIGNATURE OF DRIVER MAKING REPORT

#5261-022108

Certified Original by TripPak Driver Log Scanning for SWFT on Scanner 22. Batch: 273214 Doc: 2201349267

Lawson/Swift0044

# FREEDOM COURT REPORTING

Page 1

```
 1      IN THE UNITED STATES DISTRICT COURT
 2    FOR THE MIDDLE DISTRICT OF ALABAMA
 3         NORTHERN DIVISION
 4  SCOTT D. LAWSON and      )
 5  STEVEN LAWSON,           )
 6      Plaintiffs,   )CV2:07cv356-MHT
 7  vs.                      )
 8  SWIFT TRANSPORTATION CO.,)
 9  INC., and FREDRICK S.    )
10  MARTIN, JR.,          )
11      Defendants.    )
12
13     DEPOSITION OF FREDRICK S. MARTIN, JR.
14
15      In accordance with the Federal
16  Rules of Civil Procedure, as Amended,
17  effective May 15, 1988, I, Maya Rose, am
18  hereby delivering to MATT GLOVER, the
19  original transcript of the oral testimony
20  taken on the 15th day of January, 2008.
21      Please be advised that this is
22  the same and not retained by the Court
23  Reporter, nor filed with the Court.
```

Page 2

```
 1       S T I P U L A T I O N S
 2      IT IS STIPULATED AND AGREED, by
 3  and between the parties, through their
 4  respective counsel, that the deposition of
 5  FREDRICK S. MARTIN, JR. may be taken
 6  before MAYA ROSE, Commissioner, Court
 7  Reporter and Notary Public, State at
 8  Large.
 9      IT IS FURTHER STIPULATED AND
10  AGREED that the signature to and the
11  reading of the deposition by the witness
12  is waived, the deposition to have the same
13  force and effect as if full compliance had
14  been had with all laws and rules of Court
15  relating to the taking of depositions.
16      IT IS FURTHER STIPULATED AND
17  AGREED that it shall not be necessary for
18  any objections to be made by counsel to
19  any questions, except as to form or
20  leading questions, and that counsel for
21  the parties may make objections and assign
22  grounds at the time of trial, or at the
23  time said deposition is offered in
```

Page 3

```
 1  evidence, or prior thereto.
 2      IT IS FURTHER STIPULATED AND
 3  AGREED that the notice of filing of the
 4  deposition by the Commissioner is waived.
```

Page 4

```
 1       A P P E A R A N C E S
 2
 3  FOR THE PLAINTIFFS:
 4    Mr. R. Matt Glover
 5    Attorney at Law
 6    Prince Glover Law
 7    1 Cypress Point
 8    701 Rice Mine Road North
 9    Tuscaloosa, Alabama  35406
10
11  FOR THE DEFENDANTS:
12    Mr. Chad S. Godwin
13    Ms. Brandi M. Kellis
14    Attorneys at Law
15    Carr Allison
16    100 Vestavia Parkway, Suite 200
17    Birmingham, Alabama  35216
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 5

I N D E X

PAGE

EXAMINATION BY MR. GLOVER:...............7

E X H I B I T S

(No exhibits were marked.)

---

Page 6

I, Maya Rose, a Court Reporter of Birmingham, Alabama, and a Notary Public in the State of Alabama at Large, acting as commissioner, certify that on this date, pursuant to the Federal Rules of Civil Procedure and the foregoing stipulation of counsel, there came before me at 100 Vestavia Parkway, Suite 200, Birmingham, Alabama, on the 15th day of January, 2008, commencing at 1:06 p.m., FREDRICK S. MARTIN, JR., witness in the above cause, for oral examination, whereupon the following proceedings were had and done:

FREDRICK S. MARTIN, JR.,
being first duly sworn, was examined and testified as follows:

THE REPORTER:  Usual stipulations?

MR. GODWIN:  Please.

MR. GLOVER:  That will be fine

---

Page 7

1    with me.
2
3    EXAMINATION BY MR. GLOVER:
4        Q.   If you would, just state your
5    full name for me, please.
6        A.   Fredrick Stanley Martin.
7        Q.   Mr. Martin, I know you probably
8    already know this, but I represent the
9    Lawson brothers in a case that's been
10   filed in the Middle District of Alabama.
11   And you're a defendant in the case as well
12   as Swift Transportation.
13       A.   Uh-huh.
14       Q.   Of course, you're aware that
15   today's deposition testimony is under
16   oath; correct?
17       A.   Yes.
18       Q.   Have you ever provided any
19   sworn testimony before?
20       A.   No.
21       Q.   And when I mean sworn
22   testimony, I'm talking about whether it be
23   at trial or in a setting like this for a

---

Page 8

1    deposition?
2        A.   No.
3        Q.   Okay.  This is your first time?
4        A.   First time.
5        Q.   Have you ever been involved in
6    a lawsuit prior to this?
7        A.   No.
8        Q.   Have you ever been named as a
9    defendant in a lawsuit --
10       A.   No.
11       Q.   -- prior to this?
12       A.   No.
13       Q.   Okay.  And one of the things
14   that probably you and I will do -- both of
15   us may do today is while I'm talking
16   you'll talk, or while you're talking I'm
17   talking.  And just to be real clear for
18   the record, I'll wait until you finish and
19   I may remind you to wait until I finish,
20   too, just for clarity; okay?
21       A.   Certainly.
22       Q.   What is your full address where
23   you live today?

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 9

```
1       A.  I use Post Office Box 3285,
2   Cookville, Tennessee 38502.  My street
3   address is 533 East 20th Street, 38501.
4       Q.  That's in Cookville as well?
5       A.  It is in Cookville.
6       Q.  Okay.  Are you married?
7       A.  No.
8       Q.  Have you ever been married?
9       A.  Yes.
10      Q.  How many times?
11      A.  Twice.
12      Q.  Are either of your spouses,
13  former spouses still alive?
14      A.  Yes.
15      Q.  Do either of them live in
16  Alabama?
17      A.  No.
18      Q.  Do you have any children over
19  the age of eighteen?
20      A.  Yes.
21      Q.  Do any of those children live
22  in Alabama?
23      A.  No.
```

Page 11

```
1       A.  My terminal is Memphis,
2   Tennessee.
3       Q.  Is Cookville pretty close to
4   Memphis?
5       A.  Two hundred and nine miles.
6       Q.  Okay.  Do you have to drive
7   over there before you go to driving your
8   tractor?
9       A.  No, sir.  I went to Memphis and
10  got a truck, and then I drive
11  over-the-road.  And when I go home, I
12  bring my truck home.
13      Q.  You bring your tractor home?
14      A.  Uh-huh.
15      Q.  And so then you -- when you
16  leave the next go-around, you just leave
17  from your home?
18      A.  Yes.
19      Q.  And have you been doing that
20  for the entire three time --
21      A.  Yes.
22      Q.  -- three years?
23      A.  Yes.
```

Page 10

```
1       Q.  Do you have any family that you
2   know of that live in the state of Alabama?
3       A.  None.
4       Q.  Okay.  What about any close
5   personal friends that live in Alabama?
6       A.  None.
7       Q.  All right.  Are you currently
8   employed?
9       A.  Yes.
10      Q.  And who are you employed with?
11      A.  Swift Transportation.
12      Q.  How long have you been employed
13  with Swift Transportation?
14      A.  Approximately three years.
15      Q.  What kind of work do you
16  currently do for Swift Transportation?
17      A.  Drive a truck.
18      Q.  You've been driving a truck for
19  the entire three-year period?
20      A.  Yes.
21      Q.  Now, where are you stationed
22  out of?  I should say, where's your
23  terminal?
```

Page 12

```
1       Q.  Do you have a supervisor over
2   at Swift Transportation?
3       A.  My driver manager is Darlene
4   Smith.
5       Q.  Darlene Smith?
6       A.  Uh-huh.
7       Q.  How long has Ms. Smith been
8   your driver manager?
9       A.  I'm not sure.
10      Q.  Has she been there the entire
11  three-year period?
12      A.  No.
13      Q.  Now, did you have other
14  managers?
15      A.  Yes.
16      Q.  Can you recall any of their
17  names?
18      A.  Ryan Lacks, William Kirkdorfer,
19  and Rick Bryant.
20      Q.  Who hired you at Swift?
21      A.  That would -- I don't know.
22      Q.  You just don't recall or --
23      A.  No.  It was done over the phone
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 13

1  with an Arizona recruiter.
2      Q.  How did you come about applying
3  with Swift?
4      A.  I had a friend driving for
5  them.
6      Q.  Who is that friend?
7      A.  Frank McNutt.
8      Q.  How long have you been driving
9  a tractor?
10     A.  Approximately eight years.
11     Q.  Do you still have a license?
12     A.  Yes.
13     Q.  And have you had a license just
14 for eight years?
15     A.  A commercial CDL license, yes.
16     Q.  For eight years.  Which state
17 issued you that license?
18     A.  Connecticut.
19     Q.  Is that where you were living
20 eight years ago?
21     A.  Yes.
22     Q.  When did you actually start
23 driving a commercial vehicle?

Page 14

1      A.  Approximately eight years ago.
2      Q.  Who did you first start driving
3  with?
4      A.  Baylor Trucking Company out of
5  Milan, Indiana.
6      Q.  And how long did you drive for
7  that particular company?
8      A.  Approximately five years.
9      Q.  And then you left -- did you
10 leave there to go work at Swift?
11     A.  Yes.
12     Q.  And why did you leave the
13 company up in Indiana?
14     A.  Just for more money, better --
15 better position, better company.
16     Q.  All right.  You were not asked
17 to leave --
18     A.  No.
19     Q.  -- the company in Indiana?  In
20 that eight-year period that you've had
21 your commercial license, has it ever been
22 suspended?
23     A.  No.

Page 15

1      Q.  Have you ever lost it
2  temporarily for any reason?
3      A.  Yes.  One time briefly.
4      Q.  What was that for?
5      A.  It was because after my
6  divorce, the renewal statement for my
7  license went to my ex-wife's house and she
8  never forwarded it to me.  And I just
9  never looked at the expiration date.
10     Q.  All right.  Do you recall about
11 when that occurred, time frame?
12     A.  It was late '80s.  But other
13 than that, I can't tell you.  I don't
14 know.
15     Q.  Late '90s?
16     A.  '80s.  Late '80s.
17     Q.  Okay.  Was that a commercial
18 license?
19     A.  No.
20     Q.  That was just a driver's
21 license?
22     A.  Just a driver's license.
23     Q.  Okay.  Have you ever had your

Page 16

1  commercial driver's license --
2      A.  No.
3      Q.  -- suspended or --
4          MR. GODWIN:  Let him finish the
5  question before you --
6      A.  Right.
7          MR. GODWIN:  I know you
8  probably both are on the same page, but --
9      A.  Yeah.  Understood.
10     Q.  You've had your commercial
11 license consistently for the last eight
12 years?
13     A.  Yes, I have.
14     Q.  What you were telling me about
15 a license not being renewed for a period
16 was just your ordinary driver's license?
17     A.  That is correct.
18     Q.  And what state did you have a
19 license with at that time?
20     A.  Connecticut.
21     Q.  Is your driver's license today
22 issued through the State of Tennessee?
23     A.  Yes.

4  (Pages 13 to 16)

# FREEDOM COURT REPORTING

Page 17

1    Q.   Do you have a copy of that here
2  today?
3    A.   Yes.
4    Q.   Okay.  I may, if it's okay with
5  your attorney, get a photocopy of your
6  driver's license before I leave.
7    MR. GODWIN:  That's fine.
8    Q.   Now, since you've worked with
9  Swift Transportation, have you had any
10  speeding tickets?
11    A.   Yes.  Just the one I can
12  recall.
13    Q.   Okay.  You've had one speeding
14  ticket that you can recall while driving
15  for Swift Transportation?
16    A.   Yes.
17    Q.   What do you recall about that
18  particular speeding ticket?
19    A.   It was going 62 in a 55 zone in
20  California.
21    Q.   Let me show you your responses
22  to our first set of interrogatories.  I
23  just want to make sure that you have seen

Page 18

1  these --
2    A.   Yes --
3    Q.   -- before.
4    A.   -- I have.
5    Q.   What did you do to prepare for
6  your deposition here today besides
7  speaking with your attorneys?
8    A.   Nothing.
9    Q.   Did you review any documents?
10    A.   No, sir.
11    Q.   Did you review any of your
12  responses to the interrogatories?
13    A.   I reviewed these, yes.
14    Q.   Okay.  Did you review any
15  photographs?
16    A.   No.
17    Q.   Did you review any videotapes?
18    A.   No.
19    Q.   Have you reviewed any other
20  testimony in this case?
21    A.   No.
22    Q.   You say that you could only
23  recall one speeding ticket since you've

Page 19

1  started working for Swift?
2    A.   Yes, sir.
3    Q.   Is there a chance that you may
4  have had another one while you were
5  working with Swift Transportation that you
6  can't recall the details of?
7    A.   I'm not sure.
8    MR. GODWIN:  Object to the
9  form.
10    Q.   Have you had any wrecks,
11  besides the one that we're here for today,
12  since you started working for Swift
13  Transportation?
14    A.   Yes.
15    Q.   How many?
16    A.   One.
17    Q.   That's besides the one we're
18  here for today?
19    A.   Yes.
20    Q.   What do you recall about that
21  wreck?
22    A.   There was a truck parked on the
23  side of the road, and I was in the first

Page 20

1  lane going by that truck when a flatbed
2  passed me and came over across into my
3  lane and forced me over.  And my right
4  mirror hit the driver's side mirror of the
5  truck on the side of the road just because
6  of being squeezed in.  But that was it.
7    Q.   Was anyone injured in that
8  wreck?
9    A.   There was no damage other than
10  the mirrors, and no injuries.
11    Q.   Where did that wreck occur?
12    A.   I have no idea.
13    Q.   According to the interrogatory
14  responses that you provided, there's a
15  description of a wreck in New Mexico, July
16  of '05.  You said, I hit another
17  tractor-trailer's mirror with one of mine.
18    A.   That's it.
19    Q.   Okay.  So that would have -- if
20  the information you provided in your
21  interrogatory is correct, that should have
22  been in July of '05?
23    A.   Yes, sir.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 21

1    Q.  Now, I know some companies when
2  you're involved in a wreck, they make a
3  determination as to whether or not the
4  wreck was preventable on the part of their
5  driver.  Are you familiar with a process
6  like that?
7    A.  Yes, I am.
8    Q.  Does Swift Transportation, from
9  your experience, use that type system?
10    A.  Yes, they do.
11    Q.  When you're involved in a wreck
12  like the one back in July of '05, do you
13  have to submit any kind of documentation
14  to your employer, Swift Transportation?
15    A.  You take pictures of the
16  incident, of the trucks, of the
17  intersection of the highway, and you fill
18  out an accident report, and -- with a
19  description of the accident, and send it
20  in to the Phoenix home office.
21    Q.  When are you supposed to fill
22  out the accident report in relation to
23  when the wreck occurs?

Page 22

1    A.  As soon as possible.
2    Q.  Do you fill that out by
3  yourself?
4    A.  Yes.
5    Q.  Do you write a description of
6  how the wreck occurred?
7    A.  Yes.
8    Q.  Did you do that back in '05
9  with the New Mexico incident?
10    A.  I don't know, to be honest, but
11  I believe I did.
12    Q.  Okay.  Did you recall whether
13  or not your employer at that time, Swift
14  Transportation, made a determination as to
15  whether or not that was a preventable
16  incident on your part?
17    A.  I don't know the answer to that
18  either, no.
19    Q.  How does Swift Transportation
20  ordinarily let their employees or drivers
21  know as to their determination about
22  whether a wreck is preventable or not
23  preventable?

Page 23

1    A.  Frankly, it's by assumption.
2  Usually 99 percent of the time, the
3  company is going to say it's preventable.
4    Q.  It's preventable on the part of
5  the driver?
6    A.  That's, yeah, very often the
7  case, according to the company, yes.
8    Q.  When you started working with
9  Swift Transportation, did they give you
10  any kind of an employee or driver's
11  manual --
12    A.  Yes.
13    Q.  -- that explained their
14  policies?
15    A.  Yes.
16    Q.  Do you have a copy of that?
17    A.  Yes, I do.
18    Q.  Do you know if that employee
19  manual in any way addresses this notion of
20  determining whether or not a wreck is
21  preventable or not preventable?
22    A.  I don't believe it does.
23    Q.  How do you know that Swift

Page 24

1  Transportation has that, that procedure of
2  making a determination as to whether or
3  not a wreck is preventable or not
4  preventable?
5    A.  I -- I don't know.  I don't
6  know how to answer that.
7    Q.  You just know that they do?
8    A.  I -- I do.  I know that every
9  trucking company comes up with preventable
10  or non-preventable in every incident.
11    Q.  Does Swift Transportation have
12  any kind of policy of assigning you points
13  for various driving offenses?
14    A.  Not that I'm aware of.
15    Q.  Do they have any kind of bonus
16  or incentive policy to reward you for good
17  driving?
18    A.  No.
19    Q.  I think I asked this, but you
20  don't know if the company determined the
21  July '05 incident was preventable on your
22  part or not?
23    A.  I don't know.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 25

1    Q.  Do you know who makes that
2  determination on behalf of Swift?
3    A.  No, sir.
4    Q.  I know you said you had one
5  speeding ticket, at least one speeding
6  ticket while working with Swift, and then
7  this one incident in New Mexico in '05.
8  Have you had any other driving or moving
9  violations since you started working with
10  Swift Transportation?
11    A.  Yes.  I had one other lane -- I
12  was in the left lane when I was supposed
13  to be in the right lane on a -- passing a
14  truck on a hill.
15    Q.  Did you get a citation for
16  that?
17    A.  Yes.
18    Q.  Do you recall what state?
19    A.  No.
20    Q.  Do you have to report those to
21  your company when you get something like
22  that?
23    A.  Yes.

Page 26

1    Q.  Would you have reported that to
2  Swift Transportation?
3    A.  Yes.
4    Q.  How does a driver report that
5  type information to the company?
6    A.  You just tell your dispatcher.
7    Q.  Is the dispatcher different
8  than the manager that we spoke about?
9    A.  Driver manager.
10    Q.  Okay.  Same thing?
11    A.  It used to be called a
12  dispatcher.  Their new title is driver
13  manager.
14    Q.  Okay.  Do you know which
15  dispatcher or driver manager that you
16  reported that moving violation to?
17    A.  No idea.
18    Q.  Now, when a violation like that
19  occurs, does the company pay for the
20  citation?
21    A.  No.
22    Q.  You have to pay that yourself?
23    A.  Yes.

Page 27

1    Q.  Do you recall where you paid
2  your fine?
3    A.  No, sir.
4    Q.  Any other moving violations
5  since you worked with Swift
6  Transportation?
7    A.  No, sir, none that I can think
8  of.
9    Q.  Now, I know that most companies
10  that abide by the law will every year
11  require their drivers to fill out a
12  form --
13    A.  Uh-huh.
14    Q.  -- which certifies whether
15  they've had any violations in the year.
16  Are you aware of that procedure?
17    A.  Yes, I am.
18    Q.  Okay.
19    MR. GODWIN:  I just want to
20  make sure he wasn't about to talk over
21  you.
22    MR. GLOVER:  Oh, okay.
23    Q.  Have you done that since you've

Page 28

1  worked at Swift Transportation?
2    A.  Yes, I have.
3    Q.  And would you provide those
4  type documents to the -- to your employer
5  when you completed it?
6    A.  It's done on the Qualcomm
7  computer in my truck.  It's not on a paper
8  form.
9    Q.  Okay.  Explain how that would
10  work if you would -- like, let's say, you
11  get a moving violation.  Do you have to
12  log that in on the Qualcomm system?
13    A.  You send it, just a free form
14  message, to the dispatcher saying, you
15  know, I was ticketed for whatever, lane
16  violation.
17    Q.  All right.  But is that the
18  only -- the document that I'm thinking of
19  is like a written paper that says --
20  you've got to list them out, your
21  violations.  It's like your annual renewal
22  certification, and you certified that that
23  is the only moving violations that you've

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 29

...during the year.

A. Okay. As I said, it is done on ... Qualcomm computer. It's not on done ... paper.

Q. All right.

A. But they have a format on the ... computer. They send you that saying, this ... your annual review. Please list all ... ations. And you have to put them all ... on the computer and send it.

Q. Gotcha. Have you ever received ... warnings about your job performance by ... Transportation?

A. Yes, I guess I could say I ... . But for minor -- it was for idling ...

Q. Explain what idling time is for

A. Stopping at night, leaving the ... running all night. They want you in ... certain percentage range, and I was ... ... that percentage range. And that was ... ... nly. But that's the result of the

Page 30

... itself being a problem.

Q. Okay. Is that the only type ... ... ing you've ever received --

A. Yes, sir. That's all I can ... ... of.

Q. -- from Swift Transportation?

MR. GODWIN: Let him finish his ... question. You're doing good. I'm just --

Q. Yeah. You're doing real good. ... 're doing better than me.

The other moving violation that ... ... talked about with me when you passed a ... vehicle in the wrong lane, has that been ... since the wreck that we're here for today, ... or was that before?

A. It was prior.

Q. That was prior to the wreck?

A. Yes.

Q. Okay. Have you had any moving violations since the wreck --

A. No, sir.

Q. -- that we're here for today,

... the --

Page 31

1    A. No, sir.
2    Q. Have you ever had any kind of
3 written reprimands from Swift
4 Transportation?
5    A. No.
6    Q. You've never been placed on
7 probation or anything like that?
8    A. No.
9    Q. Have you ever missed out on any
10 raises that you were supposed to get
11 because of a driving violation?
12    A. No.
13    Q. Now, if I understand, you
14 worked for two different driving
15 companies --
16    A. That's correct.
17    Q. -- transportation companies?
18    A. Yes.
19    Q. I want to go back and talk
20 about the other one now, the one that was
21 up in Indiana.
22    A. Uh-huh.
23    Q. What was it called again?

Page 32

1    A. Baylor, B-a-y-l-o-r.
2    Q. Now, while you drove a
3 commercial vehicle for Baylor, did you
4 have any wrecks?
5    A. I had one that was my fault --
6 well, it wasn't a wreck, so to speak, but
7 it was an accident. And one that was a
8 student's fault.
9    Q. In looking at your
10 interrogatory responses, it says that in
11 January of '07 -- that would have been, I
12 guess, two months before this wreck;
13 right?
14    A. Uh-huh.
15    Q. It says a student driver was
16 driving and hit a parked vehicle while
17 making a left turn at a truck stop. I was
18 a passenger -- I was in the passenger
19 seat.
20    A. Yes.
21    Q. Are you referring to that one?
22    A. No.
23    Q. Okay. Well, let's start with

8 (Pages 29 to 32)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 33

1  the one then that you said was -- I think
2  you described it as an accident that may
3  have been your fault.
4      A.  That was as we were talking
5  about Baylor.  The 2007 was with Swift.
6      Q.  I'm sorry.  I apologize.  Tell
7  me about the one when you worked with
8  Baylor that you described as an accident.
9      A.  I was backed into a dock that
10  was inside a building and had the doors
11  open as they are on a trailer.  As I
12  pulled out, it's dark in the building,
13  there's bright sun outside, I couldn't --
14  I lost sight of that door.  And I came out
15  slowly, but nonetheless, I hit -- the door
16  caught on the doorjamb --
17      Q.  Gotcha.
18      A.  -- and ripped the door off the
19  back of the trailer.  That was it.  It was
20  not with another vehicle.
21      Q.  Did anyone get injured in that?
22      A.  No.
23      Q.  Now, you also described another

Page 34

1  one with a student driver --
2      A.  Yes.
3      Q.  -- I believe, when you worked
4  at Baylor?
5      A.  Yes.
6      Q.  Can you tell me about that?
7      A.  We were at an intersection.  He
8  was driving.  I was in the passenger seat.
9  He was making a left to get on an entrance
10  ramp to get on the highway in Riverdale,
11  Utah.  And the oncoming traffic from the
12  opposite direction got a red light and we
13  had a green arrow.  He turned, and a lady
14  came through the red light and hit the
15  tractor drive wheels --
16      Q.  Okay.
17      A.  -- with her vehicle.
18      Q.  Any other wrecks that you've
19  been involved in while you -- accidents
20  since you drove with Baylor?
21      A.  I'd say that's all I can think
22  of.
23      Q.  There's a -- on your

Page 35

1  interrogatory response, it lists one in
2  September of '01.  It says, I do not
3  recall the details.  I hit a deer.
4      A.  Oh, well, yeah.  Okay.  I was
5  in Pennsylvania.  That's all I know.  I
6  was driving down the road and a deer ran
7  in front of me.  And the rule in trucking
8  is you don't brake for deer.
9      Q.  I've gotcha.  But you were
10  driving a commercial vehicle?
11      A.  Yes, sir.  I was in a
12  tractor-trailer.
13      Q.  There's one listed in January
14  of '01 that says, I do not recall the
15  location.  Some people where I was
16  delivering claimed I hit another trailer
17  was parked.  My employer, Baylor Trucking,
18  denied the claim.
19      A.  Yes, sir.
20      Q.  Do you recall that?
21      A.  Yes, sir.
22      Q.  Do you recall anything about
23  that?

Page 36

1      A.  All I recall -- I know -- I
2  don't know where it was, but I was -- I
3  was backing into a dock between a parked
4  trailer that was docked.  There was an
5  open dock, which I was backing into, and
6  next to that was a big trash compactor.
7  And as I backed into that parking spot, it
8  was very tight.  It was a very hard angle
9  and there were a lot of cars parked
10  around, which made it extremely difficult
11  to get in.  It took me over twenty minutes
12  to park that truck in that spot because I
13  had to get out and look, back up a little
14  bit, get out and look.  I kept going
15  forward and backward and getting out and
16  looking, stopped, and, you know, back and
17  forth.  But I didn't hit the trailer.  I
18  backed into the dock and that was it.  I
19  was there.  And they never said a word.
20  They unloaded me.
21      And then after I drove out of
22  there and was proceeding to close the
23  doors on my truck, they come running out

9 (Pages 33 to 36)

# FREEDOM COURT REPORTING

Page 37

1  and said, you hit that trailer, you hit
2  that trailer. And I said, no, I never hit
3  that trailer. And we went back and forth
4  about it. And we looked at my truck
5  because there was a big long gash in the
6  trailer and aluminum peelings peeled off
7  the side of the trailer. There was no
8  shavings or aluminum filings on the back
9  of my trailer where my hinges would have
10  been what would -- of the door would have
11  been what hit him. There was nothing, no
12  evidence of that. And one of the fellows
13  there agreed, there was no evidence of it,
14  no scratching, no nothing. And so that's
15  why Baylor denied the claim.
16     Q.  Do you know if they paid the
17  claim at some point?
18     A.  I don't know if they did. I
19  have -- I would have no way of knowing
20  that. I'm sure they didn't, my guess
21  would be.
22        MR. GODWIN:  Just answer the
23  question that's asked.

Page 38

1     Q.  November of 2000, it says, I do
2  not recall the location. I made a left
3  turn and hit a pickup truck that had been
4  parked and began moving during my turn. I
5  knocked one of his mirrors off.
6     A.  Uh-huh.
7     Q.  Is that different than any of
8  the ones we've talked about today?
9     A.  Yes, it is.
10     Q.  What do you recall about that?
11     A.  I was driving down a two-lane
12  road and there was vehicles parked on the
13  side at the curb. There was a pickup
14  truck, and the man -- I saw the man get in
15  his truck as I was coming up to him very
16  slowly. It was at a light. He got in his
17  truck, started his truck and he was going
18  to move away. And I turned the corner and
19  went around another road over to the
20  place and I docked. That was all I knew.
21        And then a friend of this
22  gentleman came running over there later
23  and said I hit him, and -- with the tail

Page 39

1  swipe of the trailer. Not that I hit him
2  with any -- you know, the front. But as
3  the trailer turned around, the tail swipe
4  wiped the driver's side rearview mirror
5  off. Of course, I would not know that or
6  hear it in the truck.
7     Q.  Okay. You're not admitting it
8  or denying it?
9     A.  That's correct.
10     Q.  Okay. Was that in a commercial
11  vehicle?
12     A.  Yes.
13     Q.  Any other incidents that you
14  recall?
15     A.  No, sir.
16     Q.  Now, when you were a driver for
17  Baylor, did you get any moving violations?
18     A.  Yeah. I had -- I had one -- I
19  had one speeding ticket in Ohio.
20     Q.  While driving a commercial
21  vehicle?
22     A.  Yes.
23     Q.  What do you recall about the

Page 40

1  speeding ticket in Ohio?
2     A.  I was just -- again, Ohio is a
3  55 -- 65 for cars and 55 for trucks, and I
4  was doing, like, 60 miles an hour.
5     Q.  Any other moving violations
6  while driving for Baylor?
7     A.  None that I can think of, no,
8  sir.
9     Q.  Okay. Now, during that same
10  time period when you were driving for
11  Baylor or when you were driving for Swift,
12  have you had any moving violations in,
13  like, even a personal vehicle?
14     A.  No.
15     Q.  Have you had any other wrecks,
16  like, while you were driving a personal
17  vehicle?
18     A.  Not -- ask that again, please.
19  Clarify what you're saying.
20     Q.  Yeah. Any vehicle that's not a
21  commercial vehicle --
22     A.  Uh-huh.
23     Q.  -- have you ever had a wreck?

10 (Pages 37 to 40)

Page 41

1    A.  Ever in my life?
2    Q.  Yes.
3    A.  Yes.
4    Q.  How many would you say?
5    A.  I don't know, one or two maybe.
6  I can't -- I don't know exactly.
7    Q.  Have you had any in the last
8  ten years?
9    A.  No.
10    Q.  All right.  Any of the wrecks
11  that you've been involved in in a
12  passenger vehicle, did any of those wrecks
13  result in someone being injured?
14    A.  No.
15    Q.  While you worked at Baylor, did
16  you ever get any warnings --
17    A.  No.
18    Q.  -- about your driving
19  performance?
20    A.  No.
21    Q.  Have you ever been convicted of
22  any crimes?
23    A.  No.

Page 42

1    Q.  Have you ever been arrested?
2    A.  Well, I don't know, to tell you
3  the truth.  I was sent to jail for thirty
4  days for contempt of court, but I don't
5  know if that constitutes being arrested or
6  not.
7    Q.  Was that in the last ten years?
8    A.  No.
9    Q.  Is that the only time where you
10  may have been arrested?
11    A.  Yes.
12    Q.  In looking at your
13  interrogatory responses, it looks like you
14  received treatment at the VA Hospital in
15  Murfreesboro --
16    A.  Yes, sir.
17    Q.  -- is that correct?
18    A.  That's correct.
19    Q.  I take it you're a veteran
20  then?
21    A.  I am.
22    Q.  Of which branch?
23    A.  The Army and the Air Force in

Page 43

1  Vietnam.
2    Q.  Okay.  I'm not going to go into
3  your treatment too much, but have you ever
4  been told by a doctor that you have a
5  condition that would affect your ability
6  to drive?
7    A.  No.
8    Q.  Have you ever felt like you had
9  a medical condition that prohibited you
10  from driving?
11    A.  No.
12    Q.  I know that when you drive a
13  commercial vehicle you have to have a
14  medical card filled out every so often.
15    A.  Uh-huh.
16    Q.  Do you have a valid medical
17  card?
18    A.  Yes, I do.
19    Q.  Which doctor do you see to get
20  that completed?  Which doctor do you go to
21  for your driver's examination, your
22  medical examination?
23    A.  I can't tell you that.  I --

Page 44

1  wherever I happen to be at the time when
2  it's time for my physical, they -- the
3  company tells me to go here or go there.
4  I might go anywhere.  The last time, I
5  think I went to the Concentra Medical in
6  Memphis.  I had the card in my wallet.
7  But it can be anywhere.
8    MR. GODWIN:  You've answered
9  the question.
10    Q.  Have you ever gone without
11  having a medical card driving a commercial
12  vehicle?
13    A.  No.
14    Q.  My understanding is you've
15  never applied for any kind of disability;
16  correct?
17    A.  That's correct.
18    Q.  Now, since you've been driving
19  for Swift, is there an area of the country
20  that you primarily drive in?
21    A.  No, sir.
22    Q.  You drive about everywhere or
23  wherever they send you?

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 45

1    A.  Yes, I do.
2    Q.  Okay.  I take it then that when
3  you're out on the road, you're completing
4  a logbook?
5    A.  Yes.
6    Q.  Who do you turn that completed
7  logbook in to?
8    A.  You don't.  You turn in the
9  pages every couple of days to Swift.
10    Q.  Do you mail those in?
11    A.  Yes.
12    Q.  Going forward now to this wreck
13  that we're here for today, did you have
14  someone else in the vehicle with you?
15    A.  Yes.
16    Q.  Who was that?
17    A.  It was a student.  Jose Pagan.
18    Q.  He was allowed to be there?
19    A.  Yes.  He was a student.
20    Q.  Were you showing him some of
21  the ins and outs of being a driver?
22    A.  We -- I train students for
23  Swift, and I take a student out for six

Page 46

1  weeks and train them.
2    Q.  Okay.  That's what you -- part
3  of what you were doing during the time of
4  this wreck?
5    A.  Yes.
6    Q.  Do you recall how many days you
7  had been on the road at the time of this
8  wreck?
9    A.  No, sir.
10    Q.  That's something that your log
11  entry should be able to tell us; right?
12    A.  Uh-huh.
13    MR. GODWIN:  Try and answer yes
14  or no, so she --
15    A.  Yes.  I'm sorry.
16    MR. GODWIN:  -- can take
17  everything down on the record.  You're
18  doing great.  You're doing a great job.
19    Q.  Now, I know you were just
20  outside of Andalusia at the time of the
21  wreck; correct?
22    A.  Yes, sir.
23    Q.  Do you recall why you were in

Page 47

1  Andalusia?
2    A.  It was to make a pickup.
3    Q.  Were you empty at the time --
4    A.  Yes.
5    Q.  -- of the wreck?
6    A.  Yes.
7    Q.  Do you recall where you were
8  making a pickup?
9    A.  No.
10    Q.  Do you recall what you were
11  going to pick up?
12    A.  No.
13    Q.  Had you been to Andalusia
14  before?
15    A.  No.
16    Q.  Well, tell me what you recall
17  about the wreck that we're here for today.
18    A.  Well, we were looking for -- we
19  were looking to try to find the place
20  ahead of time.  We couldn't pick up until
21  morning, but we were trying to find it
22  that night so we'd know where it was
23  before we parked for the evening.  And he

Page 48

1  was about out of hours, so we pulled to
2  the side of the road and we switched
3  drivers, did our logbooks, and I took off.
4  And we were -- at that point, we were at
5  an area where the roads were getting
6  narrower and smaller and we were past
7  where we needed to go.  And it was really
8  pitch black out.  And I didn't want to
9  continue down that road not knowing where
10  the road went and how small it would get
11  or residential it would get.  So we
12  determined we needed to make a U-turn.
13  And I pulled around and looked in my
14  mirror, rearview mirror on the side,
15  driver's side, and there was nothing
16  coming.  And, like I said, it was misting.
17  The roads were wet.  It was pitch black.
18  I could see nothing.  I could see no
19  lights coming or no vehicles coming.  So I
20  made a left turn into the -- onto the tar
21  strip in the median.  And I stopped before
22  I went across to see if there was oncoming
23  traffic.  And at that point, I heard tires

12  (Pages 45 to 48)

# FREEDOM COURT REPORTING

Page 49

1 squealing and looked out the window and
2 saw his vehicle at that point. And he
3 went into me.
4    Q. All right. This gentleman that
5 was a student, Jose Pagan?
6    A. Uh-huh.
7    Q. Do you know if he's driving for
8 Swift Transportation now?
9    A. I don't believe he is, no, sir.
10    Q. Do you know, did he -- did he
11 ever drive for Swift Transportation
12 besides as a student?
13    A. I don't know that.
14    Q. Do you know if he's driving for
15 someone today?
16    A. I have no idea.
17    Q. It sounds like Mr. Pagan had
18 been driving earlier in the day?
19    A. Yes, sir.
20    Q. I take it he's permitted to do
21 that?
22    A. Certainly.
23    Q. Do you recall where you had

Page 50

1 been earlier that day?
2    A. No, sir.
3    Q. But as you start identifying
4 the place where you're going to make your
5 pickup the next morning, y'all realize
6 that Mr. Pagan is almost out of hours --
7    A. Uh-huh.
8    Q. -- is that what you said?
9    A. Yes.
10    Q. Can you tell me what you mean
11 by that?
12    A. You only can drive for eleven
13 hours in a row. And he was running low
14 and getting tired, so I -- I was going to
15 replace him.
16    Q. All right. Had you driven at
17 all earlier that day?
18    A. No.
19    Q. So, at what point, if you can
20 recall, did y'all realize that Jose was,
21 Mr. Pagan, was getting close on being out
22 of hours?
23    A. Right around that time.

Page 51

1    Q. Okay. Was that why pulled
2 over --
3    A. Yes.
4    Q. -- on the side of the road?
5    A. Yes. Well, both -- both
6 reasons. One, we needed to turn around;
7 and, two, he was out of hours and we were
8 going to switch drivers.
9    Q. Was he already out of hours?
10    A. No. No.
11    Q. Now, when Jose is driving, Mr.
12 Pagan is driving as a student driver, is
13 he keeping up with a logbook as well?
14    A. Certainly.
15    Q. So you would have a logbook and
16 he would have a logbook?
17    A. Certainly. Yes.
18    Q. And at some point -- it was
19 evening when the wreck happened; right?
20    A. Yes.
21    Q. It was nighttime; is that
22 right?
23    A. Yes.

Page 52

1    Q. Y'all pulled off on the side of
2 the road for two reasons; one, it seems
3 like you're going in the wrong direction;
4 right?
5    A. Yes.
6    Q. And secondly is that Mr. Pagan
7 is getting close to being out of hours?
8    A. Yes.
9    Q. Who pulled the vehicle over on
10 the side of the road?
11    A. He did.
12    Q. And then did you take the
13 driver's seat at some point?
14    A. Yes.
15    Q. Was Mr. Pagan driving at the
16 time of the wreck?
17    A. No.
18    Q. Y'all had already switched?
19    A. Yes.
20    Q. How long would you say that you
21 had sat there on the side of the road?
22    A. Just a couple minutes. I don't
23 know exactly, but not very long. Just

13 (Pages 49 to 52)

# FREEDOM COURT REPORTING

Page 53

1  long enough to stop the truck, do the
2  logbook and take off again.
3      Q.  Okay.  So when Mr. Pagan pulled
4  over on the side of the road, he completed
5  his logbook entry?
6      A.  That's correct.
7      Q.  And you picked up showing that
8  you were now driving on your logbook?
9      A.  That's correct.
10      Q.  And that's something you had
11  completed prior to the wreck?
12      A.  Yes.  Yes.
13      Q.  Now, did y'all do anything in
14  the vehicle to figure out where you were
15  supposed to be going?
16      A.  No.  Not at that point, no.
17      Q.  How were y'all going to figure
18  out where the location was that you were
19  looking for?
20      A.  We were -- well, we were going
21  to turn around and head back and find a
22  place to park and call them in the morning
23  because we couldn't find the location.  So

Page 54

1  we were just going to wait until they
2  opened in the morning and call.
3      Q.  Okay.  Were y'all running a
4  little behind that day?
5          MR. GODWIN:  Object to the
6  form.
7      A.  No.
8      Q.  And what I mean by that is,
9  were you supposed to pick up the load that
10  day, the day of the wreck as opposed to
11  the next morning?
12      A.  No.  I was supposed to pick it
13  up the next morning.
14      Q.  All right.  I know as you sit
15  here today, it doesn't appear that you're
16  wearing any glasses, but I see you've got
17  some in your pocket.
18      A.  Uh-huh.
19      Q.  Is that correct?
20      A.  That is correct.
21      Q.  Going back to the time of this
22  wreck, did you wear glasses then?
23      A.  I don't wear glasses as a rule

Page 55

1  to see.  I wear them for reading --
2      Q.  Okay.
3      A.  -- close-up.
4      Q.  I know you say you don't wear
5  them.  Are you supposed to wear them while
6  you're driving?
7      A.  No, sir.
8      Q.  Do you have any restrictions
9  about your vision?
10      A.  No, sir.  None.
11      Q.  Let me ask you a couple of
12  questions about the road you were on.  I
13  recall seeing, I think, it's Highway 84.
14      A.  Yes, sir.
15      Q.  Does that sound correct to you?
16      A.  That's right.
17      Q.  Is that a four-lane highway?
18      A.  Yes, it is.
19      Q.  And you would have been parked
20  over on the side of the road and not in
21  any of the lanes?
22      A.  That's correct.
23      Q.  All right.  So your plan was

Page 56

1  you were just going to turn the vehicle
2  around and go -- make a U-turn?
3      A.  Well, yes.
4      Q.  Had you gone down the road at
5  all to do that or were you trying to make
6  the U-turn from where you were parked?
7      A.  No.  I pulled out -- we weren't
8  at the point of turning where we parked.
9  I pulled out onto the road and went a
10  short distance, and then made the turn.
11      Q.  Can you give me an idea of what
12  that short distance would have been?
13      A.  No, sir, not really.
14      Q.  Do you think it would have been
15  as much as a half a mile?
16      A.  I really don't know.  I don't
17  really don't know how to answer that.
18      Q.  Okay.  When did you first see
19  the vehicle where my clients were?
20      A.  After I had completed the turn
21  and was in the middle of the median up
22  with the nose of the tractor right at the
23  oncoming -- right at the -- before the

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

Page 57

1  oncoming traffic from the other direction.
2  And as I got that turn made, I heard the
3  squealing of the tires, looked out the
4  window and saw that car at that point.
5      Q.  Okay.  So your testimony is
6  that you didn't see them until your
7  tractor was in the median?
8      A.  That's correct.
9      Q.  Now, did you try to make that
10 U-turn from the far right lane?
11     MR. GODWIN:  Object to form.
12 Go ahead and answer.
13     Q.  Do you know what I mean?
14     A.  Yes.
15     Q.  Okay.  There's two lanes going
16 on --
17     A.  That's correct.
18     Q.  -- each side of Highway 84.
19     A.  Yes.
20     Q.  Which lane --
21     A.  I was in the right lane.
22     MR. GODWIN:  Let him finish his
23 question first.

Page 58

1      Q.  So you were making the U-turn
2  from the far right lane?
3      A.  Yes.
4      Q.  Not from the inside lane?
5      A.  Right.
6      Q.  Okay.  Why is that?
7      A.  Because I needed the room to
8  make the turn.
9      Q.  All right.  And you're saying
10 that -- just so I understand -- that you
11 did not see the vehicle that the Lawsons
12 were in until your tractor was in the --
13 it was in the median?
14     A.  Yes, sir.
15     Q.  All right.  And so I guess if
16 your tractor is in the median, that means
17 your trailer is probably taking up both
18 the right and the left lane?
19     MR. GODWIN:  Object to form.
20     A.  No, it wasn't completely.  It
21 was taking up the left lane and part of
22 the right lane, but not the whole right
23 lane.

Page 59

1      Q.  Okay.  Do you know what lane
2  the Lawsons were in as they approached
3  your vehicle?
4      A.  Yes.  They were on the inside
5  lane.
6      Q.  Now, do you recall speaking to
7  any of the police officers out at the
8  scene that night?
9      A.  Yes.
10     Q.  Do you recall how many of the
11 police officers were -- or how many police
12 officers were at the scene?
13     A.  No.  I spoke with one.
14     Q.  Do you recall anything about
15 him by description?
16     A.  No, not really.
17     Q.  Did you tell him what happened?
18     A.  Yes, I did.
19     Q.  Did you provide him any kind of
20 written statement?
21     A.  No, sir.
22     Q.  What do you recall telling the
23 police officer about how the wreck

Page 60

1  happened?
2      A.  I recall telling him exactly
3  what I just told you.
4      Q.  You haven't reviewed the
5  testimony that the officer has provided in
6  this case?
7      A.  I -- yeah, we discussed it.
8      MR. GODWIN:  He doesn't have
9  any right to know --
10     MR. GLOVER:  Sure.
11     MR. GODWIN:  -- what we
12 discussed.
13     A.  Well, okay.
14     Q.  Have you reviewed it your
15 yourself, though?  Have you looked at the
16 testimony?
17     A.  No.
18     MR. GODWIN:  Matt, when you get
19 to a breaking point --
20     MR. GLOVER:  Great time right
21 now.
22     MR. GODWIN:  Is it?
23     MR. GLOVER:  Yeah.  I need a

15 (Pages 57 to 60)

# FREEDOM COURT REPORTING

Page 61

1  refill.
2         (Whereupon, a short break was
3     taken.)
4     Q.  (BY MR. GLOVER:)  Mr. Martin, I
5  want to give you the opportunity to review
6  a question and answer.  And by all means,
7  you have a right to look at as much
8  information as you want.  I'm not trying
9  to trick you.  I just -- I want you to
10  look at what the officer has testified
11  about concerning his interview with you
12  that night.
13     A.  Uh-huh.
14     Q.  And just to look at it, and I
15  want to ask you a few questions about it.
16        MR. GODWIN:  May I see --
17        MR. GLOVER:  Sure.
18        MR. GODWIN:  -- what part
19  you're asking him to take at look at?
20        MR. GLOVER:  He can look at all
21  of it, but if you want on the right --
22  here, let me show you.
23        MR. GODWIN:  The tabbed

Page 62

1  portion?
2         MR. GLOVER:  Well, that's just
3  the page.  It says "And what did he tell
4  you happened?"
5         MR. GODWIN:  Okay.
6         MR. GLOVER:  And then the
7  answer.
8         MR. GODWIN:  Thank you.
9  (Reviewing document.)  Okay.  And you're
10  asking him to look at his answer?
11        MR. GLOVER:  Just to, first,
12  look at his answer.
13     A.  Uh-huh
14        MR. GODWIN:  It starts right
15  there, "And what did he tell you
16  happened?"
17     A.  (Reviewing document.)
18     Q.  (BY MR. GLOVER:)  And you've
19  had an opportunity to read that?
20     A.  Yes, I have.
21     Q.  Do you believe that there are
22  some differences in what the officer has
23  testified you told him and what you're

Page 63

1  telling me today?
2     A.  Yes.
3     Q.  Do you think the officer is
4  wrong about this?
5     A.  Yes.
6     Q.  And just so we know what we're
7  talking about here, according to the
8  officer, you informed him that you saw the
9  Lawson car sometime before the wreck
10  occurred?  I mean, you recognize that in
11  the answer; right?
12     A.  That's what --
13     Q.  That he provided?
14     A.  That's what he says, yes.
15     Q.  But you're saying that's not
16  accurate?
17     A.  That's true.  That's not
18  accurate.
19        MR. GODWIN:  Object to the form
20  to the extent that I think it
21  mischaracterizes some of his prior
22  testimony today.
23     Q.  I know earlier you said that

Page 64

1  when you would be involved in a wreck with
2  Swift Transportation, that there would be
3  a few things that you would need to do out
4  at the scene, like take photographs --
5     A.  That's correct.
6     Q.  -- for instance?
7     A.  That's correct.
8     Q.  Did you do that --
9     A.  Yes, I did.
10     Q.  -- in this case?
11     A.  Yes.
12     Q.  Did you take the photographs as
13  the vehicles were positioned in the road?
14     A.  Yes, I did.
15     Q.  Did you take photographs of
16  both vehicles involved?
17     A.  Yes, I did.
18     Q.  How would you describe for me
19  from your recollection the damage that was
20  done to the Lawsons' vehicle?
21     A.  The damage was to the passenger
22  side, front end passenger fender,
23  passenger door, and corner post, I

16 (Pages 61 to 64)

# FREEDOM COURT REPORTING

Page 65

1  believe, the windshield. But that was --
2  I think it was limited to just that.
3      Q.   How was the Lawson vehicle
4  positioned in relation to your transfer
5  truck?
6      A.   My truck was articulated sort
7  of like this (indicating), and he was into
8  the trailer with the passenger's fender.
9      Q.   Okay. Do you have any judgment
10  as to the speed that Mr. Lawson was
11  traveling?
12      A.   No, sir.
13      Q.   Do you fault Mr. Lawson at all
14  for what happened?
15      A.   Yes, sir, I think I do. I
16  believe that if he had not panicked and
17  had pumped his brakes, which is what
18  you're supposed to do, he could have
19  steered around. But I think he panicked
20  and jammed on the brakes, that's my
21  speculation. That's what it appeared to
22  be. He just jammed them on, locked it up,
23  and turned and slid into my truck.

Page 66

1      Q.   How do you know he panicked?
2      A.   I don't. I don't. I'm saying
3  pure speculation.
4      Q.   How do you know he didn't pump
5  his brakes?
6      A.   Because it was just one sound
7  is all I heard.
8      Q.   That's your basis for saying
9  that?
10      A.   I heard -- yes, sir. I heard
11  the tires squealing, looked out and saw
12  the car.
13      Q.   You believe that Mr. Lawson
14  should have been able to go to the right
15  and avoid your trailer?
16      A.   Yes, sir, I think he could
17  have.
18      Q.   Do you place any fault on
19  yourself for this wreck?
20      MR. GODWIN:  Object to the
21  form.
22      A.   I -- I really don't know. I
23  just -- it's a matter of interpretation.

Page 67

1  I guess it could be anybody's.
2      Q.   It seems like you were a little
3  quicker to blame Mr. Lawson and find fault
4  with what he did as opposed --
5      A.   No, I merely stated what I
6  thought.
7      Q.   Okay.
8      A.   I wasn't finding fault. I was
9  just merely stating I thought that perhaps
10  he could have done better in the
11  situation, but --
12      Q.   What could you have done
13  different, perhaps better, given the
14  situation?
15      A.   Well, I don't know quite
16  frankly, but, you know, hindsight being
17  what it is, I -- it's now time to think if
18  I might have done other things. But at
19  that time and that place, it appeared to
20  be the thing I needed to do. Because I
21  was heading out of town, the roads were
22  getting smaller. And when the roads get
23  smaller, it means you're going in a

Page 68

1  residential area where you're probably not
2  going to be able to turn around. So I
3  deemed it necessary at that point to turn
4  around.
5      Q.   And y'all had been on the road
6  for about eleven hours that day?
7      MR. GODWIN:  Object to the
8  form.
9      Q.   Is that right?
10      MR. GODWIN:  Same objection.
11      A.   I'm not sure. I don't know how
12  long it was. I have no way of knowing
13  these things.
14      Q.   When you're over there on the
15  far right side making a conscious decision
16  to do a U-turn across two lanes, did you
17  look in the rearview mirror to see if a
18  car was coming?
19      MR. GODWIN:  Object to the form
20  of the question. Go ahead and answer, if
21  you can.
22      A.   I wasn't in the passenger seat
23  making the decision to --

17 (Pages 65 to 68)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 69

1    Q.  No, I don't know if I said -- I
2  sure didn't mean to say passenger seat if
3  I did.
4    A.  I thought that's what you said,
5  but I'm not sure either.
6    Q.  When you were over on the side
7  of the road and you made the conscious
8  decision to make a U-turn from the right
9  lane and cross over another lane into the
10  median, did you look in your rearview
11  mirror to see if a car was coming?
12    A.  Yes.
13    MR. GODWIN:  Object to the form
14  of the question.
15    Q.  And do you have any explanation
16  for why you didn't see the car coming?
17    A.  No, sir, I have no idea why I
18  couldn't see it.  As I said, it was pitch
19  black.  I should have seen the lights if
20  they were -- if they weren't at an angle
21  behind a hill or something.  I don't know.
22  But there was nothing.  It was pitch
23  black.  There was no light.  And so I had

Page 70

1  no reason to believe there was a car
2  there.
3    Q.  Did you have an opportunity to
4  speak to either of the Lawson boys that
5  night?
6    A.  Well, yes, I did.  I spoke to
7  the passenger, the brother, who was
8  rational.  The -- Scott, the driver, was
9  crying like a five-year-old girl and just
10  screaming, what am I going to do?  What am
11  I going to do?  My car.  And his brother
12  was, like, calm down.  It's just an
13  accident.  It will be okay.  And he just
14  was -- he was ranting and raving and
15  crying and just carrying on.  I -- there
16  was no talking to him.  The police
17  officers tried to speak with him and
18  couldn't for a while.
19    MR. GODWIN:  You've answered
20  the question.
21    Q.  When you got out of your
22  vehicle and saw the damage that was done
23  to the Lawson vehicle, did it ever cross

Page 71

1  your mind that someone had been killed?
2    A.  No.
3    Q.  Did it look to you to be the
4  kinds of damage where someone could have
5  lost their life in the wreck?
6    A.  No.
7    Q.  Did it ever cross your mind
8  that perhaps the reason, as you say, the
9  driver was crying like a five-year-old
10  girl was perhaps because they thought they
11  had almost lost their life as a result of
12  the maneuver that you made?
13    A.  I doubt it.  Don't know.
14    Q.  You said the passenger was
15  rational.
16    A.  Uh-huh.
17    Q.  With that explanation, do you
18  recall anything that he said to you, the
19  passenger?
20    A.  All he -- yes.  The only thing
21  he said to me was -- well, he said to his
22  brother, Scott, calm down.  It's just an
23  accident.  We're both okay.  And Scott

Page 72

1  went away and was getting on the
2  telephone.  And the other fellow -- I
3  don't know his name -- just said, I don't
4  know what his problem is.  It's no big
5  deal.  I don't know what the problem is,
6  but --
7    Q.  The passenger said that to you?
8    A.  That's correct, yes, sir.
9    Q.  That it was -- it was no big
10  deal?
11    A.  Yes, sir.
12    Q.  What else, if anything, do you
13  recall the passenger saying to you?
14    A.  That's all.
15    Q.  Did the passenger ever explain
16  how the wreck happened?
17    A.  No.
18    Q.  Now, what did the driver say to
19  you, if anything, that you can recall?
20    A.  Nothing.  Nothing at all.
21    Q.  Have you talked to either of
22  those two gentlemen since the wreck?
23    A.  No.

18  (Pages 69 to 72)

# FREEDOM COURT REPORTING

Page 73

1    Q.  Do you know if Jose Pagan had
2  any conversations with either of the
3  Lawson boys?
4    A.  I don't know.
5    Q.  Have you talked to Jose --
6    A.  No.
7    Q.  -- since the night of the
8  wreck?
9      MR. GODWIN:  Let him finish his
10  question.
11    Q.  Have you talked to Jose Pagan
12  since the night of the wreck?
13    A.  No.
14    Q.  Now, in addition to taking
15  photographs, I know you said that you
16  would also customarily fill out a
17  narrative, incident report --
18    A.  Yes.
19    Q.  -- of how the wreck happened?
20    A.  Yes.
21    Q.  Did you do that with this
22  wreck?
23    A.  Yes.

Page 74

1    Q.  When did you complete that
2  narrative?
3    A.  I believe the next morning.
4    Q.  Where did you complete that
5  narrative?
6    A.  In my truck.
7    Q.  Okay.  Was Mr. Pagan with you
8  when you completed it?
9    A.  Yes.
10    Q.  Was anyone else with you?
11    A.  No.
12    Q.  Had you spoke to any attorneys
13  prior to writing out that narrative?
14    A.  No.
15    Q.  Had you consulted with any
16  attorneys before filling out that
17  narrative?
18    A.  No.
19    Q.  Did you submit that incident
20  report to Swift Transportation?
21    A.  Yes.
22    Q.  Have you reviewed that incident
23  report recently?

Page 75

1    A.  No.
2    Q.  Have you reviewed it at all
3  since you submitted it to Swift
4  Transportation?
5    A.  No.
6    Q.  Would you mail that out to the
7  Phoenix office?
8    A.  Yes.
9    Q.  Did you ever get any feedback
10  from Swift Transportation regarding this
11  wreck?
12    A.  No.
13    Q.  Do you know if they determined
14  whether it was preventable or not on your
15  part?
16    A.  No.
17    Q.  They didn't communicate that to
18  you --
19    A.  No.
20    Q.  -- one way or the other?  Were
21  you issued any warnings as a result of
22  this wreck?
23    A.  No.

Page 76

1    Q.  Did you receive any medical
2  treatment from the wreck?
3    A.  No.
4    Q.  Do you know if Mr. Pagan --
5    A.  No.
6    Q.  -- received any treatment?
7    A.  Yes, I know.  No, he did not.
8      MR. GODWIN:  Let him finish.
9    Q.  Did Mr. Pagan fill out an
10  incident report?
11    A.  No.
12      MR. GODWIN:  You're doing fine.
13  I just -- I've got to keep reminding you.
14      THE DEPONENT:  That's fine.
15  Yeah, that's fine.
16    Q.  Are you on any kind of -- do
17  you take any medication today?
18    A.  Yes.
19    Q.  This time frame?
20    A.  Yes.
21    Q.  What type medication do you
22  take?
23    A.  I take blood pressure medicine,

19 (Pages 73 to 76)

# FREEDOM COURT REPORTING

Page 77

1 arthritis medicine, metformin for
2 diabetes.
3    Q.  What type diabetes do you have?
4    A.  Type II.
5    Q.  How long have you had type II
6 diabetes?
7    A.  I -- I don't know exactly, ten,
8 twelve years.
9    Q.  Do you take any insulin for
10 that?
11    A.  No.
12    Q.  Just medication?
13    A.  Yes.
14    Q.  How often do you take the
15 medication for your diabetes?
16    A.  Once a day.
17    Q.  Back at the time of this wreck,
18 which was, you know, this time -- I mean,
19 less than a year ago, what type medication
20 did you take then?
21    A.  The same.
22    Q.  Any additional medications that
23 you're not taking now?

Page 78

1    A.  No.
2    Q.  Had you taken your medication
3 that day?
4    A.  Not yet, no.
5    Q.  When do you ordinarily take
6 your medication?
7    A.  At night.
8    Q.  All your medications are taken
9 at night?
10    A.  All together, yes.
11    Q.  Do you know if there were any
12 witnesses to the wreck besides yourself
13 and Mr. Pagan --
14    A.  Yes.
15    Q.  -- and the Lawson gentlemen?
16    A.  Yes, I know that there were
17 none.
18    Q.  No other witnesses?
19    A.  (Witness shaking head
20 negatively.)
21    Q.  The vehicle that Mr. Pagan had
22 been driving that day and that you were
23 driving at the time of the wreck, is that

Page 79

1 the vehicle that you ordinarily drive for
2 Swift Transportation?
3    A.  It was at that time.
4    Q.  What I mean by that is, that's
5 the tractor-trailer that you had driven in
6 the weeks before the wreck, too?
7    A.  That's correct.
8    Q.  Mr. Pagan hadn't been assigned
9 a vehicle yet by Swift?
10    A.  That's correct.
11    Q.  Did you submit to any drug or
12 alcohol test after the wreck?
13    A.  No.
14    Q.  Is that something you
15 ordinarily do when you're involved in a
16 wreck driving a transfer truck?
17    A.  It is up to the company to ask
18 for one or not.  And in this case, they
19 didn't.
20    Q.  When did you first report the
21 wreck to your company?
22    A.  Well, immediately.  I mean, we
23 send in a macro on the Qualcomm computer.

Page 80

1    Q.  And what type information do
2 you provide Swift when you've been in a
3 wreck by Qualcomm?
4    A.  It's just a canned statement
5 that says, attention safety, I have been
6 in an accident.  It was at this place at
7 this time and give a brief description.
8    Q.  Okay.  Did you do that that
9 night?
10    A.  Yes.
11    Q.  And is that description -- that
12 is a different type description than
13 filling out the incident report?
14       MR. GODWIN:  Object to the
15 form.
16    Q.  Is that correct?
17    A.  No.  Really, it's the same.
18 You describe it the same way.
19    Q.  No.  I didn't mean it that way.
20 I meant that you provide a notification to
21 the company --
22    A.  I provide --
23    Q.  -- which includes a

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 81

1  description, and then you also later fill
2  out an incident report?
3      A.  That's correct.
4      Q.  Okay.  And you believe that you
5  sent in the Qualcomm notification on the
6  night of the wreck?
7      A.  Yes.
8      Q.  Did you speak to anyone at
9  Swift Transportation that night about the
10 wreck besides Jose Pagan?
11     A.  No.
12     Q.  Are you supposed to call anyone
13 on the day of the wreck?
14     A.  You send in the macro on the
15 Qualcomm.  That is communicating with
16 them.
17     Q.  Okay.  I mean, how would you be
18 notified if they wanted you to submit to a
19 blood or -- I mean, a drug or alcohol
20 test?
21     A.  They would send me back a
22 message to either call in or to go to a
23 certain place, and they would advise me

Page 82

1  where to go.
2      Q.  Do you know why they did not
3  ask you or Mr. Pagan to submit to a drug
4  and alcohol test that night?
5      A.  I cannot speculate as to why
6  they would or wouldn't.
7      Q.  Had you been drinking anything
8  that day?
9      A.  No, sir.
10     Q.  What about Mr. Pagan, had he
11 been --
12     A.  No, sir.
13     Q.  Same question, taken any kind
14 of drug at all on the day of the wreck?
15     A.  No, sir.
16     Q.  What about Mr. Pagan; do you
17 know?
18     A.  No, sir.  I mean, not to my
19 knowledge.
20     Q.  Did you speak to anyone the
21 following day from Swift about the wreck?
22     A.  Yes.
23     Q.  Who did you speak to?

Page 83

1      A.  I have no idea.  The
2  accident -- the people in safety, the
3  safety department.
4      Q.  They contacted you?
5      A.  Yes.
6      Q.  What do you recall about that?
7      A.  I don't really recall anything
8  about it.  We spoke about the accident,
9  went over what happened.
10     Q.  Do you know if that was
11 recorded?
12     A.  No, I don't.
13     Q.  And that is separate from the
14 incident report that you provided?
15     A.  Yes, sir.
16     Q.  And that was -- someone called
17 you from safety out at Phoenix?
18     A.  Phoenix.
19     Q.  Did you ever speak to anyone
20 else about the wreck from Swift?
21     A.  No.
22     Q.  Can I see your driver's license
23 and your medical card?

Page 84

1      MR. GLOVER:  Chad, can I have
2  copies of both of these?
3      MR. GODWIN:  Absolutely.
4      MR. GLOVER:  And then I'll
5  review my notes and I -- I'm getting
6  really close to being done.
7      MR. GODWIN:  Okay.
8      (Whereupon, a short break was
9  taken.)
10     MR. GLOVER:  I just have a few
11 more.  Do you want me to go ahead?
12     MR. GODWIN:  That's fine.
13     Q.  (BY MR. GLOVER:)  Mr. Martin,
14 do you receive any of your treatment for
15 diabetes from the VA medical doctors?
16     A.  Yes.
17     Q.  Do you know which doctor treats
18 you for your diabetic condition?
19     A.  Dr. Sriharan right now is my
20 current doctor.
21     Q.  Did you take an application --
22 did you complete an application with Swift
23 Transportation?

21 (Pages 81 to 84)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING



Page 85

1    A.  Yes.
2    Q.  Did you notify them of your
3  diabetic condition?
4    A.  Yes.
5    Q.  Okay.  And your understanding
6  is the kind of diabetic condition you have
7  does not prohibit you from driving?
8    A.  That's correct.
9    Q.  All right.  Have you talked to
10 anybody since the night of the wreck who
11 has claimed to represent the Lawson
12 brothers in any way?
13   A.  No.
14   Q.  Okay.  And you haven't talked
15 to them -- the Lawson brothers at all
16 since the night of the wreck?
17   A.  That's correct.
18   Q.  Okay.  All right.  Well, I
19 thank you for your time today.
20
21       FURTHER THE DEPONENT SAITH NOT
22
23

Page 86

1       C E R T I F I C A T E
2
3  STATE OF ALABAMA)
4  SHELBY COUNTY   )
5
6       I, Maya Rose, Court Reporter, do
7  hereby certify that I recorded by means of
8  stenotype the foregoing proceedings at the
9  time and place stated in the caption
10 hereof.  That later, under my supervision,
11 the proceedings were transcribed by means
12 of computer-aided transcription, and the
13 foregoing represents a full, true, and
14 correct transcript of the proceedings on
15 said occasion.
16      I further certify that I am
17 neither of counsel nor of kin to any
18 parties of said cause, nor am I in any
19 manner interested in the result thereof.
20
21
22
23    Maya Rose - ACCR# 242

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           MIDDLE DISTRICT OF ALABAMA
 3                NORTHERN DIVISION
 4
 5
 6    SCOTT D. LAWSON and
      STEVEN LAWSON,
 7
          Plaintiffs,
 8
 9    vs.          CASE NO. 2:07cv356-MHT
10    SWIFT TRANSPORTATION
      CO., INC., and
11    FREDRICK S. MARTIN, JR.,
12        Defendants.
13
14
         * * * * * * * * * * *
15
16    DEPOSITION OF STEVEN FRANCIS McGOWIN, taken
17    pursuant to stipulation and agreement before Sherry
18    McCaskey, Certified Court Reporter and Commissioner
19    for the State of Alabama at Large, in the Law
20    Offices of Jones & Jones, 530 East Three Notch
21    Street, Andalusia, Alabama, on Tuesday, October 23,
22    2007, commencing at approximately 10:15 a.m.
23       * * * * * * * * * * *
```

Page 2

```
 1              APPEARANCES
 2    FOR THE PLAINTIFFS:
 3    JOSHUA P. HAYES, ESQUIRE
      Prince Glover Law
 4    Attorneys at Law
      1 Cypress Point
 5    701 Rice Mine Road N.
      Tuscaloosa, Alabama 35406
 6
      JOHN F. JONES, JR., ESQUIRE
 7    Jones & Jones, P.C.
      Attorneys at Law
 8    530 East Three Notch Street
      Andalusia, Alabama 36420
 9
      FOR THE DEFENDANTS:
10
      LEA RICHMOND, IV, ESQUIRE
11    Carr, Allison, Pugh,
      Howard, Oliver & Sisson, P.C.
12    Attorneys at Law
      100 Vestavia Parkway
13    Birmingham, Alabama 35216
14       * * * * * * * * * * *
15          EXAMINATION INDEX
16    STEVEN FRANCIS McGOWIN
17    BY MR. HAYES              4
      BY MR. RICHMOND          30
18
19
20          EXHIBIT INDEX
      PLAINTIFFS' EXHIBIT NO.:
21
22    1  Accident report        28,29,30
                                 51,60
23
```

Page 3

```
 1              STIPULATIONS
 2       It is hereby stipulated and agreed by and
 3    between counsel representing the parties that the
 4    deposition of STEVEN FRANCIS McGOWIN is taken
 5    pursuant to stipulation and agreement; that all
 6    formalities with respect to procedural requirements
 7    are waived; that said deposition may be taken before
 8    Sherry McCaskey, Certified Court Reporter and
 9    Commissioner for the State of Alabama at Large,
10    without the formality of a commission; that
11    objections to questions other than objections as to
12    the form of the questions need not be made at this
13    time but may be reserved for a ruling at such time
14    as the deposition may be offered in evidence or used
15    for any other purpose as provided for by the Alabama
16    Rules of Civil Procedure.
17       It is further stipulated and agreed by and
18    between counsel representing the parties that the
19    filing of the deposition is hereby waived and that
20    the deposition may be introduced at the trial of
21    this case or used in any manner by either party
22    hereto provided for by the Statute.
23       It is further stipulated and agreed by and
```

Page 4

```
 1    between the parties hereto and the witness that the
 2    signature of the witness to this Deposition is
 3    hereby waived.
 4       * * * * * * * * * * *
 5          STEVEN FRANCIS McGOWIN
 6    The witness, having first been duly sworn to
 7    speak the truth, the whole truth and nothing but the
 8    truth, testified as follows:
 9              EXAMINATION
10    BY MR. HAYES:
11    Q. Officer McGowin, we met just a few minutes
12       ago, but I'm Josh Hayes.  I practice law in
13       Tuscaloosa.  And Matt Glover at my firm as
14       well as John Jones represent the Lawsons who
15       have filed a lawsuit in federal court
16       concerning an accident that you investigated.
17       So we're going to be asking you some general
18       questions this morning about your background
19       and training, and then we'll also ask you
20       about that accident.  If at any point I ask
21       you a question which you don't understand,
22       which I'm prone to do by the way, if you'll
23       just let me know and I'll try to rephrase it.
```

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 5

1     I don't think we'll be here very long this
2     morning, but if you want a break at any point,
3     this is certainly not a marathon, so we'll be
4     glad to take a break.
5         Will you please state your full name for
6     the Record?
7   A. Steven Francis McGowin, M-C-G-O-W-I-N.
8   Q. Mr. McGowin, where are you employed?
9   A. With the City of Andalusia as a police
10     officer.
11   Q. Did you grow up in Andalusia?
12   A. No, I didn't grow up in Andalusia. I was born
13     here. My father, during my youth, was in the
14     Marine Corps and traveled back and forth from
15     wherever he was stationed at. And then when
16     he was deployed, we would occasionally live in
17     Andalusia.
18   Q. Where did you graduate from high school?
19   A. Camp Lejeune, North Carolina, Camp Lejeune
20     High School.
21   Q. And then what did you do after high school?
22   A. I went into the service. I went into the
23     Army. I spent four years as a infantryman and

Page 6

1     a military policeman. Got out of the Marine
2     Corps, came to Andalusia, was a police officer
3     for several years. Went back into the service
4     as a -- as a Marine, started out as an
5     infantryman, went into special operations, and
6     then retired as a gunnery sergeant in special
7     operations, intelligence, counter terrorism
8     intelligence.
9   Q. How many years combined have you served as
10     either a military police officer or a police
11     officer in the civilian world?
12   A. Off and on since 1979, probably pretty close
13     to about 25, 26 years of some type of law
14     enforcement.
15         During the time period that I was in the
16     Marine Corps, I was a reserve officer here in
17     the city of Andalusia. So when I would come
18     back, I would work as a reserve officer. Then
19     during my time period in the Marine Corps, I
20     did a tremendous amount of work with -- with
21     what would be referred as the alphabets, which
22     would be FBI, US Secret Service, Diplomatic
23     Security Service, the CIA, Office of Military

Page 7

1     Affairs, National Security Council, National
2     Security Agency, DEA, and then several other
3     organizations.
4   Q. What kind of training have you had over the
5     years as a police officer?
6   A. I've gone through the military police
7     academy. I went through the Montgomery Police
8     Academy in 1983, graduating second in my
9     class. Then maintaining my required credits
10     by APOST, which is Alabama Peace Officers
11     Standards and Training Commission, throughout
12     the years. And then upon returning to full
13     military service -- excuse me -- full law
14     enforcement service, I went back to the
15     Montgomery Police Academy and graduated number
16     one in my class during that time period. That
17     was in 2005 -- either 2004 or 2005.
18         Then during my time period while I was in
19     the military, in addition to the military
20     police academies that I attended, there were
21     numerous courses that I had completed, to
22     include traffic accident investigator's
23     course, traffic accident reconstruction

Page 8

1     specialist course. Both of those were done
2     in -- while I was stationed in Germany.
3   Q. Can I stop you for just a moment and ask you
4     about those two things? Did you receive
5     certification from either of those?
6   A. Yes, I did. From U.S. Army traffic accident
7     investigator's course and the U.S. Army's
8     traffic accident reconstruction course. Both
9     of those were taught by instructors from the
10     Traffic Institute at Northwestern University.
11   Q. Okay. I'm sorry to interrupt. Were you --
12   A. And then I received numerous training and --
13     from the FBI, from the Secret Service, and
14     then from my work with the Office of Military
15     Affairs with the CIA.
16   Q. How many traffic accidents would you say you
17     have investigated over your tenure?
18   A. Everything from a fatality to a fender bender,
19     I would say probably in excess of 150 or so
20     traffic accidents. Fatalities, I've worked
21     probably five -- between five and seven
22     fatalities. Major traffic accidents with
23     serious injury, I would say probably in the

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

## Page 9

1 neighborhood of 25, maybe -- maybe as many as
2 30.
3 Q.  Besides your experience as a police officer,
4 do you have any other kind of work-related
5 experience?
6 A.  In what field?
7 Q.  Well, what else have you done besides being a
8 police officer?  Let me ask it that way.
9 A.  For a time period, I was the shop foreman for
10 Massey Automotive.  Upon initially retiring
11 out of the Marine Corps, I worked for Al
12 Thompson Trucking, which is a tanker company
13 out of Chester, South Carolina.  And for two
14 years, I pulled chemicals in a tanker.
15 Q.  Did you have a CDL at that time?
16 A.  I still have the class A CDL.
17 Q.  So it's fair to say, then, that you have
18 experience both from driving a truck and
19 investigating acts involving trucks?
20 A.  Yes, sir, I do.
21 Q.  Why don't you tell us -- now I think we'll
22 just move on to this accident we're here
23 talking about today which happened March 15th

## Page 10

1 of 2007.
2 How did you first learn that there was an
3 accident that you needed to investigate?
4 A.  We were at shift change.  Our shift change
5 occurs between 1850 or 6:50 in the evening to
6 about 1910 to 1915 which would be 7:15.  And
7 while we were at the end of shift change, we
8 received notification of a traffic accident on
9 the eastern side of town.  That particular
10 evening, I was working that particular
11 sector.  And because of my background, I'm
12 normally dispatched to almost all of the
13 roadway traffic accidents that we have.  So I
14 was dispatched to this traffic accident on
15 Highway 84 East.
16 Q.  And that would have been sometime around 7,
17 7:30 in the evening?
18 A.  It would -- I would have been dispatched
19 probably around 7:15'ish.
20 Q.  Do you remember what the weather was like that
21 night?
22 A.  It had been raining for most of the afternoon,
23 if I remember.

## Page 11

1 Q.  Were the roads wet?
2 A.  Yes, they were.
3 Q.  Tell us what you saw when you first got to the
4 accident scene.  Well, let me back up.  Where
5 was the accident?  Was it in the city of
6 Andalusia?
7 A.  It was -- yes, within the city limits of
8 Andalusia on Highway 84.  It would have been
9 in the vicinity of Ireland Trailers.  There
10 was turn spot there at Ireland trailers where
11 Shreve Road -- where you would turn onto
12 Shreve Road, and that's where the accident had
13 occurred at.  And it occurred on Highway 84.
14 Q.  All right.  What did you see when you first
15 got to the accident scene?
16 A.  When I first got there, I noticed the position
17 of the trailer and the tractor.  And noticed
18 that the trailer was completely covering the
19 inside lane of Highway 84 East and had -- and
20 actually, if I remember, the very end edge of
21 the trailer was actually in the outside lane
22 of Highway 84 East.  And I immediately noticed
23 that there was a car partially underneath the

## Page 12

1 center portion of the trailer.
2 Q.  Was the tractor part in a median turn lane or
3 the intersection?
4 A.  The tractor would have been, yes.
5 Q.  And the trailer would have been covering all
6 of the left lane and portions of the right
7 lane?
8 A.  A very small portion of the right lane, if at
9 all.  But it seemed like it was just like the
10 very edge of the trailer was in the -- in the
11 outside lane.
12 Q.  All right.  After you made those initial
13 perceptions, what was the first thing you did
14 when you got on the scene?
15 A.  Check to see if anyone was killed.
16 Q.  And what was your determination on that?
17 A.  It turned out that neither of the -- the
18 persons in the car had received any
19 life-threatening injuries as a result of the
20 accident.
21 Q.  Why did it occur to you to check to see if
22 anybody was killed?
23 A.  The position of the car.  The car was -- the

3  (Pages 9 to 12)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 13

1   whole front end of the car, all the way up to
2   a portion of the windshield was actually
3   underneath the trailer.  And from my vantage
4   point of driving up behind it, it -- it looked
5   as though the vast majority of the passenger
6   compartment was underneath the trailer as the
7   top of the car had been sheared -- partially
8   sheared.  It wasn't until I actually got to
9   the car that I realized that it was all the
10  way up to and including the windshield.
11  Q.  What did you do after you checked to see that
12  no one was killed?
13  A.  Then I -- I checked to see if there were any
14  serious injuries of the parties involved.  It
15  seems like they were still inside the vehicle
16  or at least one of them was still inside the
17  vehicle when I arrived there.  Rescue squad
18  was not far behind me.  As soon as the rescue
19  squad and other units arrived and I
20  established a traffic pattern, I turned back
21  to identify who was the driver of the two
22  vehicles.
23  Q.  What do you mean by establish a traffic

Page 14

1   pattern?
2   A.  Well, with the lane -- the lane being blocked,
3   it being raining, there's not a lot of
4   lighting on that particular part of the road,
5   when other -- when other officers got there, I
6   had them position their vehicles so that
7   traffic would be moved to the outside lane and
8   the shoulder of the road so that traffic
9   traveling east could continue on.
10  Q.  All right.  After you made the roadway safe
11  for people to get around, did you conduct an
12  investigation out there at the scene?
13  A.  I had already begun my investigation as I was
14  approaching the car, as I was approaching the
15  accident itself.
16  Q.  And that's from your training --
17  A.  Correct.
18  Q.  -- they teach you to do that?
19      What are the ultimate goals of your
20  investigation as you conduct it?
21  A.  To determine what happened before the
22  accident, during the accident, and after the
23  accident; determine if there were any

Page 15

1   injuries; damage to property, other than the
2   vehicles; and then to attempt to -- attempt to
3   determine through investigative techniques who
4   were -- who and what were the contributing
5   factors and who was at fault of the accident.
6   Q.  And what sorts of things do you do when you're
7   conducting an investigation like that to make
8   those determinations that you just told us
9   about?
10  A.  When I approach the traffic scene, I'm looking
11  to see what the position of the vehicles are.
12  I'm also -- as I'm approaching it, I'm looking
13  to see if there are any skid marks that are
14  visible as I'm driving up on it from the rear.
15      As I'm getting to the scene, I'm beginning
16  to position my vehicle where I'm in a position
17  of safety and a position to move traffic into
18  another direction away from my scene.
19      At that time, even though it's a traffic
20  accident, it -- it -- in my training, it is a
21  criminal scene -- a crime scene.  At that
22  time, I'm beginning to start to preserve any
23  evidence that may be a contributing factor to

Page 16

1   determine who is or isn't at fault and to
2   determine what are the contributing factors
3   leading up to the traffic accident.
4       Then I'm going to look at damage to the
5   vehicles.  As I'm looking for the damage to
6   the vehicles, I'm also looking for any
7   contributing defects of the vehicle to
8   determine if there was something mechanical
9   that might have been a contributing factor to
10  the traffic accident.
11      As I'm speaking with the drivers, I'm
12  looking for any type of impairment, whether it
13  be that they've had anything to drink or any
14  type of narcotics, or it may be something as
15  simple as they were just tired or that they
16  were inattentive.  Could be possibly due to
17  they were lost, didn't know with they were at,
18  confused about the roadway or the traffic
19  pattern, whether or not they were listening to
20  the radio, what they were doing prior to that.
21      I've had several traffic accidents that
22  I've investigated where the contributing
23  factor was the driver not paying attention

4  (Pages 13 to 16)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 17

1  because they were trying to find another radio
2  station.
3      So it would be any number of things that
4  would lead me to determine what may have
5  caused an accident.
6  Q.  Do you talk to the people in the vehicles?  Is
7  that part of your investigation?
8  A.  Yes, I do.
9  Q.  Do you talk to any witnesses if there are any?
10 A.  If there are, and I get their names and
11 whatever information I need pertaining to that
12 individual so they can be contacted at a later
13 date.
14 Q.  All right.  Tell us about any conversations
15 you had with the two men in the passenger car
16 that night.
17 A.  The two persons in the passenger car, both of
18 them -- I spoke with them separately.  And
19 they pretty much said the same thing, of
20 course, both of then using different
21 verbiage.  But as they were traveling east on
22 Highway 84, they had proceeded down the hill,
23 which would have been just out -- or just at

Page 18

1  Jones Veterinary Clinic, traveling on 84
2  East.  It's a four-lane roadway at that
3  point.  They traveled down the hill.  As
4  they're coming up out of the bottom of the
5  hill, they're traveling at about -- about 45,
6  maybe as much as 50 miles an hour but, in
7  general terms, about 45.  They knew that the
8  roads were wet.  They were just trying to get
9  back to the house.
10     When they crested the hill, they could
11 see -- there's actually like another little
12 dip, and then they -- they could see the
13 tractor trailer and a -- according to them,
14 the tractor trailer was in the outside lane,
15 which will be the right-hand lane.
16     And as they were coming up on the rear of
17 the tractor trailer, at that point, the
18 tractor trailer just made a left-hand turn,
19 cutting right in front of them.  The driver
20 was able to slam on the brakes and turn the
21 steering wheel slightly to the left,
22 attempting to avoid a collision.  And the
23 tractor trailer continued to turn to the left

Page 19

1  and -- and then them ended up driving
2  partially underneath the trailer.
3  Q.  Did your examination of the physical evidence
4  at the scene confirm their story?
5  A.  It supported their story.
6  Q.  Supported their story.  Did you find them to
7  be credible that night?
8  A.  Yes.
9  Q.  You didn't feel like they were hiding anything
10 from you?
11 A.  No.
12 Q.  Did you also speak with the -- there were two
13 gentlemen I believe in the tractor trailer.
14 Did you speak with those men?
15 A.  Yes, I did.
16 Q.  And what did they tell you happened?
17 A.  The driver told me -- I believe his name
18 is -- I think his name is Fredrick.  And I
19 don't remember if that's his first name or
20 last name.  But he told me that he was -- was
21 looking for a particular business.  Had driven
22 all the way through Andalusia and knew he had
23 to go back to Andalusia, but he wasn't sure

Page 20

1  where the business was located at.  Had pulled
2  to the shoulder of the road, had stopped.  Had
3  then determined that he needed to go back into
4  Andalusia.  Pulled onto the -- onto the
5  right-hand lane.  Believed that he was in the
6  left-hand lane, the inside lane.  Saw the car
7  in his mirror as it was coming down the hill.
8  And -- and as it was starting up the hill.
9  And then still believing that he was in the
10 left-hand lane, began to make his left turn to
11 make a U-turn.
12 Q.  Okay.  Were you able to make a determination
13 as to which of the two vehicles was at fault
14 in the accident?
15 A.  The tractor trailer.
16     MR. RICHMOND:  Object to the form.
17 Q.  He's just protecting the Record.  Will you
18 repeat your answer, please?
19 A.  The tractor trailer.
20 Q.  And what are some of things that led you to
21 that conclusion?
22 A.  The positioning of the vehicle at the -- at
23 it's final resting point.  The vehicle -- it

5 (Pages 17 to 20)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 21

1 was clear that the vehicle, in making its
2 turn, had come from the outside lane, the
3 right-hand lane in making its turn.
4 Statements from the driver that the driver
5 believed that he was in the left-hand lane and
6 not the outside lane.
7     I even took the driver back, showed him
8 the position of his trailer. And -- and at
9 that point, the driver -- for lack of a better
10 expression, you could see the light bulb come
11 on. And he realized at that point in time
12 that when he was pulling onto the shoulder of
13 the road, pulling into the outside lane, that
14 somewhere in there, that he had lost track of
15 what lane he was in as he was preparing to set
16 up to make his U-turn.
17 Q. Did he ever admit to you that he was, in fact,
18    in the right-hand lane when he thought he was
19    in the left?
20 A. He did after I had showed him the position of
21    his trailer.
22 Q. Did you also speak with the other man in the
23    car with him -- in his tractor with him?

Page 22

1 A. Very, very briefly.
2 Q. And what did he have to say?
3 A. He said that he didn't even realize what all
4    had happened.
5 Q. Do you know who he was?
6 A. Actually, I don't -- I don't have his name.
7    Like I said, I spoke with him very briefly. I
8    know he was a trainee that was in the truck.
9 Q. How old was that person; do you remember?
10 A. I don't recall.
11 Q. Do you recall if he was white or black?
12 A. He was a white male.
13 Q. When you were describing what you do in an
14    investigation, you said you try to determine
15    the position of the vehicles before, during,
16    and after the wreck. Did I say that right?
17 A. That's correct.
18 Q. And can you briefly explain to us what you
19    believe the positioning of the vehicles were
20    before, during, and after the wreck?
21 A. Before the traffic accident occurred, I
22    believe that the driver of the tractor trailer
23    was on the right-hand side of the road. He

Page 23

1 had determined that he needed to make a
2 U-turn. And he was short of where the
3 turnaround spot would be at -- at Shreve Road
4 and the vicinity of Ireland Trailers.
5     As he pulled out onto the roadway, I
6 believe -- in my mind, I believe that he is
7 looking at where it is that he needs to turn
8 around at, and that during that time period,
9 lost what lane he was in.
10     I believe that he did do exactly what he
11 said of looking in the mirrors of his truck,
12 checking the traffic coming up behind him.
13 But still believing that he was in the inside
14 lane, it did -- I think that it dawned on him
15 at that point as to where his truck physically
16 was located at.
17     As he began to make the left-hand turn, at
18 that point, there's a blind spot to him to
19 that oncoming lane. I know this from my
20 previous experience as having driven a truck.
21 So he may not have seen that car coming up on
22 him at that time until the car was immediately
23 on the -- on his vehicle. And at that point,

Page 24

1 it's too late.
2     The driver of the car, traveling eastbound
3 in the inside lane, as he's coming up on the
4 tractor trailer, he sees that the tractor
5 trailer is beginning to make that move to the
6 left. As the vehicle begins making the move
7 to the left, the driver -- you can see from
8 the skid marks -- began stomping on the brake
9 or depressing the brake pedal in a -- in a
10 very rapid and forceful manner causing the
11 vehicle to skid, that partially due to the
12 weather because the vehicle was equipped with
13 ABS brakes. So you're getting not so much of
14 a skid as what's referred to as a yaw mark.
15 The vehicle is -- actually moves into the
16 turning lane of the -- of that particular
17 turnaround spot as it is -- and I'm going to
18 use the term "skidding" instead of "yawing"
19 because it is skidding forward.
20     And by the positioning of the wheels of
21 the vehicle, you can see that the driver is
22 still trying to make a -- make the vehicle
23 move to the left, instead of driving up

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Page 25

1　underneath the trailer.
2　　　Problem was, no -- no more forward
3　movement of the trailer, so it's more or less
4　a brick wall. And because of the speed of
5　this vehicle and the conditions of the roadway
6　that night, he ran out of terrain before he
7　could complete the maneuver.
8　　　And that -- he was that was -- they were
9　lucky that the car had slowed to the point
10　that it had slowed at, or it could have been a
11　truly catastrophic accident with the car
12　having the top of it sheared off and them
13　being underneath the trailer.
14　Q.　You mentioned some skid marks. Did you
15　measure those skid marks?
16　A.　It wasn't necessary to measure them. The
17　story from the driver and the story from
18　the -- or the statement from the driver and
19　the statement from the two people in the
20　vehicle, all -- all seemed to coincide with --
21　with each other. So there wasn't any
22　necessity to do that.
23　Q.　Okay. You also told you us earlier that you'd

Page 26

1　try to determine contributing factors to the
2　wreck. What contributing factors on the part
3　of the driver of the tractor trailer do you
4　believe influenced this wreck?
5　　　MR. RICHMOND:　Object to the form.
6　A.　The first would be that he made an improper
7　left-hand turn. He made it from the outside
8　lane instead of the inside lane. Even driving
9　a tractor trailer in that position, it's my
10　opinion that had he been in the left-hand
11　lane, he would have had ample room to make the
12　U-turn without having to come from the
13　right-hand lane.
14　　　Another contributing factor would be his
15　not seeing where the vehicle coming up behind
16　him was properly located at. I believe that
17　had he been observant and had noted that the
18　vehicle was coming up behind him on the inside
19　lane, I believe that the driver would have,
20　one, either waited for that vehicle to pass
21　before continuing his maneuver because there
22　was no traffic behind that vehicle; or he
23　would have proceeded down to the next

Page 27

1　turnaround, made his turn there, and come back
2　into Andalusia.
3　　　I also believe that the driver of the
4　tractor trailer was distracted. And I would
5　say that he was distracted in that he did not
6　realize where his vehicle was located at in
7　his mind in conjunction to where it was
8　actually located at. And I think that he was
9　distracted in that he knew that he had to turn
10　around to go back into town, and that's more
11　of what he was concentrating on.
12　　　And those are my suppositions.
13　Q.　All right. Are those suppositions based on
14　what he was telling you?
15　A.　Based on what he was telling me and based on
16　the maneuvers of the tractor.
17　Q.　Okay. You mentioned something a few minutes
18　ago that I meant to follow up on and I
19　forgot. So let me just ask you now.
20　　　Did he tell you that he had lost what lane
21　he was in?
22　A.　Those weren't the words that he used. The
23　words that he used was, he didn't realize he

Page 28

1　was in the outside lane. He thought he was in
2　the inside lane.
3　Q.　But at some point, he realized that that was
4　incorrect?
5　　　MR. RICHMOND:　Object to the form.
6　A.　That was -- he told me that he realized that
7　he wasn't where he thought he was when he
8　looked in the -- looked back over his shoulder
9　and saw the car coming up on him.
10　Q.　Did you take photographs of the scene that
11　night?
12　A.　Yes, I did.
13　Q.　And do those photographs accurately represent
14　what you saw that night?
15　A.　I would hope so.
16　Q.　It's a silly lawyer question. Sorry.
17　　　And you made a report of your
18　investigation that night, too?
19　A.　Yes, I did.
20　Q.　When did you make the report?
21　A.　That night.
22　Q.　And I'm going mark that as Plaintiffs' Exhibit
23　1.

# FREEDOM COURT REPORTING

Page 29

1      (Plaintiffs' Exhibit 1 was marked
2         for identification.)
3   Q.   Have you had a chance to review this accident
4      report?
5   A.   I did when I came in this morning.
6         MR. HAYES:  I'm going to mark it on the
7         back, Ms. Court Reporter.
8   Q.   In your judgment, did the passenger car do
9      anything to contribute to the accident?
10        MR. RICHMOND:  Object to the form.
11  A.   No.  I do not think that it contributed --
12     that its actions contributed to the accident.
13  Q.   That's all I have right now.  Thank you.
14        MR. RICHMOND:  Are you offering that?
15        MR. HAYES:  I am offering it.
16        MR. RICHMOND:  I'll object to this as to
17        the admissibility into evidence at
18        trial, but will not object to marking
19        it as an exhibit --
20        MR. HAYES:  Sure.
21        MR. RICHMOND:  -- to Officer McGowin's
22        deposition.
23        (Brief recess)

Page 30

1         EXAMINATION
2   BY MR. RICHMOND:
3   Q.   Officer McGowin, my name is Lea Richmond.  I
4      represent Fredrick Martin and Swift
5      Transportation Company, Incorporated, in this
6      lawsuit.
7         Let me start by asking you a question
8      about what's been marked as Plaintiffs'
9      Exhibit 1.  I understand that this is the
10     Alabama Uniform Traffic Accident Report that
11     you completed in connection with this
12     accident, correct?
13  A.   It's a copy.
14  Q.   Copy of the report that you completed?
15  A.   Correct.
16  Q.   Now, the information that you relied upon at
17     least, in part, to complete this report was
18     based upon conversations you had with the
19     parties or witnesses.  Would that be a true
20     statement?
21  A.   In -- possibly in part.
22  Q.   Correct.  Insofar as that not all the
23     information was based upon your observation of

Page 31

1      the physical evidence.  It's at least based in
2      part on your conversations with individuals.
3      Would that be a true statement?
4   A.   No.
5   Q.   So all of this information in this report was
6      derived from physical evidence?
7   A.   With the exception of the information of the
8      driver's information, the information
9      concerning insurance
10     companies -- what -- information that I would
11     have to receive from the person involved in it
12     in order to fill in the blank, that
13     information comes from the driver.  So in that
14     context, you would be correct.
15  Q.   Okay.  What I'm getting at is, particularly in
16     regards to speed, you had to rely entirely
17     upon what the individuals at the scene --
18  A.   No, that's not correct either.
19  Q.   Did you calculate based upon physical evidence
20     and math, physics, what have you?  Did you do
21     your own analysis to calculate the speeds?
22  A.   The way that I -- well, no, because of there
23     being rain and all and that being a yaw mark,

Page 32

1      what I was -- what I was able to determine was
2      that in my estimation, the speed that the
3      driver said that he was doing was -- did
4      coincide with where his vehicle was at, the
5      distance that the vehicle had traveled once
6      there was a yaw mark that was visible, and the
7      final resting point of the vehicle.
8   Q.   Right.  And we'll talk in more detail about
9      that.  I'm not trying to quibble with you
10     about your actual findings.  I just wanted to
11     see if you would agree with me that at least
12     some of the information relied upon this
13     report or the information that you relied upon
14     in compiling this report was given to you
15     verbally by people at the scene.
16  A.   I would say that it was contributing to my
17     reaching my conclusions.
18  Q.   And along those lines, Mr. Martin, did you
19     find him to be cooperative with you at the
20     scene?
21  A.   Yes.
22  Q.   Was he pleasant and cordial with you?
23  A.   He was very concerned.

8  (Pages 29 to 32)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 33

1  Q.  Did he extend you the respect that was due to
2      you as an officer on the scene?
3  A.  Yes, he did.  So did the other individuals.
4  Q.  He was polite?
5  A.  That is correct.
6  Q.  Did you find any evidence that there were any
7      drugs or alcohol consumed by any of the
8      parties in connection with this accident?
9  A.  No, I did not.
10 Q.  Did you find any evidence of driver fatigue on
11     the part of Mr. Martin?
12 A.  No, I did not.
13 Q.  Did you find any evidence of driver fatigue
14     relative to either of Lawsons?
15 A.  I'm sorry?
16 Q.  Mr. Scott and Steven Lawson, did you find any
17     evidence of fatigue being a contributing
18     factor on their part relative to this
19     accident?
20 A.  Well, the only one that would have been --
21 Q.  Would have been Scott?
22 A.  Yeah.  And, anyway, to answer your question,
23     no in either one.

Page 34

1  Q.  You had a CDL when you drove commercials for a
2      while, correct?
3  A.  That is correct.
4  Q.  So you're familiar with the hours of service
5      regulations, Federal Motor Carrier Safety
6      Regulations, having to keep log books as a
7      commercial motor vehicle driver?
8  A.  Yes.
9  Q.  Did you endeavor to look into whether
10     Mr. Martin had complied with that; did you
11     look at his log book?
12 A.  Yes, I did.  And -- and in my examination of
13     his book, even though I am not a DOT-certified
14     officer, I am familiar with the rules and
15     regulations of the Federal Highway
16     Safety -- Federal Highway Traffic Safety
17     Administration concerning hours of service.
18     So I did look at his book to see if he was
19     within his hours of service.
20         I will tell you that had I found him not
21     to be within his hours of service, I would
22     have notified a DOT-certified officer with the
23     Alabama State Troopers, which in this area

Page 35

1      would have been Trooper Steven Kelly, who
2      would have come out and conducted that portion
3      of the investigation.
4  Q.  And they would have done a full level-one
5      audit --
6  A.  Correct.
7  Q.  -- probably based upon the information that
8      you initially provided?
9  A.  That is correct.
10 Q.  But that wasn't the case either?
11 A.  No, it was not.
12 Q.  And you didn't -- although you're not a DOT
13     officer per se, you do have a working
14     knowledge of what the hours of service
15     regulations are?
16 A.  That is correct.
17 Q.  And they appeared to be met by Mr. Martin in
18     this instance?
19 A.  Yes.  And I tell you that his -- his log book
20     to -- that I can remember was very
21     well-maintained.
22 Q.  Did you do an inspection of the equipment --
23     Mr. Martin's equipment, the tractor and the

Page 36

1      trailer?
2  A.  No, I did not because I did not -- during the
3      course of the investigation, I did not see
4      anything that would have been a contributing
5      factor that was not in operation that I could
6      not see.
7  Q.  A more efficient question would be, during the
8      course of your investigation, did you find any
9      equipment defects relative to either vehicle
10     that contributed to the cause of the
11     collision?
12 A.  No, I did not.
13 Q.  Do you recall what time you received the
14     dispatch call to get --
15 A.  It was going to be about 1915, which would be
16     7:15 p.m.
17 Q.  Were you riding in a -- is police cruiser the
18     correct term, at that time?  Were you out on
19     patrol, or were you actually at the --
20 A.  No, I was actually at the police department.
21 Q.  And do you have a partner?
22 A.  No, I do not.
23 Q.  At the time of accident, did you have a

9 (Pages 33 to 36)

# FREEDOM COURT REPORTING

Page 37

1   partner?
2   A.  Just my video camera.
3   Q.  How long did it take you to respond to the
4       scene?
5   A.  I would say probably -- I would say probably
6       around three minutes, no -- no more than five.
7   Q.  How did you approach the scene?
8   A.  By traveling east on Highway 84 so I would
9       have been coming up on the back of the traffic
10      accident.
11  Q.  And where did you bring your vehicle to a
12      stop?
13  A.  In the -- initially, in the inside lane of the
14      Highway 84 East to block traffic, to make that
15      traffic move to the outside lane to -- outside
16      lane and the shoulder of the road at that
17      intersection to be -- for traffic to be able
18      to continue forward.
19  Q.  Were you the first law enforcement personnel
20      to arrive on the scene?
21  A.  Yes, I was.
22  Q.  Were you the only member of law enforcement to
23      work the scene?

Page 38

1   A.  I was the only officer to investigate the
2       scene, but I was not the only officer on the
3       scene.
4   Q.  Who else was on the scene?
5   A.  Actually, I -- I would say that at some point
6       in time, everyone on the shift was there.  So
7       that would have been -- I want to say Sergeant
8       Tyree.  Let me see if I can come up with the
9       date of this.  That would have been Sergeant
10      Tyree, if he was working that night.  Officer
11      Bulger.
12  Q.  B-U-L-G-E-R?
13  A.  Correct.  Seems like there were a couple of
14      deputies that eventually showed up at the
15      scene and then the rescue squad.  And seems
16      like there may have been one other officer
17      that was on the scene.
18          And the reason I'm having difficulty
19      remembering exactly who was there were a
20      couple of things.  One is, it occurring right
21      at shift change, there would have been a
22      number of officers who would have responded
23      being that it was tractor trailer verse car

Page 39

1   traffic accident.  And the other being, once I
2   arrived at the scene and I placed the first
3   officer in a position to direct traffic, at
4   that -- from that point on, I don't care who's
5   at the scene.  That's not my focus.  My focus
6   is the investigation of the accident.
7   Q.  So if I hear correctly, and in the interest of
8       time, none of these other officers would have
9       participated in any manner or assisted you in
10      your investigation of the accident?
11  A.  That would be correct.
12  Q.  They were simply there to assist with the flow
13      of traffic, things of that nature?
14  A.  Correct.  I may have had one of them, at some
15      point in time, hold the flashlight while I
16      took a picture.  But as far as them actually
17      contributing to the investigation of the
18      accident, I would say, no.
19  Q.  When you arrived on the scene, were you the
20      first person responding to the scene?  In
21      other words, were paramedics there, rescue
22      squad?
23  A.  No.  They all arrived after I arrived.

Page 40

1   Q.  How far back did you stop your police cruiser
2       from the area of impact?
3   A.  I'd say probably about 50 feet.  I'd say
4       between 25 and 50 feet.
5   Q.  Did you have your video camera running?
6   A.  Yes, I would have.
7   Q.  And was that -- did that video camera run the
8       entire time that you were on the scene?
9   A.  Actually, I believe the videotape ran out
10      sometime while the -- while I was at the
11      scene.
12  Q.  But the videotape would have been turned on
13      and running as you approached the scene, or
14      did you turn it on after you came to a stop at
15      the scene?  I'm just trying to get a time
16      frame as to when --
17  A.  I don't recall.
18  Q.  Have you reviewed that videotape?
19  A.  No, I have not.
20  Q.  Has that tape been maintained?
21  A.  Yes, it has.  All of our videotapes, when the
22      officer signs for it, there's a log that the
23      officer signs saying that -- that they have

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 41

1   been issued that specific tape. Once that
2   specific tape has ended and you insert a new
3   tape into your camera, those -- you take that
4   tape, sign it in the log, saying that it is --
5   with a date, time of when that tape ended.
6   And then that tape is then placed in an
7   evidence locker which is a -- which is
8   accessible to put a tape in but you can't take
9   it out unless you have the key. The only
10   person who has the key to that particular
11   locker is the evidence custodian for the
12   police department, who at that time period was
13   Sergeant Matt Mansell, who now works for the
14   Alabama Criminal Justice Information Center as
15   a regional investigator.
16 Q.  So if I understand you correctly in this
17   particular instance, you fully documented the
18   chain of custody with respect to that tape
19   inasmuch as you removed it, signed some
20   paperwork documenting that you were turning
21   that tape in to the custodian of evidence?
22 A.  That's correct.
23 Q.  And as far as you know, that tape should still

Page 42

1   be at the Andalusia Police Department in the
2   evidence locker.
3 A.  Well, it will be -- you'd have to speak to the
4   evidence custodian as to how it is maintained,
5   but I do know that it is maintained as
6   evidence.
7 Q.  Okay. My question --
8 A.  Every tape within the department is maintained
9   as evidence -- as controlled property.
10 Q.  You have no knowledge of it being removed,
11   taped over, or anything of that nature?
12 A.  Not to my knowledge.
13 Q.  Is that something typically parties need to
14   subpoena from the police department in order
15   to get a copy of?
16 A.  Yes, they would.
17 Q.  That will not be released voluntarily for a
18   fee or copied for a charge like an accident
19   report?
20 A.  You're -- you're -- that's an administrative
21   procedure, and I don't have anything to do
22   with administration or operations of the
23   department.

Page 43

1 Q.  Did you ever go back and review that videotape
2   when conducting your investigation of this
3   accident?
4 A.  You've already asked me that, and I said, no.
5 Q.  When you arrived on the scene, could you see
6   the occupants of -- I'll refer to it as the
7   Chevy. It was a --
8 A.  The Chevy Lumina?
9 Q.  Lumina.
10 A.  Again, it seems like one of them was out of
11   the vehicle and one of them was in the
12   vehicle. Or both of them may already -- had
13   been out of the vehicle. I -- and somewhere
14   in there, as I'm arriving at the scene -- I'm
15   not really sure, but I -- I almost want to say
16   that -- that both of them were out. But if
17   both of them were not out, it would have been
18   one was out and one was getting out.
19 Q.  How quickly did it take you to determine that
20   someone was not killed?
21 A.  When I walked up and I looked in the vehicle
22   and saw that no one was in it with their head
23   decapitated.

Page 44

1 Q.  But you don't remember who was -- if someone
2   was in the vehicle or out of the vehicle at
3   that juncture?
4 A.  Again, it seems as though they were both out.
5   But if they were -- both were not out, the
6   driver was out, and the passenger was getting
7   out. And I -- I don't actually recall which
8   it was at this time.
9 Q.  Would the passenger have been able to get out
10   from the passenger's side door?
11 A.  No.
12 Q.  So if the passenger was getting out, he would
13   have had to either had to go through the back
14   seat or through the driver's side door?
15 A.  He would have -- he went through the driver's
16   side door. That was the only door that was
17   opened.
18 Q.  Did you have to assist him out of the vehicle?
19 A.  Not that I recall.
20 Q.  So to your knowledge, both Scott Lawson and
21   Steven Lawson were able to get out of the
22   vehicle on their own power?
23 A.  That I recall.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 45

1  Q.  Did you ever have to assist them physically at
2      the scene to walk to a particular point?  What
3      I'm getting at is, were they able to ambulate
4      on their power around the accident scene?
5  A.  Yes, they were.
6  Q.  Did they appear to be physically injured?  Did
7      you see any severe laceration, blood, any
8      immediate serious injuries?
9  A.  Not what I would call a serious injury.
10 Q.  What type of injuries did you observe then?
11 A.  Seems like that were -- on the passenger, it
12     seems like he had a couple of cuts and
13     scrapes.  You could tell that both of them
14     were -- were still in what I would refer to as
15     a state of shock.
16     I think that the realization as time went
17     on and began to sank -- began to sink in that
18     they truly came within tenths of a second of
19     possibly being killed.
20     I think that as I can remember them
21     walking, that both of them complained of being
22     a little bit stiff or -- or body parts aching
23     but -- but them still, you know, being able to

Page 46

1      walk around and all.
2      And I can remember that -- them stating
3      that they did not want to go to the emergency
4      room or making some type of statements to EMS
5      into that.  And I don't remember if they told
6      me that or if a EMS told me that they did not
7      want to be transported to the hospital.
8      And I do remember one of them or someone
9      in that group speaking that they didn't have
10     any medical insurance.  Now, I don't know if
11     that was a contributing factor to them not
12     going to the emergency room.  I -- I don't --
13     I couldn't -- I couldn't answer that.  But I
14     do remember vaguely somebody making that
15     comment or hearing that comment.
16 Q.  Did you see the EMS, paramedics, however you
17     would like to describe them, arrive on the
18     scene and offer treatment --
19 A.  Yes.
20 Q.  -- to Mr. Scott Lawson and Mr. Steve Lawson?
21 A.  Yeah.  And both were looked at and I believe
22     treated at the scene.  But I don't remember
23     either one of them -- I know neither one of

Page 47

1      them were transported to the hospital by EMS.
2  Q.  And you've told me already, you've
3      investigated numerous accidents; you've been
4      on numerous accident scenes?
5  A.  Correct.
6  Q.  And would have seen paramedics or EMTs arrive
7      on those scenes and attempt to provide
8      treatment to the parties involved, true?
9  A.  Yes.
10 Q.  And is it your experience that if a party
11     refuses medical treatment, the paramedics or
12     EMTs will typically get a waiver of treatment
13     form executed by the parties?
14     MR. HAYES:  Object to the form.
15 A.  You would have to ask Advanced EMS what their
16     procedures were.
17 Q.  You've never seen that before?
18 A.  Well, I'm telling you that I don't know what
19     the procedures are.
20 Q.  Okay.  But my question to you is, have you
21     ever seen on the scene parties execute waiver
22     of treatment forms that were offered by
23     paramedics or EMTs?

Page 48

1  A.  I have seen some services over the year do
2      that.  But, again, as far as Advanced EMS, you
3      would have to ask them what their procedures
4      are.  I don't know.
5      And on this specific evening, at that
6      point in time, I was -- honestly, I wasn't
7      paying attention to them.  I was paying
8      attention to the investigation of the
9      accident.  So I couldn't tell you what they
10     did or did not do.
11 Q.  Okay.  So you didn't overhear any
12     conversations between the paramedics or EMTs
13     and Scott and Steven Lawson?
14 A.  I'm sorry?
15 Q.  You didn't overhear any conversations between
16     the paramedics and Scott and Steven Lawson?
17 A.  If -- if I did, I wasn't paying attention.
18 Q.  Is it your understanding that you have to have
19     medical insurance in order to receive a
20     transport from an accident scene to an
21     emergency room to be checked out?
22 A.  No, you don't.  You -- if you're brought into
23     the emergency room, you will be treated as an

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 49

1 emergency regardless of where it is that you
2 go to.
3 Q. What was the weather like right when you
4 pulled up on the scene; was it still raining?
5 A. Seemed like it was -- that there was a -- I
6 want to say somewhere between a rain and a
7 drizzle if I remember.
8 Q. And what was the lighting like near the
9 accident scene?
10 A. There's no light on that particular section of
11 roadway. That roadway is -- is dark in that
12 particular area. However, there is artificial
13 exterior lighting in the vicinity of Ireland
14 Trailers that does partially illuminate that
15 intersection at night.
16 Q. What distance is that business from the
17 accident scene?
18 A. Well, the property is -- is on the
19 right-of-way or just mixed with the
20 right-of-way of Highway 84 West. The building
21 itself, I would say, sits probably about 100
22 yards from -- from that intersection, maybe
23 not quite a hundred yards. And -- but, now,

Page 50

1 their lighting is throughout their exterior
2 area of their business.
3 Q. Did you note on that particular evening
4 whether or not those secondary business lights
5 were providing illumination at the scene?
6 A. There -- well, there -- again, that's
7 subjective or -- but I would say that I know
8 the lights were on. How much lighting was
9 shining on -- on that particular intersection,
10 I couldn't tell you. I can tell you that from
11 the position of the final resting point of the
12 tractor trailer, that most any light that
13 would have illuminated it would have been
14 blocked by the tractor trailer.
15 Q. Relative to whom?
16 A. Relative to the passenger car.
17 Q. The weather, I assume, was cloudy since it was
18 raining and there wasn't much moonlight that
19 evening or would you have a recollection --
20 A. There wasn't a -- there wasn't a -- there was
21 no moon illumination that was visible due to
22 cloud coverage.
23 Q. And I don't mean to re-turn ground that was

Page 51

1 already covered, but describe for me again, as
2 best you can, the position of the vehicles as
3 you walked up to the scene.
4 A. Okay. That would be accurately depicted in
5 this. This right here is the final resting
6 point of the tractor trailer. This is the
7 final resting point of the car.
8 MR. HAYES: Just for the Record, you're
9 referring to Plaintiffs' Exhibit 1.
10 A. I'll tell you that the truck was generally
11 facing to the north and that the car was
12 generally facing to the north, northeast.
13 Q. When you investigate accident scenes, do you
14 typically mark on the roadway the resting
15 position of the vehicles?
16 A. It depends upon the accident and the
17 circumstances of the accident. I don't
18 believe that I did on -- now, let me think if
19 I did or didn't. Actually, I don't recall if
20 I did that evening, and I -- I would say that
21 the reason that I didn't was because of the
22 wetness of the roadway, that there would have
23 been difficulty in getting the paint to

Page 52

1 actually stick to the roadway.
2 Q. Are there other means of marking the resting
3 position of vehicles in -- say, for instance,
4 when you're investigating a scene where you
5 have wet roads?
6 A. There are. One of the methods that I've used
7 in the past, however, in the kit that I have
8 in my patrol car, I don't have this equipment
9 in it. And it's actually become, over the
10 years, very difficult to get the pieces. But
11 I used to paint the top of a Coca-Cola bottle,
12 and then take a nail and drive through the
13 Coca-Cola bottle, and then drive that into the
14 roadway as a marker.
15 Q. Did you ever endeavor to find out what the
16 weight of the tractor was?
17 A. Yes, I did. I did that by looking on his bill
18 of lading. And if you'll -- it's in the --
19 it's marked right here that the tractor was
20 17,400 pounds. The trailer was 13,322 for a
21 gross vehicle weight of 33,722 pounds.
22 Q. Now, is that section of the report for gross
23 vehicle weight rating or for the actual weight

13 (Pages 49 to 52)

# FREEDOM COURT REPORTING

Page 53

1  of the vehicle?
2  A.  Oh, I'm sorry.  There's for the rating.
3  However, I did look on the bill of lading.
4  And one of the things that I was looking for
5  and I know that he was under was maximum gross
6  vehicle weight of 80,000.
7  Q.  Which would be the limit?
8  A.  That's correct.
9  Q.  Under the Federal Motor Carrier Safety
10  Regulations?
11  A.  That's correct.  And he was --
12  Q.  He was underneath that.
13  A.  Yes.
14  Q.  Did you ever endeavor to weigh or find out
15  what the weight of the Chevy Lumina was?
16  A.  No.  It's immaterial.
17  Q.  Why is it immaterial?
18  A.  Because it's not going to exceed 80,000
19  pounds.
20  Q.  Well, if you wanted to calculate the speed of
21  that vehicle, outside of relying upon the
22  information provided by either Scott Lawson or
23  Steven Lawson, then that would be a material

Page 54

1  factor, correct?
2  A.  It would have been if I were attempting to
3  determine what the coefficient of friction was
4  for the highway and for the motor vehicle.  I
5  also would have had to have taken samples of
6  the tires, particularly the front tires of the
7  vehicle because that is a front wheel drive
8  vehicle in order to assist in determining that
9  information.
10  I also would have had to conduct a
11  detailed inventory of the vehicle and the
12  trunk of the vehicle in determining what it
13  was that was contributing factors to any
14  excessive weight that may have been in the
15  vehicle.  However, because of the
16  circumstances of the traffic accident, I did
17  not see that there would be any need for that.
18  Another thing that I would have had
19  difficulty in determining, in determining
20  their minimum speed based on speed distance,
21  coefficient of friction, and time traveled
22  would have been reconstructing the conditions
23  of the roadway that night where it was raining

Page 55

1  and the upward slope of the roadway at the
2  time period of the traffic accident, the
3  conditions of the roadway at the particular
4  time.  I would have also had to have taken a
5  sample of the asphalt to determine the
6  chemical makeup of the asphalt at that
7  particular location.
8  Q.  And these are all things that you did not do,
9  correct?
10  A.  That is correct because this particular
11  accident I don't believe warranted having to
12  do that.
13  Q.  Did you measure the dimensions of the Chevy
14  Lumina?
15  A.  It's a Chevy Lumina.
16  Q.  You would reference materials and manuals for
17  that?
18  A.  Yeah.  Well, there wouldn't be any -- I mean,
19  it's a Chevy Lumina.  It's not like the car
20  has been set up for NASCAR or stacked or cut,
21  extended, or -- or any way that I could
22  determine modified beyond what the original
23  manufacturer specified for the vehicle.

Page 56

1  Q.  Did you measure the tractor or the trailer?
2  A.  It's -- the tractor was a standard commercial
3  tractor.  The trailer was a standard -- if I'm
4  not mistaken, I think it was a 53 foot
5  trailer.
6  Q.  Regular drive-in box trailer?
7  A.  Regular drive-in box trailer.
8  Q.  Do you know what kind of tractor it was?
9  A.  It was either a Freightliner or a Volvo if I
10  can remember.  A Volvo.
11  Q.  Have you ever driven a Volvo?
12  A.  Yes, I have.
13  Q.  What year was this particular Volvo?
14  A.  Looking at the report, it is a -- it was a
15  2007.  And, actually, I commented to him about
16  how clean the inside of the tractor was.
17  Q.  Have you ever driven an '07 Volvo tractor?
18  A.  Not an '07, no.
19  Q.  Was this a -- do you know if it was a straight
20  shift or an automatic?
21  A.  Actually, I -- I don't know.  I don't know if
22  it was an automatic or if it was a ten-speed
23  with a Roadranger or a straight ten or a super

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

Page 57

1      ten, as it would be called.
2  Q.  Did you make any efforts to determine what the
3      turning radius for that equipment was?
4  A.  No, I did not.
5  Q.  Sitting here today, do you have any knowledge
6      as to what the turning radius of that unit
7      was?
8  A.  No, I do not.  However, in my experience as
9      having pulled equipment, I know what -- what
10     area of terrain is needed to -- to make
11     that -- to make that turn -- the type of turn
12     that he was making.  And in my estimation, had
13     he been in the inside lane, he would have had
14     ample -- ample ability to make that U-turn.
15 Q.  But sitting here today --
16 A.  And that's notwithstanding him being in the
17     far inside lane which was actually a turn
18     lane.  If he had been inside that turn lane, I
19     would say that he would have had ample terrain
20     in which to safely make that turn.
21 Q.  Did you take any measurements of the roadway
22     relative to the dimensions of the median, the
23     turn lane, the left lane, the right lane?

Page 58

1  A.  No, I didn't have to do that, in that that was
2      a newly constructed roadway.  And I know that
3      the general specifications of the lane of
4      traffic, what they are, in relationship to --
5      to what was present.  And they -- they were
6      all within, what I felt to be, the guidelines
7      by the federal government.
8  Q.  How wide would those lanes be?
9  A.  I believe they are 11 feet.
10 Q.  And they appeared, at least to you, to be
11     within that?
12 A.  Correct.
13 Q.  Now, what about the turning lane; do you know
14     what that has to be?
15 A.  Same thing.  At -- at it's -- at the end of
16     that turning lane, it has to be a standard
17     lane of traffic.
18 Q.  So it would be 11-feet wide?
19 A.  Yes, it would.
20 Q.  How long would that turn lane be?
21 A.  I don't know.  It would depend on -- upon the
22     terrain of the -- of that particular location.
23     And I don't recall what it is.

Page 59

1  Q.  Do you know, sitting here today, that if that
2      tractor trailer being, as you told me earlier,
3      a drive-in box --
4  A.  Right, 54 foot.
5  Q.  And would be, what, at least another 12 feet
6      on the tractor if not more, right?
7  A.  Probably.
8  Q.  All right.  Do you know if that unit would fit
9      within the turning lane?
10 A.  No, that's what I said.
11 Q.  But that's not my question.  That's what my
12     question is, would it fit within that turning
13     lane?
14 A.  I would have to go back out and look at it.
15     But I do believe that it would -- if it did
16     not fit in it, that it would have come very
17     close to fitting in it.
18 Q.  And if it didn't fit in it and it was sitting
19     there to make a left-hand turn, then --
20 A.  It would have been in the left lane or -- or
21     part of the trailer would have been in the
22     left lane.
23 Q.  Did you ever make any measurements as to the

Page 60

1      median, the width of the median, if you're
2      looking -- I guess you'd be looking north?
3  A.  You'd be looking east to west.
4  Q.  Yes.  You're correct.  I'm sorry.  Well, if
5      you're trying to make a left-hand turn to go
6      back the way Mr. Martin intended to go, if
7      you're sitting there waiting to make that turn
8      in the median, you're looking which direction?
9  A.  Well, to take the measurements of the
10     particular median there, you would be taking
11     your measurements, as an example, from west to
12     east or east to west and then from north to
13     south or south to north.
14 Q.  Right.  But as you got -- in Plaintiffs'
15     Exhibit 1, you've got Mr. Martin coming to
16     rest, he's looking -- he would be looking
17     north, correct?
18 A.  That is correct.
19 Q.  Did you inspect any of the lights on the
20     tractor trailer?
21 A.  Yes, I did.
22 Q.  And did they all seem to be operational and
23     functioning properly to you?

15  (Pages 57 to 60)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 61

1    A.  Yes, they were.
2    Q.  Both on the tractor and the trailer?
3    A.  That's correct.  However, I don't recall if
4         the light in the center of the trailer on the
5         lower portion of it, I don't recall if that
6         light was still functioning or not or whether
7         or not it had been broken in as a result of
8         the accident.
9    Q.  Sitting here today, you don't have any
10        information that's been made available to you
11        that that light was not functioning properly?
12   A.  That's -- that's correct.
13   Q.  Okay.  And with regards to the conspicuity
14        tape on the trailer, was that all there?
15   A.  Yes, it was.
16   Q.  Am I understanding your opinions to be that
17        had Mr. Martin utilized the left-hand turning
18        lane, that a U-turn right there would have
19        been a proper maneuver?
20   A.  Say your question one more time.
21   Q.  I understand your criticism of Mr. Martin to
22        be that he started, at least in part, that --
23   A.  Okay.  To start off with, I never criticized

Page 62

1         Mr. Martin.
2    Q.  Okay.  You have no criticisms of how he
3         handled his tractor trailer on this --
4    A.  Okay.  But I -- I think we're using a word
5         possibly out of context in relationship to my
6         investigation.
7    Q.  Okay.
8    A.  Okay.
9    Q.  And that's one thing that we've got to get on
10        the same page about, so I'm referring to your
11        discussing contributing factors earlier?
12   A.  Right.
13   Q.  And in particular the beginning of the
14        left-hand maneuver from the right lane.
15   A.  Yes.
16   Q.  Which you understood to be him beginning in
17        the right-hand lane.
18   A.  Right.
19   Q.  And that being a contributing circumstance, in
20        your opinion, to this accident.
21   A.  That's correct.
22   Q.  Okay.  Now, my question to you is simply, had
23        he begun that left-hand turn in the left-hand

Page 63

1         turn lane, would that U-turn be proper?
2    A.  Yes.
3    Q.  I just want to make sure that this wasn't a
4         situation of roadway where under no
5         circumstances can you make a U-turn.
6    A.  Oh, no.  If he had been in the left -- the
7         left-turn lane, that would have been a proper
8         maneuver.
9    Q.  So I just wanted to establish under the
10        Alabama Rules of the Road that that was not a
11        per se violation by attempting to make a
12        U-turn there?
13   A.  No.
14   Q.  And what about if he had attempted to make
15        that U-turn from the left-hand lane?
16   A.  Technically, he would have been in violation
17        of the law.  However, I think that
18        jurisprudence needs to step in at some point
19        in time.  And I can tell that I, myself -- not
20        speaking for any other officers, but I,
21        myself, would not have cited him for
22        initiating that turn from the left-hand --
23        from the inside lane.

Page 64

1    Q.  Is that because tractor trailers are difficult
2         to maneuver and it may be quite possible that
3         he couldn't even fit the entire tractor
4         trailer in the left-hand turn lane?
5             MR. HAYES:  Object to the form.
6    A.  I would say that in my experience as having
7         driven a tractor trailer that it takes more
8         room, more terrain to maneuver a vehicle, to
9         make that type of a driving maneuver than it
10        would a passenger car.
11   Q.  So if Mr. Martin did, in fact, believe that he
12        was in the left-hand lane beginning his turn
13        in the left-hand lane, you would find that to
14        be a more reasonable state of mind as to the
15        maneuver he was endeavoring to make.  Would
16        that be true?
17   A.  I would say that had he initiated his turn
18        while inside the lane, the left lane, that, in
19        my opinion, it would be less critical or less
20        contributing of a circumstance than from where
21        he actually did begin his maneuver which was
22        in the right-hand lane.
23   Q.  So if we assume what you're saying is, in

16 (Pages 61 to 64)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 65

1  fact, the case, that Mr. Martin believed he
2  was in the left-hand lane when he began that
3  maneuver, then you would find less fault with
4  his decision-making process with respect to
5  the maneuver he actually made?
6  A.  I would find less fault with
7  his decision-making process of that maneuver.
8  Q.  As he understood it?
9  A.  As he understood of where he thought that he
10  was vice where he was actually was.
11  Q.  How did you determine who was driving the
12  Chevy?
13  A.  From conversation with the two people in the
14  vehicle and with the driver of the tractor
15  trailer.
16  Q.  And you understood that to whom after you had
17  spoken with folks -- parties?
18  A.  Scott Lawson I think it is.  Yes, Scott
19  Lawson.
20  Q.  And you had a conversation, I assume, with
21  both Scott and Steven about how the accident
22  sequence unfolded?
23  A.  That's correct.  That conversation was

Page 66

1  conducted independent of each other.
2  Q.  You read my mind.
3       Did you speak with Scott first or Steven
4  first?
5  A.  I actually spoke with Scott first.
6  Q.  And what do you specifically remember Scott
7  telling you?  And, again, I apologize for
8  rehashing this.  But I want to know exactly
9  what you remember each of these fellows
10  telling you individually?
11  A.  To paraphrase what both stated was, they were
12  driving to Andalusia to the -- I believe they
13  said on the way to their house.  They were in
14  the inside lane.  They were driving about
15  45'ish.  They had just gone down the hill, and
16  so they were driving about 45, 50 miles an
17  hour.  They were -- both -- the driver knew
18  that he was driving right around the speed
19  limit because that's -- at that time, it was a
20  heavily enforced traffic area because it goes
21  into a construction zone.  So he knew that.
22  He also knew that it was raining and that the
23  road was wet and that it was dark.  So he said

Page 67

1  that he knew he was driving about 45'ish.  As
2  he was coming up the hill, he could see the
3  tractor trailer in the right-hand lane, the
4  outside lane.
5  Q.  Let me stop you right there.  Did he tell you
6  or do you have any sort of judgment as to how
7  far back he was when he first saw the tractor
8  tailer?
9  A.  No, he did not.  He said that -- he said that
10  they had come out of the bottom and were
11  coming up the hill.  So I would say that he
12  was probably at the bottom of the hill,
13  traveling east on Highway 84.
14  Q.  And you're familiar with that terrain, the
15  layout of the roadway right there?
16  A.  Yes.
17  Q.  And sitting here today, since he gave you that
18  landmark or point of reference, for lack of a
19  better word, do you have a judgment as to how
20  far back he would have been from the tractor
21  trailer?
22  A.  I would say several hundred feet.
23  Q.  Okay.  Go ahead.

Page 68

1  A.  As they came up on the rear of the tractor,
2  the tractor suddenly, according to what I can
3  remember them saying, the tractor suddenly
4  turned to the left, turning right in front of
5  them, and that they slammed on the brakes and
6  were trying to turn the -- turn the car to the
7  left to -- to avoid the collision.
8  Q.  Let me ask you something.  Did they tell
9  you that they were -- did Scott tell you if he
10  was in the right-hand lane as he approached
11  the -- when he first saw the tractor trailer?
12  A.  Inside lane which would be the left lane.
13  Q.  He told you, he was in the left lane?
14  A.  The inside lane which is the left lane.  The
15  tractor trailer was in the right lane.
16  Q.  So he never told you that he was ever over in
17  the right-hand lane?
18  A.  Not that I recall.
19  Q.  Did he tell you if he braked right when he
20  first saw the tractor trailer?
21  A.  No, he did not.  He did not begin braking
22  until the tractor tailer began its maneuver to
23  the left, turning in front of him.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 69

1  Q.  Did he tell you if he perceived the tractor
2      trailer to be moving, stopped, or give you any
3      sort of judgment as to speed?
4  A.  No, he did not.
5  Q.  So he didn't specify if he believed the
6      tractor trailer was stopped or moving at that
7      point in time?
8  A.  But at the same time, he didn't tell me that
9      it was stopped or that it wasn't moving.
10  Q.  Fair enough. Did he say if his flashers were
11      on, emergency flashers?
12  A.  No, the emergency flashers were not on. As
13      they were approaching the tractor trailer, the
14      left turn signal wasn't even on.
15  Q.  And how do you know that?
16  A.  Because I had asked that question.
17  Q.  This is all information being provided by
18      occupants of the Chevy?
19  A.  By the -- yes, independent of each other.
20  Q.  You didn't endeavor to do any sort of hot or
21      cold shine analysis of any of the lights on
22      the trailer to figure out whether or not they
23      were incandescent at the time of impact, did

Page 70

1      you?
2  A.  It wasn't necessary to do that.
3  Q.  Again, because you were relying upon the
4      information provided by the parties?
5  A.  And the fact that the -- yeah, by both
6      parties -- by both parties involved in the
7      accident and -- and the fact that when I had
8      arrived there, that the lights were all
9      operational on the tractor -- tractor and
10      trailer.
11  Q.  Did the driver of the tractor ever tell you
12      that he had engaged his left-hand turn signal
13      before the impact?
14  A.  I want to say that he did tell me that -- that
15      he turned on his left turn signal as he began
16      turning to the left.
17  Q.  Assume for me that that tractor trailer is
18      moving very slowly. In fact, you have a speed
19      for that tractor trailer on your accident
20      report, correct?
21  A.  Yeah, about ten miles an hour because he had
22      just come off the shoulder of the road. Just
23      prior to the accident, had come off the

Page 71

1      shoulder of the road where he was -- I'd say
2      probably about a third way back down the hill.
3  Q.  Now, do you know why he had come off the
4      shoulder of the road?
5  A.  Yeah. I stated earlier that he stopped on the
6      shoulder of the road, trying to find out where
7      it was that he needed to go in Andalusia and
8      realized that he needed to make a U-turn.
9  Q.  Do you have any sort of judgement, if he was
10      traveling slowly in the right outside lane at
11      about ten miles an hour, how much time it
12      takes for him to get from the time he
13      initiates that left-hand maneuver from the
14      right-hand lane over to where you believe his
15      vehicle came to rest -- the tractor came to
16      rest? Do you know how much --
17  A.  I would say a couple of seconds.
18  Q.  And what's that based on?
19  A.  Based on my having operated a tractor trailer
20      in the -- in the past.
21  Q.  Would that necessitate -- if he's going about
22      ten miles an hour, would that necessitate a
23      gear shift, assuming it's a ten speed?

Page 72

1  A.  Let's see a second. He was -- in my
2      estimation, if this were a ten speed with a
3      Roadranger, I'd say that he was probably
4      in -- probably in third, maybe fourth gear.
5  Q.  And based upon your experience in driving
6      tractor trailers, at that weight that we've
7      discussed at ten miles an hour, would that
8      maneuver necessitate an upshift?
9  A.  Well, he would have had -- probably had a
10      upshift coming from -- he probably left the
11      shoulder of the road in second, probably
12      immediately went to third. And that's why I
13      say he was probably -- as he was beginning his
14      maneuver, I would say probably in third or
15      fourth gear. He may have even at that point,
16      as he began to make his maneuver, he may have
17      downshifted to second. But I would say he was
18      probably in -- in most likely in third
19      gear, could possibly have been in either
20      second, third, or fourth.
21  Q.  So that's another factor that we got,
22      increasing the passage of time or for him to
23      make that maneuver; fair enough?

18  (Pages 69 to 72)

# FREEDOM COURT REPORTING

Page 73

1   A.   Say your question again.
2   Q.   Downshifting or upshifting in order to make
3        that maneuver is going to increase the passage
4        of time needed to complete the maneuver?
5   A.   No, it's not if it's a simultaneous operation.
6   Q.   But you believe it would have taken two
7        seconds for his --
8   A.   I didn't say that. I said, it would have
9        taken a couple of seconds -- several seconds
10       to make the maneuver.
11  Q.   I'm just trying to get a judgment as to what
12       you believe the passage of time would have
13       been for him to move from the right-hand lane
14       over to where his vehicle came to rest.
15  A.   I would say several seconds.
16  Q.   Okay. Back to Mr. Lawson as he's approaching
17       from the rear, assuming that the trailer
18       lights were shining, he should have been able
19       to see those. Is that a fair statement?
20  A.   That if the lights were illuminated and that
21       he would have seen those. And he did because
22       he said that he saw the tractor trailer as he
23       was approaching it from the rear.

Page 74

1   Q.   And if that blinker was engaged, there's
2        nothing about the roadway or what you found
3        out there that evening in the course of your
4        investigation that would have obstructed his
5        vision if that blinker was engaged?
6   A.   Well, it would depend on what time in
7        relationship to where he was at that they --
8        that the turn signals were engaged and that
9        the driver actually began his maneuver. If he
10       was already on the rear of the tractor trailer
11       and the driver didn't see him and then engaged
12       his turn signal, then, no, he would not have
13       seen it.
14  Q.   And do you know, sitting here today, based on
15       any information from whatever source given to
16       you, how long before Mr. Martin started his
17       maneuver that he actually engaged his blinker?
18  A.   No, I don't.
19  Q.   And did either of the Lawson fellows tell you
20       that they saw the blinker?
21  A.   I don't recall if they did or not.
22  Q.   That would have been something you would have
23       asked though, correct?

Page 75

1   A.   I may or may not have.
2   Q.   And if Mr. Lawson -- Scott Lawson approaches
3        the tractor trailer from the rear, given the
4        weather conditions, the poor lighting that
5        night, and he first sees it several hundred
6        feet away and perceives it to be stopped or
7        moving very slowly, would you agree with me
8        that braking at that point would be a
9        reasonable maneuver?
10  A.   No.
11  Q.   So if you are driving down the wet roadway on
12       a poorly lit evening and a vehicle is several
13       hundred feet in front of you and you perceive
14       it as being stopped or moving very slowly,
15       braking is not advisable?
16  A.   No, that's not the question you asked me.
17  Q.   Well, that is my question in general terms.
18  A.   Well, is that -- is that vehicle blocking your
19       lane? Is that vehicle blocking your ability
20       to move freely through traffic?
21  Q.   Fair enough. Good point. Assume for me that
22       you're -- Mr. Lawson is in the right-hand
23       lane, right directly behind the tractor

Page 76

1        trailer.
2   A.   Well, if he's in the right-hand lane, then,
3        yes, I -- I would probably at least do an
4        initial brake, turn on left turn signal, move
5        into the left-hand land in attempt to move
6        around it -- maneuver around it.
7   Q.   It's never advisable when --
8   A.   But that's not where Mr. Lawson said that he
9        was at. Mr. Lawson said he was in the inside
10       lane.
11  Q.   I understand. I'm just going by what -- my
12       hypothetical. If Mr. Lawson says that he came
13       up on that tractor trailer and was in the
14       right-hand lane --
15  A.   And I may not brake. I may turn on my left
16       turn signal, make a safe -- safe and proper
17       lane change into the left-hand lane and
18       proceed past him in a normal rate of speed.
19  Q.   But if a vehicle --
20  A.   Because I had no indication that he would have
21       been attempting to maneuver into my lane of
22       traffic.
23  Q.   Right. But I'm just asking you in general.

19 (Pages 73 to 76)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 77

1    You've never advised people -- motorists in
2    general to simply drop over into another lane
3    and never decrease the speed and overtake a
4    vehicle that you perceive to be stopped or
5    going ten miles an hour without braking?
6    A.  I didn't say that.  And I didn't
7    say that -- and I'm not saying that I would
8    never not advise somebody to do that because
9    I've had plenty of times myself, as I'm sure
10   that you probably have, when traveling down
11   the highway that there's a slower vehicle in
12   front of you.  When you're coming up behind a
13   slower vehicle on the interstate where you're
14   traveling 70 and that vehicle may be traveling
15   50, do you brake before you make a maneuver?
16   Most people don't.  Most people make the lane
17   change and then safely proceed past of it.
18        So I think it would just depend upon the
19   totality of the situation.  But in that
20   particular instance, I don't think that I
21   would have tapped my brakes.  I think that I
22   would have made a lane change and proceeded
23   safety past the vehicle.

Page 78

1    Q.  And proceeding safely past the vehicle, in
2    your opinion, would not have included braking
3    when you perceive a vehicle moving slowly, if
4    not stopped, several hundred feet in front of
5    you?
6    A.  Are you still using the hypothetical that this
7    vehicle was stopped or this vehicle was
8    traveling slow, or are you using the
9    realization that that vehicle was traveling
10   slow?
11   Q.  Just assume for me that that vehicle was
12   traveling very slowly, as you have it marked
13   ten miles an hour.
14   A.  But, see, you keep saying traveling slowly or
15   stopped.  Which is it?  Is the vehicle
16   stopped?
17   Q.  Okay.  Stopped.
18   A.  If the vehicle is stopped in the roadway, does
19   it have its four-way flashers on?
20   Q.  No.
21   A.  Does it have anything indicating to me as I'm
22   approaching that vehicle that there's any type
23   of safety concern that I need to be worried

Page 79

1    with concerning that vehicle being stopped in
2    that lane of traffic --
3    Q.  None other than --
4    A.  -- like it's broke down or something?
5    Q.  None other than it being stopped in the
6    roadway directly in front of you.
7    A.  Then -- then, no.  I may slow down by taking
8    my foot off the accelerator.  But that doesn't
9    necessarily mean that I'm going to brake.
10   That's me.
11        You may not do that.  Matter of fact, you
12   may perceive as a danger that that vehicle is
13   there, and you may want to get past that
14   vehicle as quickly as possible.  You may speed
15   up.  So I don't know.  It would depend and be
16   based on the totality of circumstances.
17   Q.  Well, certainly, one is going to be more
18   advisable from a law enforcement standpoint
19   than another when you're advising motorists.
20   I mean, certainly, you would never advise
21   anyone to get on the accelerator when they are
22   overcoming a vehicle that they perceive to be
23   stopped in their lane of travel.

Page 80

1    A.  Again, it's going to depend upon the totality
2    of the circumstances.  I think I've answer
3    that about four times now.
4    Q.  Do you know if there was any other traffic
5    around any of these vehicles as they were --
6    as this accident sequence was unfolding?
7    A.  Both -- both drivers informed me that they did
8    not remember seeing any other traffic at the
9    time of the accident.
10   Q.  And you testified earlier, you did see some
11   skid marks that you believe were left by the
12   Chevy?
13   A.  Actually, I clarified that in stating that
14   because of the conditions of the roadway,
15   those would actually be called or determined
16   to be yaw marks.  And that difference being
17   that after the terrain was completely dry and
18   all, that those marks may or may not have
19   remained on the roadway for any -- any length
20   of time beyond that evening.
21   Q.  Did you determine that the Chevy put down
22   those yaw marks?
23   A.  Yes, I did.

20  (Pages 77 to 80)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 81

1  Q.  And how did you go about doing that?
2  A.  Because the marks, from where they began and
3     where they ended, went right to the tires --
4     the front tires of the vehicle.
5  Q.  How long were they?
6  A.  I didn't measure them but --
7  Q.  If you have a judgment.
8  A.  I would say probably about maybe 60 or so
9     feet, give or take.
10 Q.  Did they ever deviate from the left-hand lane?
11 A.  Actually, the -- it began in the left-hand
12    lane, going into the left turn lane.  And then
13    at point of impact, the tractor trailer
14    actually moved the vehicle from facing in a
15    north, northeasterly direction to more of a
16    north, northeasterly direction.  And the
17    tractor -- or excuse me -- the trailer
18    physically moved the vehicle.  And that was
19    the determination by -- where the point of
20    impact of the tires actually being rubbed
21    as -- to the left or to the north as the
22    tractor was pushing it.
23 Q.  Do you have a judgment as to how far the

Page 82

1     tractor trailer and the Chevy traveled?  I
2     guess they're traveling while they're
3     connected -- while they're together?
4  A.  You're talking about at the point of impact.
5     I would say probably about 5 feet, 5 to 7
6     feet, something like that.
7  Q.  And they would have remained connected during
8     that --
9  A.  Yes, they did.
10 Q.  -- 5 feet of postimpact travel?
11 A.  That's correct.
12 Q.  And when they came to rest, they came to rest
13    connected still?
14 A.  That is correct.  With the -- with the front
15    end of the automobile -- actually the front
16    right portion of the automobile is still
17    underneath the -- the tractor.
18 Q.  And is that how you found the vehicles to be
19    when you arrived on the scene?
20 A.  Yes.  It's -- it's actually shown here in the
21    diagram.
22 Q.  I'm just trying to find out, Officer McGowin,
23    if you have any information that indicated to

Page 83

1     you that those vehicles were moved at all from
2     the time they came to rest until you arrived
3     on the scene.
4  A.  No, they weren't.  Actually, I had the tractor
5     trailer back up and reposition itself a little
6     bit so that the wrecker could hook to the car.
7  Q.  Where in the roadway do you believe the point
8     of impact to have been?
9  A.  I would say that the point of impact took
10    place in the right-hand -- excuse me -- in the
11    left-hand lane, which would be the inside
12    lane.  And as shown here in the diagram, if I
13    could use this ink pen here, I would say that
14    this vehicle right here (indicating) as it
15    skidded up to here (indicating), right in this
16    area here (indicating), the point of impact
17    would be right in here.
18 Q.  So the point of impact would have been on
19    the --
20 A.  Somewhere in here (indicating).
21 Q.  Right about the fog line -- well, that's -- I
22    don't know if you would describe that as the
23    fog line.  It would be the outside line --

Page 84

1     we'll call it fog line to the left-hand lane
2     and the right side line from the turning
3     lane.  Right about where the left-hand lane
4     and the left-hand turn lane come together.
5     Would that be a fair assessment for that?
6  A.  I don't know.  Would you repeat the question
7     again?
8  Q.  I'm just doing it verbally for Record.
9  A.  Yea.
10 Q.  It looks to me as if you're indicating that
11    the point of impact on the roadway would have
12    been right about where the left-hand lane and
13    the left-hand turn lane come together.
14 A.  Can I make an illustration on here?
15 Q.  Absolutely.
16 A.  Okay.  I would say that your point of impact,
17    that the vehicle was something like this
18    (indicating).  Okay.  So if that answers your
19    question of where I kept telling you earlier
20    that at the point of impact that the -- that
21    the car was, at least, partially in the
22    turning area of -- of this turn lane.
23 Q.  Do you have an opinion as to whether or not

21 (Pages 81 to 84)

# FREEDOM COURT REPORTING

Page 85

1    the tractor trailer was still moving or if it
2    had come to rest waiting to make this --
3    A.  No, it was still moving.
4    Q.  And what is that based upon?
5    A.  That's based on the fact that the -- where the
6    point of impact took place at vice where the
7    final resting point of both vehicles were
8    that.
9    Q.  Were there marks or gouges in the roadway that
10   indicated to you where the initial point of
11   impact occurred on the roadway?
12   A.  Yes, there were.
13   Q.  So there were -- in addition to the yaw marks
14   that we discussed earlier, there were also
15   some gouge marks from the point of impact or
16   scrapes or something of that nature?
17   A.  Yeah.  There was evidence there of where the
18   point of impact actually occurred.
19   Q.  But the rest position was different from where
20   that point of impact was?
21   A.  That's correct.  The rest position was
22   to -- was further to the north, I would say,
23   by about 5 to 7 feet.

Page 86

1    Q.  And was there physical evidence indicating to
2    you that the vehicles had moved or scraped on
3    the roadway postimpact?  See what I'm saying?
4    The 5 feet of travel postimpact that we
5    discussed earlier?
6    A.  Right.
7    Q.  I'm curious that that is something that you're
8    surmising, or you saw physical evidence of
9    that?
10   A.  No.  It's just like I told you.  The yaw
11   marks, the skid marks went all the way up to
12   where the point of impact was, and then you
13   could see the skid marks on the roadway and
14   gouges on the roadway from where the vehicle
15   was actually moved to the left or to the north
16   about 5 to 7 feet.
17   Q.  These fellows, was there any fast food or
18   fried chicken in the car?  Had they told you
19   where they had been?
20   A.  I don't recall if there was anything in the
21   vehicle.  I can tell you, there was a lot of
22   material -- excess material in the vehicle.
23   Q.  Of what sort?

Page 87

1    A.  Just trash.
2        MR. JONES:  Can we take just a quick break
3        right here?
4        MR. RICHMOND:  Yeah.  I'm almost done.
5        MR. JONES:  Off the Record.
6        (Off-the-Record discussion)
7        MR. JONES:  Back on.
8    Q.  Let me ask you a quick question dealing with
9        Mr. Scott Lawson's approach to the scene.
10       When you first saw the rear of that tractor
11       trailer -- and you told me that in your best
12       judgment, based on where he told me he would
13       have been in the roadway when he first saw it,
14       that would have been several hundred feet
15       back.  Assume for me that he was, in fact,
16       traveling the speed that he told you he was
17       traveling, roughly 45 miles an hour.  If he
18       was in the --
19   A.  Actually, he told me he was driving along
20       about 45, 50 miles per hour.  And the evidence
21       that was at the scene is consistent with the
22       vehicle of that make and model traveling at
23       about that speed.

Page 88

1    Q.  Okay.  And he's in the right-hand lane and he
2        perceives the tractor trailer to be --
3    A.  Yeah, but he's in the left-hand lane.
4    Q.  I'm asking you to assume for me.
5    A.  Now we're back to assumptions.
6    Q.  Yes.  Assume for me he's in the right-hand
7        lane.  Okay?  And he perceives that tractor
8        trailer to be stopped.  Would he have had
9        enough distance to bring that Chevy Lumina to
10       a controlled stop?
11   A.  A person -- I'm not -- because this is your
12       assumption, so I'm going to assume, too.  A
13       person, not Mr. Lawson but any person, you.
14       Do I believe that you in this assumption may
15       have been able to bring that vehicle to a safe
16       stop?  If you had desired to.  I also believe
17       that you in your assumption, if you were
18       driving that vehicle, would have been able to
19       safely maneuver to the left-hand lane and
20       safely pass that vehicle traveling at that
21       speed in your assumption.
22   Q.  I'm just asking you if he had enough
23       distance.  I'm not asking you to comment on

22  (Pages 85 to 88)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 89

1  what would have been proper or what maneuver
2  was proper. Just if he's several hundred feet
3  back going about 43 miles an hour, if he had
4  so chosen, could he have brought that vehicle
5  to a controlled stop?
6  A. Now, you're saying at 43 miles per hour.
7  Q. Excuse me. Forty-five.
8  A. Then I would say that a reasonably prudent
9  individual operating a motor vehicle from that
10  distance, traveling at that speed and those
11  road conditions, in all likelihood would
12  probably be able to bring a vehicle, most any
13  vehicle, to a safe stop in your assumption.
14  Q. Are you aware of any witnesses to the
15  accident?
16  A. Not -- none that I can recall. If there were
17  witnesses, then they would be listed on this
18  second sheet right here (indicating). And
19  where it say "witnesses," I don't have any
20  names listed.
21  Q. What was the posted speed limit out there?
22  A. Forty-five miles per hour.
23  Q. Did you review anything --

Page 90

1  A. Actually, if I'm not mistaken I think the
2  speed limit was actually -- I'm having to
3  think now. Yeah. Forty-five miles per hour
4  because the construction signs were up. And
5  the reason I say that is because right in
6  front of Jones Veterinary Clinic is a 55 mile
7  per hour speed limit sign where you're
8  traversing from a 45 zone into a 55 zone. But
9  during that time period, that sign was covered
10  up by the department of -- Alabama Department
11  of Transportation. And there were 45 signs
12  that were posted. And I just had to remember
13  that in my mind.
14  Q. Let me ask you this, Officer McGowin. Did
15  either Scott Lawson or Steven Lawson tell you
16  they were hurt on the scene?
17  A. Both of them did not use the word "hurt," but
18  both of them did tell me that they had been
19  banged up.
20  Q. But neither one of them, to your knowledge,
21  went to the emergency room that night by
22  ambulance from the scene?
23  A. By ambulance from the scene, neither one of

Page 91

1  them went to the accident (sic). But if I
2  recall, both of them -- either one or both of
3  them did later on go to the emergency room.
4  Q. And how do you know that?
5  A. I, usually during the course of my patrolling
6  during the night, I usually stop by the
7  emergency room just to, you know --
8  Q. Did you do that in this instance?
9  A. Seems like I did.
10  Q. Do you remember what emergency room?
11  A. It would have been the Andalusia Regional
12  Hospital Emergency Room.
13  Q. And do you recall seeing Scott and Steven
14  Lawson at that emergency room the night of the
15  accident?
16  A. I couldn't tell you if I did or didn't. I --
17  I don't recall. If I did, all I would have
18  done was just made the observation that they
19  were there.
20  Q. Have you spoken with either one of those
21  gentlemen since the accident happened?
22  A. No, I haven't. As a matter of fact, I don't
23  even know them.

Page 92

1  Q. Did you review anything other than your
2  accident report in preparation for your
3  deposition today?
4  A. That's -- and, actually, I looked at it this
5  morning when I got here.
6  Q. And I'm curious if you reviewed any other
7  documents?
8  A. No.
9  Q. Okay. None of the lawyers involved in the
10  case have got you to review any documents to
11  look at anything other than your accident
12  report before your deposition?
13  A. Actually, they didn't even offer me the
14  accident report. I asked for it.
15  Q. Did either Scott or Steven Lawson seem
16  particularly agitated to you at the scene,
17  upset?
18  A. Yeah, I would say that they were upset. They
19  were upset that they were involved in an
20  accident and that they were upset that --
21  Q. And I'm sorry. That was a poor question. Did
22  one seem more so than the other to you, based
23  on your recollection of the accident?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 93

1    A.  I just recall that both of them were upset and
2        that -- actually, both of them were upset and
3        both of them were consoling each other.  And
4        then as other family members of theirs
5        arrived, there was a -- the vast majority, I
6        felt, was concern for the safety of -- of the
7        guys -- two boys being involved in the
8        accident and the fact, you know, you know,
9        don't worry about the car because the car
10       actually didn't belong to them.  It belonged
11       to someone else.  Don't worry about the car.
12       Don't worry about what all has happened.  You
13       know, the biggest thing is, you didn't get
14       killed.  You didn't get seriously injured.
15       And -- and from the looks of the accident,
16       they -- had they been traveling faster, they
17       probably would have been very seriously
18       injured or killed.
19   Q.  Did you ever hear any conversations --
20       overhear any conversations between Scott or
21       Steven Lawson and my client, Mr. Martin?
22   A.  It seems like that they -- it seems like I do
23       recall them speaking with each other.  But it

Page 94

1        wasn't anything adversarial.  It was -- seemed
2        like it was -- I want -- I kept going back to
3        Fredrick for some reason.  I guess that's
4        Mr. Martin.
5    Q.  Yes, sir.
6    A.  You know, of those, oh, man, I'm sorry.
7        Normal things that would transpire during a
8        traffic accident.  But I don't think that
9        there were any -- I don't recall there being
10       any finger pointing.  I don't think -- I don't
11       recall there being, you know, an adversarial
12       tone between any of the parties involved.  I
13       don't recall any of that.
14   Q.  Did you take any statements, written
15       statements from anyone?
16   A.  No, I did not.
17   Q.  Did you submit anything other than the
18       videotape into evidence at your department?
19   A.  Seems like I did turn in the -- either a
20       diskette or copies of the photos.
21   Q.  I'm going to send a subpoena.  I'm just
22       curious what all would have been turned in --
23   A.  Right.

Page 95

1    Q.  -- if it's a videotape or the photos.
2            Are there any other statements, notes,
3        data compilations, measurements?
4    A.  No.
5    Q.  All right.  You've taken classes in accident
6        investigation and accident reconstruction,
7        correct?
8    A.  Correct.
9    Q.  And you did that in the military?
10   A.  Yes.
11   Q.  Have you ever done that in the private sector?
12   A.  Are you talking about as a civilian law
13       enforcement officer?
14   Q.  Yes, sir.
15   A.  Yes, I have.  I've received training in
16       traffic accident investigation.
17   Q.  And that was at the Montgomery Police Academy?
18   A.  Montgomery Police Academy.  And I've also
19       received some training from Alabama State
20       Troopers over the years.
21   Q.  Have you taken any classes in advanced
22       mathematics?
23   A.  Yes, I have.

Page 96

1    Q.  And where did you take those?
2    A.  Campbell University out of -- which is out of
3        Blues Creek, North Carolina.  And I've also
4        taken some courses in mathematics from Texas
5        Central College and also from City Colleges of
6        Chicago.
7    Q.  Have you obtained an associate's degree or a
8        bachelor's degree?
9    A.  Yes, I have.
10   Q.  Which one?
11   A.  I have an associate's degree in applied
12       sciences in education.
13   Q.  And from what university or college?
14   A.  That would be from Campbell University.
15   Q.  Campbell University.
16   A.  And then I've also got my courses that I've
17       attended for my bachelor's degree in business
18       in that.  And in that, I took numerous classes
19       in accounting.  And that was also through
20       Campbell University, accounting and
21       statistics.
22   Q.  Did you have any classes in physics?
23   A.  Other than -- I took a science class in

24 (Pages 93 to 96)

# FREEDOM COURT REPORTING

Page 97

1    physics years back.
2    Q.  What about in engineering?
3    A.  The education that I've received or advanced
4        training that I've received in engineering was
5        through the Marine Corps.
6    Q.  Are you a licensed engineer?
7    A.  No.
8    Q.  Do you consider yourself a forensic engineer?
9    A.  No.
10   Q.  Have you ever compiled a scale diagram of an
11       accident scene?
12   A.  Yes, I have.
13   Q.  Have you ever used a total station?
14   A.  I'm sorry?
15   Q.  Do you know what a total station is?
16   A.  I've never used one.
17   Q.  But you're familiar with what they are?
18   A.  I -- no.
19   Q.  Have you ever shot -- well, strike that.
20       How many scaled diagrams of accidents have
21       you compiled?
22   A.  I couldn't tell you off the top of my head,
23       but it -- it would be a very low number.

Page 98

1    Q.  Have you ever done one in connection with a
2        commercial motor vehicle accident?
3    A.  No.
4    Q.  Does the Andalusia Police Department have a
5        homicide investigation team for traffic
6        accidents?
7    A.  Yes, it does.
8    Q.  And does it have a group of officers who are
9        certified to do the reconstruction for that
10       particular team?
11   A.  I don't know about reconstruction, but I would
12       surmise that as a traffic homicide
13       investigator, that they have, at the very
14       least, a general knowledge in that.  And I
15       also know that our department has the ability
16       to do a forensics diagram of a traffic
17       accident and that we have personnel that are
18       trained in using forensics to --
19   Q.  I'm sure you're familiar with the Alabama
20       State Troopers have a particular team, a
21       reconstruction team.  They have officers that
22       receive additional training and certification
23       to go out and reconstruct how the accidents --

Page 99

1    bad commercial motor vehicle DOT-reportable
2    accidents.  And I'm curious if the Andalusia
3    Police Department has a similar counterpart.
4    A.  Well, those individuals that you're speaking
5        of are those who are traffic homicide
6        investigators who, in addition to that -- and
7        in addition to the advanced training that they
8        have received, have received an even more
9        specialized training in the reconstruction of
10       a traffic accident.  Our officers -- we have
11       two that I'm -- that I'm aware of that are
12       traffic homicide investigators.  There is one
13       of those officers, Sergeant Finley, that I am
14       aware of who has received advanced training in
15       reconstruction of traffic accidents.  So, yes,
16       we do have that capability.  No.  Neither one
17       of those individuals were called to this
18       scene.
19   Q.  Have you ever compiled a report on a fatality
20       accident that was ultimately given to the
21       district attorney as potential evidence for
22       going to grand jury?
23   A.  Yes.

Page 100

1    Q.  On how many occasions have you done that?
2    A.  One that I can recall recently, recently
3        being --
4    Q.  Maybe within the last five years maybe?
5    A.  I would say within the last two to three
6        years.
7    Q.  Did that involve a commercial motor vehicle?
8    A.  No, it did not.
9    Q.  Are you certified by the Accreditation
10       Commission for Accident Reconstruction?
11   A.  No, I am not.
12   Q.  Have you ever published an article in the area
13       of accident reconstruction?
14   A.  No.
15   Q.  Have you ever spoken as a lecturer or panel
16       speaker at a seminar or conference on accident
17       reconstruction?
18   A.  No.
19   Q.  Have you ever taught a course dealing with
20       accident reconstruction?
21   A.  I have taught a course in traffic accident
22       investigation.
23   Q.  What course was that?  Was that at the police

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 101

1   academy?
2   A. No. That was in the military and several
3   years back when I was with the city back in
4   the early 1980s or mid 1980s. The officers
5   that were assigned to my shift, I taught them
6   a class on traffic accident investigation.
7   And most -- more specifically, how to fill out
8   the traffic accident investigation form that
9   -- that's used right here (indicating). And,
10  however, that is a revised edition of the form
11  that I had taught them then. And that was
12  where I had gone to Montgomery and had
13  received a class from Alabama Department of
14  Public Safety and Alabama State Troopers on
15  traffic accident investigation.
16  Q. How long ago would it have been that you
17  taught that course?
18  A. That particular class would have been probably
19  about 1985 time period.
20  Q. How do you keep abreast of most recent traffic
21  accident investigation techniques?
22  A. I subscribe to several law enforcement
23  publications which assist in that.

Page 102

1   Q. Such as?
2   A. Police One Magazine. It is -- is one way. I
3   am also a member of NCEA which is National
4   Criminal Enforcement Association. I've
5   received -- I mean, I've gone to a couple of
6   their conferences. There is a daily
7   newsletter sent out by Police One and by NCEA.
8   Q. Are any of these exclusively dealing with
9   accident reconstruction?
10  A. No.
11  Q. And do you endeavor to -- and in the legal
12  profession, we have to go to continuing legal
13  education every year. Do you endeavor to do
14  something along those lines in accident
15  investigation and reconstruction on a yearly
16  basis?
17  A. Not specifically on traffic accident
18  investigation. It will always depend on what
19  courses are available. The -- my two -- I
20  always say that the one that does relate to
21  accident investigation or any type of
22  investigation is a class on courtroom
23  preparation for testimony.

Page 103

1   Q. And that leads right into my next question.
2   Have you ever given a deposition before?
3   A. Yes.
4   Q. How many?
5   A. I couldn't tell you. I'd say more than five.
6   Q. Were those all in the Andalusia area?
7   A. No.
8   Q. Do you know what circuit court your deposition
9   has been --
10  A. I'm sorry?
11  Q. What circuit court the case pending for which
12  you gave a deposition was?
13  A. Let's see. Two of them involved court
14  martials -- three of them involved court
15  martials.
16  Q. And just to cut to the chase so we can get you
17  out of here, have you ever given a deposition
18  based upon giving testimony about your role as
19  an investigator of an accident?
20  A. No.
21  Q. You've never given a civil deposition over a
22  car wreck?
23  A. Not that I -- not that I recall.

Page 104

1   Q. Are you a member of any organizations or
2   societies that deal with accident
3   reconstruction and investigation?
4   A. No.
5   Q. Have you ever been qualified in court, state
6   or federal, to give an expert opinion?
7   A. I have when I was in the military.
8   Q. But in a civil court?
9   A. The opportunity has never arisen.
10  Q. Have you ever been retained privately by an
11  attorney to investigate an accident?
12  A. No.
13  Q. And you're not a mechanical engineer, correct?
14  A. You've already asked me that. I said, no.
15  Q. Do you know what a reasonable perception
16  reaction time is for -- strike that. Do you
17  know what the average perception reaction time
18  is for a motorist?
19  A. Depends upon the physical conditions of the
20  motorist.
21  Q. Assuming no impairment or medical problems,
22  what's the average perception reaction time?
23  A. Seems like I read several years back that's it

26 (Pages 101 to 104)

# FREEDOM COURT REPORTING

Page 105

1    about .02 seconds.
2  Q.  .02 seconds?
3  A.  Yeah, .02 second.
4  Q.  To perceive a hazard and react?
5  A.  To -- to perceive a hazard. Now, the actual
6      reaction of the driver is going to be
7      dependent upon their mental and physical
8      capabilities. But for an average person,
9      statistically, to be able to perceive the
10     danger, is about .02 second. Now, again, for
11     the brain to tell its motor functions to do
12     something and those motor functions to be
13     followed up on is going to be dependent upon
14     the mental and physical capabilities of the
15     particular subject. It's kind of like when --
16 Q.  So .02 to perceive. But I'm asking you if you
17     have any knowledge as to what the perception
18     and reaction time is, the average perception
19     and reaction time?
20 A.  Well, it's going to depend. If that stove is
21     hot and you reach up and touch it, it ain't
22     going to take you long to take your hand off
23     the eye.

Page 106

1  Q.  Well, with regards to a motorist?
2  A.  I couldn't tell you.
3  Q.  What coefficient of friction would you have
4      utilized if you were going to determine the
5      speed of the Chevy based on the yaw marks you
6      observed?
7  A.  I couldn't tell you that. I'd have to
8      actually do a -- do several skid tests on the
9      roadway in order to determine what the COF is.
10     And then there again, I would have to go back
11     and attempt to reconstruct the physical
12     conditions of the roadway that evening with it
13     being wet and the amount of water that was on
14     the roadway, the amount of water that had been
15     absorbed into the asphalt that evening, the
16     amount of water that had been used for runoff.
17     So there would have been numerous factors that
18     would have been involved in that.
19 Q.  And you have not been retained in any manner
20     in connection with this civil litigation, have
21     you?
22 A.  Been retained as in?
23 Q.  By any parties to give any sort of expert

Page 107

1      opinion eventually in trial of this matter.
2  A.  No.
3  Q.  You're simply a fact witness having --
4  A.  That's correct.
5  Q.  -- investigated the accident?
6  A.  That's correct.
7  Q.  On behalf of the City of Andalusia?
8  A.  That's correct.
9  Q.  That's all I have. Thank you.
10     MR. HAYES: Nothing further.
11        (Deposition concluded at 12:15 p.m.)
12        * * * * * * * * * *
13     FURTHER DEPONENT SAITH NOT
14     * * * * * * * * * * *

27 (Pages 105 to 107)

# FREEDOM COURT REPORTING

Page 1

```
1       IN THE UNITED STATES DISTRICT COURT
2          MIDDLE DISTRICT OF ALABAMA
3              NORTHERN DIVISION
4
5
6    SCOTT D. LAWSON and
     STEVEN LAWSON,
7
          Plaintiffs,
8
9    vs.          CASE NO. 2:07cv356-MHT
10   SWIFT TRANSPORTATION
     CO., INC., and
11   FREDRICK S. MARTIN, JR.,
12        Defendants.
13
14
          * * * * * * * * * * *
15
     DEPOSITION OF SCOTT DANIEL LAWSON, taken
16
     pursuant to stipulation and agreement before Sherry
17
     McCaskey, Certified Court Reporter and Commissioner
18
     for the State of Alabama at Large, in the Law
19
     Offices of Jones & Jones, 530 East Three Notch
20
     Street, Andalusia, Alabama, on Tuesday, October 23,
21
     2007, commencing at approximately 1:15 p.m.
22
          * * * * * * * * * * *
23
```

Page 2

```
1        APPEARANCES
2    FOR THE PLAINTIFFS:
3    JOSHUA P. HAYES, ESQUIRE
     Prince Glover Law
4    Attorneys at Law
     1 Cypress Point
5    701 Rice Mine Road N.
     Tuscaloosa, Alabama 35406
6
7    JOHN F. JONES, JR., ESQUIRE
     Jones & Jones, P.C.
     Attorneys at Law
8    530 East Three Notch Street
     Andalusia, Alabama 36420
9
     FOR THE DEFENDANTS:
10
11   LEA RICHMOND, IV, ESQUIRE
     Carr, Allison, Pugh,
     Howard, Oliver & Sisson, P.C.
12   Attorneys at Law
     100 Vestavia Parkway
13   Birmingham, Alabama 35216
14
          * * * * * * * * * * *
15
         STIPULATIONS
16
     It is hereby stipulated and agreed by and
17
     between counsel representing the parties that the
18
     deposition of Scott Daniel Lawson is taken pursuant
19
     to stipulation and agreement; that all formalities
20
     with respect to procedural requirements are waived;
21
     that said deposition may be taken before Sherry
22
     McCaskey, Certified Court Reporter and Commissioner
23
     for the State of Alabama at Large, without the
```

Page 3

```
1    formality of a commission; that objections to
2    questions other than objections as to the form of
3    the questions need not be made at this time but may
4    be reserved for a ruling at such time as the
5    deposition may be offered in evidence or used for
6    any other purpose as provided for by the Alabama
7    Rules of Civil Procedure.
8        It is further stipulated and agreed by and
9    between counsel representing the parties that the
10   filing of the deposition is hereby waived and that
11   the deposition may be introduced at the trial of
12   this case or used in any manner by either party
13   hereto provided for by the Statute.
14       It is further stipulated and agreed by and
15   between the parties hereto and the witness that the
16   signature of the witness to this Deposition is
17   hereby waived.
18       * * * * * * * * * * *
19
20
21
22
23
```

Page 4

```
1        SCOTT DANIEL LAWSON
2    The witness, having first been duly sworn
3    to speak the truth, the whole truth, and nothing but
4    the truth, testified as follows:
5            EXAMINATION
6    BY MR. RICHMOND:
7    Q.  Would you please state your full name for the
8        Record, sir?
9    A.  Scott Daniel Lawson.
10   Q.  Mr. Lawson, my name is Lea Richmond.  I
11       represent Swift Transportation Company,
12       Incorporated, and Mr. Fredrick Martin in the
13       lawsuit that you filed against that individual
14       and that company.  I'm going to ask you a
15       series of questions today.  I'm going to try
16       not to keep you that long.  A lot of my
17       questions will be about your background.  My
18       intention is not to pry around in your
19       personal life.  But you filed a personal
20       injury lawsuit against my client, so I have to
21       ask you particular questions that may seem
22       personal to you such as your wage earnings
23       history, your medical background, things of
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 5

1    that nature.
2        I'm sure your attorney has met with you
3    and told you how this would proceed.  Do me a
4    favor of always giving me a verbal response to
5    my questions.  I'm sure they told you that.
6    It will make it easier for her to keep a clean
7    transcript if you say yes or no rather than
8    uh-huhs and huh-uhs and things of that nature.
9  A.  Yes, sir.
10  Q.  And always make sure you understand my
11    question.
12  A.  Yes, sir.
13  Q.  If for any reason I'm not making any sense or
14    you think that we're on different pages, stop
15    me, back me up.  I'll ask it as many times as
16    need be.
17        Fair enough?
18  A.  Yes, sir.
19  Q.  But if you give me an answer, I'm going to
20    assume two things: one, that you understood
21    my question and; two, that you gave a response
22    under oath.
23  A.  Yes, sir.

Page 6

1  Q.  And you understand that you're under oath
2    right now; it's no different than if we were
3    down at the courthouse and you were on the
4    witness stand?
5  A.  Yes, sir.
6  Q.  Did you take any medications this morning?
7  A.  No, sir.
8  Q.  You don't currently take any medications at
9    all?
10  A.  No, sir.
11  Q.  What is your date of birth?
12  A.  6/26/75.
13  Q.  So you are 32?
14  A.  Yes, sir.
15  Q.  What's your driver's license number?
16  A.  6047611.
17  Q.  And that's an Alabama license?
18  A.  Yes, sir.
19  Q.  Have you ever held a license in any other
20    state?
21  A.  No, sir.
22  Q.  Has your license ever been suspended in the
23    past for any reason?

Page 7

1  A.  No, sir.
2  Q.  Has your license ever been revoked in the past
3    for any reason?
4  A.  No, sir.
5  Q.  Sitting here today, you believe your license
6    is current, there's no suspensions or
7    restrictions on it?
8  A.  No suspensions.
9  Q.  I'll tell you just as a courtesy, right now, a
10    check is showing that it's expired.  So you
11    might --
12  A.  It is?
13  Q.  It's expired, so you might want to go out and
14    renew it.
15  A.  All right.  I didn't even know that.
16  Q.  I'm not criticizing you.  I'm just letting you
17    know so you might want to go and get that
18    taken care of.
19        You've never had a commercial driver's
20    license, have you?
21  A.  No, sir.
22  Q.  What's your Social Security number?
23  A.  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.

Page 8

1  Q.  Are you married, Mr. Lawson?
2  A.  No, sir.
3  Q.  Have you ever been married?
4  A.  No, sir.
5  Q.  Do you have any children?
6  A.  Yes, sir.
7  Q.  How many children do you have?
8  A.  Two.
9  Q.  What are their names?
10  A.  Santana Nicole Lawson.
11  Q.  And how old is -- does she go by Nicole or
12    Santana?
13  A.  Santana.
14  Q.  How old is Santana?
15  A.  She's 12.
16  Q.  And your other child?
17  A.  Cailin.
18  Q.  With a K?
19  A.  C. Danielle Lawson.
20  Q.  And Cailin is how old?
21  A.  She should be 7.
22  Q.  And do Cailin and Santana live with you?
23  A.  No, sir.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 9

1  Q.  With whom do they live?
2  A.  Their mothers.
3  Q.  Same mother?
4  A.  Different mothers.
5  Q.  Who is Santana's mother?
6  A.  Wendy Wheeler.
7  Q.  Wendy Wheeler.
8  A.  Uh-huh (positive response).
9  Q.  And where does Wendy live?
10  A.  Opp.
11  Q.  Oliver?
12  A.  Opp.
13  Q.  Opp, Alabama.  Do you have an address; do you
14    know an address?
15  A.  I sure don't know the address.
16  Q.  What about Cailin; what's Cailin's mother's
17    name?
18  A.  Andrea Miller.
19  Q.  Andrea Miller.  And where do Cailin and Andrea
20    live?
21  A.  Slidell, Louisiana.
22  Q.  Do you have an address in Slidell?
23  A.  No, sir.

Page 10

1  Q.  Any other children?
2  A.  No, sir.  That's it.
3  Q.  Do you provide financial assistance to or on
4    behalf of Santana or Cailin?
5  A.  Both of them.
6  Q.  And is that by court order or voluntary child
7    support arrangement?
8  A.  It's a court order I believe.  We went to
9    court and had it established.
10  Q.  Have you missed any child support payments
11    since this accident?
12  A.  No, sir.  Can't afford to miss any.  You go to
13    jail for that.
14  Q.  I just want to make sure that you're not
15    claiming in this lawsuit that as a result of
16    the accident, you've fallen behind on your
17    child support payments.  That hasn't
18    happened?
19  A.  No, sir.
20  Q.  We'll move on then.
21    Tell me about your educational background.
22  A.  Straughn High School.  Left in the 11th
23    grade.  Got my GED and have been working ever

Page 11

1    since.
2  Q.  Did you ever return to the classroom setting
3    after you graduated from high school for any
4    reason, vocational classes, get
5    certification --
6  A.  I went to MacArthur for about a year for
7    welding, but I was working at Shaw.  So it
8    sort of clashed, I mean, you know, working
9    swing shift and trying to go to school.
10  Q.  When you say MacArthur, I'm not familiar with
11    that.  Is that a --
12  A.  It's a vocational school.  I mean --
13  Q.  Vocational school?
14  A.  -- trade -- trade school.
15  Q.  And did you complete those welding classes?
16  A.  No, sir.
17  Q.  How shy are you of completing them if you were
18    to go back, if you know.
19  A.  Not right offhand.  I really don't know.  It's
20    been awhile.
21  Q.  Any other particular vocational training or
22    on-the-job training, specialized skills?
23  A.  Electrical and plumbing.

Page 12

1  Q.  Okay.  Do you hold any licenses?
2  A.  No, sir.
3  Q.  When you say "electrical and plumbing," was
4    this all on-the-job training?
5  A.  Yes.
6  Q.  And you've done electrical work and plumbing
7    work in the past with subcontractors?
8  A.  I worked for my uncle, yes.  And he is a
9    plumbing and electrical contractor.  That's
10    what we do.
11  Q.  Have you ever been in the military?
12  A.  No, sir.
13  Q.  Tell me -- if you would, walk me through your
14    employment history.
15  A.  How far back you want to go?
16  Q.  Well, let's start right after you graduated
17    from high school.
18  A.  Let's see.  Worked at Tracy -- I mean, cold
19    storage.  I can't remember the name of it
20    right offhand.
21  Q.  Cold storage?
22  A.  Uh-huh (positive response).
23  Q.  Where was that located?

# FREEDOM COURT REPORTING

## Page 13

1   A.  Sun States Cold Storage.  That's the name of
2       it.  Over here on, I guess you would say, on
3       Sanford Road.
4   Q.  And what was the name of it again?
5   A.  Sun States.
6   Q.  Sun States Cold Storage?
7   A.  Yes.
8   Q.  What did you do for them?
9   A.  Stocker.  Yeah, stocker.
10  Q.  About what years would you have worked there?
11  A.  I wasn't there but about a year.
12  Q.  Was that right after you graduated from high
13      school?
14  A.  Yes, sir.
15  Q.  And what year did you graduate from high
16      school?
17  A.  Well, I didn't graduate.  I got my GED
18      in -- let's see -- '91 or 2.  I believe is --
19  Q.  So I think you would have worked for Sun
20      States Cold Storage around '91 or '92?
21  A.  Two as best I recall.
22  Q.  Did you work 40 hours a week there?
23  A.  Yes, sir.

## Page 14

1   Q.  Do you remember what they paid you?
2   A.  Not right offhand.  It's been awhile back.
3   Q.  Let's me ask you this in the interest of
4       time:  Are you claiming that this accident has
5       hindered your ability to earn a living in the
6       future?
7   A.  I mean --
8   Q.  Is there a lost wage claim?
9       MR. JONES:  There's a lost wage but not a
10      lost wage for the future.
11      MR. RICHMOND:  Not the future?  Okay.
12      That will shortcut a lot of questions.
13      So we can stipulate to that?
14      MR. JONES:  Correct.
15  Q.  After Sun States Cold Storage where did you
16      work?
17  A.  Carport Auto Parts.
18  Q.  What did you do for them?
19  A.  I was a counter man, third key.
20  Q.  Where did you work next?
21  A.  Went from there to Shaw Industries.
22  Q.  And that is here in Andalusia, is it not?
23  A.  Yes.  Yes, sir.

## Page 15

1   Q.  What did you do at Shaw Industries?
2   A.  I was a textile -- draw texture and operator
3       and instructor.
4   Q.  Where did you work next?
5   A.  Jordan Electric.
6   Q.  Is that where you were working at the time of
7       the accident?
8   A.  Yes, sir.
9   Q.  Is that where you still work as of today's
10      date?
11  A.  Yes, sir.
12  Q.  What year did you start to work at Jordan?
13  A.  I want to say '05, late '05, early -- or early
14      '05, late '04 is what I want to say.  I'm not
15      for sure.
16  Q.  We've discussed all of your employers?
17  A.  Yes, sir.
18  Q.  Looking back through all these employers, did
19      any of them ever terminate you?
20  A.  No, sir.
21  Q.  You voluntarily left all these places of
22      employment?
23  A.  Yes, sir.

## Page 16

1   Q.  Did you ever receive any formal reprimands,
2       writeups from any of these employers?
3   A.  No, sir.
4   Q.  Did you ever miss a significant amount of time
5       from work while working for these employers?
6   A.  No, sir.
7   Q.  Was there ever a gap of more than a month or
8       two in between any of these employers?
9   A.  I think it -- I'm not sure but maybe between
10      Sun States and the Carport.
11  Q.  And at most, that would have been how long?
12      I'm just trying to get a judgment if you've
13      ever been out of work for a significant period
14      of time.
15  A.  No more than maybe a month.
16  Q.  You've never filed for unemployment
17      compensation, have you?
18  A.  No, sir.  Never received unemployment.  I
19      mean -- well, let me be clear on that now.  At
20      Shaw Industries during shutdown for Christmas,
21      we -- everybody got a week of unemployment.
22      So --
23  Q.  Right.  I'm familiar with that.  You've never

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 17

1 gone to the unemployment office after having
2 been out of work for a period of time --
3 A. No.
4 Q. -- and sought benefits from the State?
5 A. No, sir.
6 Q. Okay. And you've never filed for any sort
7 Social Security benefits, have you?
8 A. No, sir.
9 Q. Have you ever filed for any type of disability
10 benefits at all?
11 A. No, sir.
12 Q. Ever filed for bankruptcy?
13 A. No, sir.
14 Q. Ever been arrested?
15 A. No, sir.
16 Q. Moving right along.
17    Tell me what you did at Jordan Electric
18 when you were hired in '05?
19 A. Started out as a helper. I mean, like pulling
20 wire, nailing up boxes. I mean --
21 Q. Were you on the construction site every day?
22 A. Yes, sir.
23 Q. I'm just trying to get if you were in the

Page 18

1 office, if you on a site?
2 A. No. Site.
3 Q. You were on site, working, on your feet all
4 day?
5 A. Uh-huh (positive response).
6 Q. How many hours a week did you work?
7 A. Forty.
8 Q. Did you ever work more than 40?
9 A. Maybe occasionally. I mean, we might get four
10 or five hours overtime. Nothing big.
11 Q. When you started out, what were they paying
12 you per hour, or maybe you were on salary?
13 How were you compensated?
14 A. By the hour. We get paid by the hour. I
15 started out at 7.50. And I want to say it was
16 for or five months later, they moved me up to
17 foreman and raised my rate to ten.
18 Q. So you got a promotion?
19 A. Yes, sir.
20 Q. At the time of this accident, what were you
21 earning per hour?
22 A. Ten.
23 Q. At the time of this accident, were you

Page 19

1 averaging about 40 hours a week?
2 A. Yes, sir.
3 Q. And were you a W-2 employee or were you 1040
4 or -- is it 1040? Do you understand what I
5 mean? Were you an employee? Where you a
6 contractor to Jordan Electric, or were you a
7 foreman employee?
8 A. I'm their foreman employee.
9 Q. Did you have any insurance benefits?
10 A. No, sir.
11 Q. At any of these jobs you've ever worked in the
12 past, have you ever had any insurance
13 benefits?
14 A. Yes, sir.
15 Q. Which ones?
16 A. Carport, Shaw.
17 Q. All right. Did you have any, what they call,
18 COBRA, any extended coverage after you left
19 Shaw?
20 A. No, sir.
21 Q. Have you ever qualified for Medicare and
22 Medicaid coverage?
23 A. No, sir.

Page 20

1 Q. At the time of this accident, you didn't have
2 any source of insurance?
3 A. No, sir.
4 Q. And is that still true as of today's date?
5 A. Yes, sir.
6 Q. Now, can you be at Jordan Electric a certain
7 amount of time and then qualify for health
8 insurance?
9 A. No, sir.
10 Q. So to your knowledge, does Jordan Electric
11 provide health insurance for any of its
12 employees?
13 A. No, sir.
14 Q. Who is your supervisor at Jordan Electric?
15 A. Frankie Barbarow is my immediate supervisor.
16 Q. How do you spell that last name?
17 A. B-A-R-B-A-R-O-W.
18 Q. Okay.
19 A. And Ronald Jordan is the owner.
20 Q. Now, are there some folks that you're
21 responsible for supervising as a foreman?
22 A. Yes, sir.
23 Q. Who would those people be?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 21

1  A.  None of them are working there right now. I
2     mean, it just depends on -- at the time who my
3     helper is.  One of them was --
4  Q.  At the time of this accident would be a good
5     reference point.
6  A.  Let's see.  I can't really remember who was
7     working with me at the time of the accident.
8     There's been so many to come and go, so I
9     really can't remember.
10 Q.  Do you know what day of the week this accident
11    happened on?
12 A.  I can't -- I can't remember what day it was.
13 Q.  Do you get any sick time at Jordan Electric?
14 A.  Yes, sir.  If I need a day off, I mean,
15    he'll --
16 Q.  And would they pay you?
17 A.  He has occasionally.  I mean --
18 Q.  By "he," you mean Ronald Jordan?
19 A.  Yes, sir.  I mean, but that doesn't happen a
20    lot, I mean, you know.
21 Q.  But there have been occasions in the past
22    where you missed time from work for health
23    reasons but he still paid you a full day's

Page 22

1     wages?
2  A.  I think there was -- I really can't remember,
3     but I think there was once he done that for
4     me.
5  Q.  How many days did you miss from work following
6     this accident?
7  A.  I really can't remember.  I want to say maybe
8     four or five, if -- if that.  But I
9     really -- really can't remember the exact
10    number.
11 Q.  Your best judgment is four or five, somewhere
12    around in there?
13 A.  Yes, sir.
14 Q.  And you would have typically worked eight
15    hours a day?
16 A.  Nine hours a day.
17 Q.  Nine hours a day.
18 A.  Nine hours a day.  They way our work schedule
19    is Monday through Thursday, nine hours a day;
20    Friday, four hours.
21 Q.  That was my next question: Was that your work
22    schedule at the time of the accident?
23 A.  Yes, sir.

Page 23

1  Q.  And did that workload or work schedule
2     continue in the months following this
3     accident?
4  A.  Yes, sir.
5  Q.  And is that still true as of today's date,
6     that work schedule?
7  A.  Yes, sir.
8  Q.  So it's not one of those situations where you
9     are wanting for work?
10 A.  No.  We've got work.
11 Q.  And at the time of this accident, you had at
12    least 40 weeks coming to you?
13 A.  Yes, sir.
14 Q.  And you appropriately filed all your state and
15    federal income taxes, right?
16 A.  Yes, sir.
17 Q.  Have you sat down and tried to figure out an
18    exact figure on how much you're claiming
19    you're out of pocket for lost wages from the
20    time you missed from work?
21 A.  I --
22 Q.  And you can give me your best judgment?
23 A.  Maybe $500.  I mean, I really don't know.  I

Page 24

1     mean, it's just a ballpark figure.  I mean --
2        MR. HAYES:  Just so we're clear, Lea, that
3        was lost wages and out of pockets
4        or --
5        MR. RICHMOND:  Just wages.
6        MR. HAYES:  I'm sorry.  I didn't hear your
7        question.
8        MR. RICHMOND:  Yeah.  I'm talking about
9        just wages.  Yeah.  And that's a good
10       point.
11 Q.  Are you out of pocket any other moneys in
12    addition to your lost wages?
13 A.  Some prescriptions like from the emergency
14    room that I had to buy, rental car.  We had
15    to -- I think it was an extra week we had to
16    rent it for.
17 Q.  You didn't own the car you were driving at the
18    time of this accident, right?
19 A.  Uh-huh (positive response).  But that was the
20    only way we had to get around.
21 Q.  And when you say "we," did you mean you and
22    your brother or you and your --
23 A.  My girlfriend.

6 (Pages 21 to 24)

# FREEDOM COURT REPORTING

Page 25

1  Q.  Your girlfriend?
2  A.  Yes.
3  Q.  Were y'all living together at the time of the
4      accident?
5  A.  Yes, sir.
6  Q.  And that vehicle, that Chevy Lumina was your
7      only means of transportation?
8  A.  Yes, sir.
9  Q.  Do you know if she has received any sort of
10     property damage settlement?
11 A.  Yes, sir.  She received property damage for
12     the car.
13 Q.  Do you know if they included the rental
14     expense in her property damage settlement?
15 A.  I don't believe they did.  I mean, I'm not
16     sure.  I don't think they did.
17 Q.  Do you have any judgment as to what figure
18     that is?
19 A.  Well, when I went up in there and rented it
20     again myself, I want to say it was $89, is
21     what I paid on that day.
22 Q.  Do you have any judgment as to how much money
23     you've expended for prescriptions?

Page 26

1  A.  Close to $63 I believe is what that was.
2  Q.  And where do you get your prescriptions
3      filled?
4  A.  Pharmacare.
5  Q.  Pharmacare?
6  A.  Yes.
7  Q.  And were you on any prescription medications
8      at the time of this accident?
9  A.  No, sir.
10 Q.  Were you on any medications at all at the time
11     of this accident?
12 A.  No, sir.
13 Q.  And Pharmacare is here in Andalusia?
14 A.  Yes, sir.
15 Q.  Do you know where it is?  I'm not real
16     familiar with the area.
17 A.  Highway 29.  That's all I know.
18 Q.  Are you out any other moneys?
19 A.  I had to reimburse my uncle some for gas, for
20     mileage for the work truck.  I mean, for round
21     trip ten miles, take me home, pick me up from
22     work, you know, take me back home.
23 Q.  He was giving you a lift?

Page 27

1  A.  Yes, sir.
2  Q.  Do you have a judgment as to what that figure
3      is?
4  A.  It's possibly -- it should be close to 200,
5      $250.  It's not a small truck.  So --
6  Q.  Any other moneys you're out of pocket?
7  A.  Not that I can think this -- at this time.
8  Q.  Are you getting any notices in the mail from
9      your doctors, physicians, health care
10     providers about overdue bills?
11 A.  No, sir.
12 Q.  You haven't been contacted by any type of
13     collection agency following this accident,
14     have you?
15 A.  No, sir.
16 Q.  You haven't fallen behind on any of your
17     household bills, have you?
18 A.  No, sir.
19 Q.  Tell me about your medical background in
20     general.  Have you suffered from any ongoing
21     medical problems in the past?  Some folks have
22     hypertension, diabetes, anything of that
23     nature?

Page 28

1  A.  No diabetes, no hypertension.
2  Q.  Do you have any medical conditions for which
3      you seek regular medical treatment?
4  A.  Not over the past few years.  I mean --
5  Q.  Do you have any restrictions on your license
6      or did you at the time of this accident?
7  A.  Glasses.  Still haven't found them.  They're
8      in that car somewhere.  So --
9  Q.  Were you wearing them at the time of the
10     accident?
11 A.  Yes.
12 Q.  Do you need them to drive?
13 A.  They help some.  I mean, I'm not blind but
14     they help.
15 Q.  Who is your family physician?
16 A.  Dr. Boynington.
17 Q.  And is he a medical doctor?
18 A.  Yes, sir.
19 Q.  And that's the person you would see if you
20     fell and broke your leg or if you had the flu?
21 A.  Yes, sir.
22 Q.  He's your regular physician.  Have you treated
23     in any hospitals in the last ten years, gone

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 29

1    to any emergency rooms?
2    A.  Sir?
3    Q.  Other than following this accident, have you
4         treated in any emergency rooms?
5    A.  I think I -- I'm not sure.  Maybe Andalusia
6         Emergency Room.
7    Q.  Do you remember what that would have been for?
8    A.  It was in the last ten years.  I mean, I may
9         have been out there for something.  But --
10   Q.  Can't remember anything specific?
11   A.  Yeah.  I can't nothing specific.
12   Q.  Being on the safe side?
13   A.  Yeah.
14   Q.  Can you tell me any other doctors that you
15        would have treated with in the last ten years
16        other than Dr. Boyington and possibly the ER
17        personnel at Andalusia?
18   A.  I don't -- I don't think that -- I'm not
19        sure.  I don't think there's any than just --
20        I think he's -- he should be about the only
21        one I would think.
22   Q.  Was he your pediatrician as well?
23   A.  No, sir.

Page 30

1    Q.  He's just your internal medicine doctor now?
2    A.  Yes, sir.
3    Q.  Have you ever been hospitalized for any
4         reason?
5    A.  No, sir.
6    Q.  Have you ever had surgery?
7    A.  No, sir.
8    Q.  Have you ever had any outpatient procedure
9         done where you are in the facility for most of
10        the day but then they let you go home?
11   A.  No, sir.
12   Q.  You're claiming you suffered some bodily
13        injuries in this accident?
14   A.  Yes, sir.
15   Q.  What body parts are you claiming were injured?
16   A.  At the emergency room, they said I had some
17        whiplash, but it was my lower back mainly.
18        That's what I went to see Dr. Boyington about,
19        was my lower back.
20   Q.  And my question to you is, I need to know each
21        and every part of your body that you're
22        claiming was injured as a result of this
23        accident.  And right now, I'm hearing your

Page 31

1    lower back.  Were there any others?
2    A.  It's in my neck, hurt for, you know, a -- it
3         was --
4    Q.  Your neck was sore after the accident?
5    A.  Yes, sir.
6    Q.  So you would include your neck?
7    A.  Yes, sir.
8    Q.  Has the pain in your neck resolved?
9    A.  Yes, sir.
10   Q.  It's gone away?
11   A.  Yes, sir.
12   Q.  Is the pain in your back still there?
13   A.  Yes, sir.  I mean, by overdoing it.  I mean,
14        it's there.  It --
15   Q.  Are you taking any prescription pain
16        medication for your back?
17   A.  I have some at the house if -- if I need it.
18        I mean, I don't like to take it.
19   Q.  Who has prescribed that for you?
20   A.  Dr. Boyington.
21   Q.  And what type of medication is that.
22   A.  Lorcet 10, Ultram.
23   Q.  Ultram?

Page 32

1    A.  Yes, sir.  And Nexapro (phonetic).  I believe
2         that's how you pronounce it.  I'm not sure.
3    Q.  Do you take any of these on a regular basis?
4    A.  No, sir.  I try not to.
5    Q.  When was the last time that you took any of
6         these medications for your lower back?
7    A.  Took some, I want to say, Sunday night.
8    Q.  And was there a particular reason why you took
9         some Sunday night?  Had you been doing an
10        activity that precipitated the need?
11   A.  I had been outside with playing with my step
12        boys so, yeah.  I mean, doing something I
13        shouldn't have been doing probably.  But --
14   Q.  Prior to that, when was the last time you took
15        medication?  Well, strike that.
16            On average, in 2007, about how often do
17        you think you take it?  One a week, once a
18        month?
19   A.  You're talking about from the wreck forward?
20   Q.  Well, from -- yes, from the wreck forward,
21        yes, sir.
22   A.  Yes, sir.
23   Q.  For some reason I thought it was '06.

8  (Pages 29 to 32)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 33

1  A.  After the wreck when I got in to see
2     Dr. Boyington and he put me on it, I took it
3     on a regular basis. I mean, it made me sick.
4     So we had to -- he lowered the dosage, but I
5     had to take it quite frequently for almost a
6     month, I mean, just to sleep. That's -- you
7     know, and he recommended after so long backing
8     down off of it, you know, because I don't like
9     to take it. I mean, so I may take it once a
10    week now if I need it.
11  Q.  About an average about once a week?
12  A.  If I need it.
13  Q.  When was the last time that you had those
14    prescriptions filled; do you remember?
15  A.  It's been awhile. He -- he filled them at the
16    office for me. This is just what I've got
17    left over. I mean --
18  Q.  Has it been more than two or three months
19    since you've gone to the pharmacy to get some
20    more of these pills?
21  A.  I did not get these pills from the pharmacy.
22  Q.  So you've never --
23  A.  They were prescribed at the doctor's office.

Page 34

1  Q.  And did he give you -- oftentimes my physician
2    sometimes does this. Did he give you samples?
3  A.  These are not samples. These are -- I'm not
4    the sure how he handled it. He filled them
5    there at office, I want to say, like --
6  Q.  So you didn't have to pay for them?
7  A.  Yes. But I'll have to -- yes.
8  Q.  When was the last time that you saw
9    Dr. Boyington for your lower back?
10  A.  I'm not sure.
11  Q.  Would it have been in the last couple of
12    months?
13  A.  I'm not sure. Maybe June, May. I'm not sure
14    when was the last time I went in to see him.
15  Q.  If I'm showing May, would that sound right to
16    you?
17  A.  That's about right.
18  Q.  Did you go the hospital on the night of this
19    accident?
20  A.  Yes, sir.
21  Q.  But I understand that you did not got to the
22    hospital by way of the ambulance?
23  A.  No, sir, I didn't go by way of ambulance.

Page 35

1  Q.  And did the ambulance personnel come out there
2    to the scene and offer you medical treatment?
3  A.  Yes, sir.
4  Q.  What all did they say to you out there at the
5    scene?
6  A.  I -- it was -- I don't remember what all was
7    said. I mean, it was kind of confusing that
8    night.
9  Q.  I can appreciate that. Did they offer you
10    treatment?
11  A.  They offered me a ride to the emergency room,
12    but that's just one more bill I can't afford.
13    So --
14  Q.  Did they encourage you to get checked out?
15  A.  Yes, sir.
16  Q.  Did they get you to sign a waiver form saying
17    that, hey, we've advised you to go to the
18    emergency room but you're declining to go?
19  A.  Yes, sir, I believe so. I mean, I went to the
20    emergency room. So --
21  Q.  Did they tell you on the scene -- they being
22    the hospital personnel -- that you would not
23    be denied treatment because you didn't have

Page 36

1    insurance? Did they have any of those type of
2    conversations with you? You don't remember
3    them saying that?
4  A.  They might have. I mean, like I said, it was
5    really confusing.
6  Q.  Do you remember, Mr. Lawson, why you changed
7    your mind and decided to go?
8  A.  I was planning on going. I was distraught. I
9    mean, and I had my -- my cousin showed up. I
10    called him. I got him to take me. I mean, we
11    was out there shortly after the accident. So
12    we --
13  Q.  Did your cousin or any other friends or
14    relatives arrive at the scene and change your
15    mind or tell you that they thought you should
16    go? Is it one of those situations, or did you
17    start hurting or --
18  A.  No, I went because I needed to go. I mean --
19  Q.  At the time of the impact, did you feel pain
20    anywhere in your body?
21  A.  I was in such shock from it. I mean, like,
22    they told me at the emergency room that
23    adrenalin was running, probably wouldn't feel

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 37

1  it until the next day. I mean, I felt it the
2  next morning.
3  Q.  Do you remember if any parts of your body
4    struck the interior of your car at impact?
5  A.  To tell you the truth, there's no telling how
6    many parts of the inside of that car I
7    struck. I mean, I really don't remember.
8  Q.  Did you have your seat belt on?
9  A.  Yes, sir.
10 Q.  Did your air bag deploy?
11 A.  Yes, sir.
12 Q.  Did you come in contact with the air bag?
13 A.  Yes, sir.
14 Q.  Were you able to get out the car on your own
15   power?
16 A.  Yes, sir.
17 Q.  Were you able to walk around and ambulate
18   around the scene -- walk around the accident
19   scene on your own power?
20 A.  Yeah, I -- yes, sir.
21 Q.  Were you able to --
22 A.  I didn't walk around a whole lot.
23 Q.  Were you bleeding when you gathered yourself

Page 38

1  right after the accident; could you tell if
2  you had any cuts or bleeding anywhere?
3  A.  I think some glass cut my knuckles and maybe
4    my arm a little bit.
5  Q.  Did you have any burns on your body from the
6    air bag, anything like that?
7  A.  I'm not sure. I don't think so.
8  Q.  Was your back hurting when you got out of the
9    car, your lower back?
10 A.  It was tender. I mean -- I mean, I felt it
11   when I stepped out of the car when I put
12   pressure down. So -- but like I said, like
13   they told me at the emergency room, adrenalin
14   was running. I didn't feel a lot of it, the
15   bumps and bruises and stuff until the next
16   morning when I got up. I mean --
17 Q.  And understand, Mr. Lawson, I'm not -- as you
18   can tell, I'm not here to criticize and say,
19   no, you weren't hurt. But what I'm trying to
20   do, this is a discovery deposition. I'm
21   trying to figure out all the parts of your
22   body that were hurt, and I'm here to learn
23   what you're claiming was injured in the

Page 39

1  accident. Now, where I will criticize you is,
2  if this case goes to trial and you're on the
3  witness stand at trial and you describe some
4  other injuries that you haven't told me about
5  today. So right now I'm hearing that your
6  lower back was tender, and maybe a day or two
7  after the accident, some other parts of your
8  body hurt. Tell me what those were.
9  A.  Just that -- my knee from slamming into the
10   dash.
11 Q.  Okay.
12 A.  It was bruised.
13 Q.  Okay.
14 A.  My foot was stove up from --
15 Q.  Was it bruised?
16 A.  No, it was just stove up a little.
17 Q.  And your neck was tender?
18 A.  And my neck was tender.
19 Q.  Right.
20 A.  It was mostly my back.
21 Q.  Mostly your lower back?
22 A.  Yes.
23 Q.  Did you take any pictures of any of your body

Page 40

1  parts, any injuries or bruises or scrapes?
2  A.  No, sir.
3  Q.  Has anyone ever taken any pictures of your
4    body parts following the accident?
5  A.  Not that I remember.
6  Q.  How long was it until your neck pain resolved
7    and got better?
8  A.  Maybe a couple of weeks.
9  Q.  Did you ever have to wear a collar or brace or
10   anything like that?
11 A.  Yes, sir.
12 Q.  How long did you wear the collar?
13 A.  A week.
14 Q.  Who gave you that collar?
15 A.  The emergency room physician.
16 Q.  Did they give you any other medical device or
17   brace or anything of that nature?
18 A.  No, sir. Just recommended that I see my
19   family doctor.
20 Q.  When you got to the emergency room that night,
21   did they do any tests on you?
22 A.  X-rays.
23 Q.  And do you remember what parts of your body

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 41

1    they x-rayed?
2    A.   Neck, back.  I believe that was all the
3    x-rays, was my neck and my back.
4    Q.   Did they tell you if those x-rays were normal?
5    A.   Don't really -- I'm trying to remember.  I
6    mean --
7    Q.   If you can't remember, that's fine.
8    A.   I can't remember.
9    Q.   Did they give you any pain medication at the
10   emergency room?
11   A.   I want to say that they did.  But, really, I
12   can't remember what they did that night.  I
13   mean, it was --
14   Q.   Do you remember how long it was after the
15   accident that you got in to see Dr. Boyington?
16   A.   I really can't remember.  I can't remember
17   right offhand.  It wasn't too long after the
18   accident I don't think, but I don't remember.
19   Q.   What did Dr. Boyington do for you; did he
20   check you out?
21   A.   Yes, sir.
22   Q.   Were you happy with the care that
23   Dr. Boyington provided you?

Page 42

1    A.   Yes, sir.
2    Q.   You're satisfied with how he's treated you and
3    responded to your complaints and needs?
4    A.   Yes, sir.
5    Q.   You don't have any criticisms of him or the
6    care he's given you, do you?
7    A.   No, sir.
8    Q.   Did he run any tests on you like x-rays or
9    MRIs or anything like that?
10   A.   I -- I'm not sure.  I don't remember if he did
11   or not.  It's been awhile back.  So, I mean,
12   I'm not sure.
13   Q.   How long was it, Mr. Lawson, until your knee
14   pain resolved?  You told me it was a couple of
15   weeks for your neck.  How long did it take
16   your knee pain to resolve?
17   A.   Maybe the same amount time, you know.  I mean,
18   I'm not sure.
19   Q.   So after about two weeks, the only part of
20   your body that continued to hurt would be your
21   lower back?
22   A.   Yes, sir.
23   Q.   And if you had to rate your pain on a scale of

Page 43

1    one to ten a couple of weeks after the
2    accident for your lower back, how would you
3    rate it?
4    A.   An eight.  It kept me up at night.  So --
5    Q.   How would you rate it, sitting here today?
6    A.   Sitting here today?  Two, three.
7    Q.   And that's without the medication?
8    A.   Yes, sir.
9    Q.   Have any of your physicians -- well, strike
10   that.  Let me ask you this first:  Have you
11   treated with anybody other than Dr. Boyington
12   for the injuries you're claiming in this
13   accident.
14   A.   Just ER.
15   Q.   The Andalusia ER?
16   A.   Uh-huh (positive response).
17   Q.   Anybody else?
18   A.   No, sir.
19   Q.   Have you ever gone to a chiropractor in the
20   past ever?
21   A.   No, sir.
22   Q.   Has Dr. Boyington ever withheld you from work
23   following this accident?

Page 44

1    A.   Following this accident, he limited me to
2    lifting nothing over 5 pounds.  Like I said, I
3    work for my uncle.  He allowed me to basically
4    do nothing.
5    Q.   But he still paid you?
6    A.   Yes.  I mean, I -- I mean, really didn't do
7    anything.  I mean --
8    Q.   Did Dr. Boyington, at some point, lift those
9    work restrictions?
10   A.   Yes.
11   Q.   Did he tell you, you could go back to work
12   full-duty?
13   A.   Yeah.  Told me to watch what I lift and how I
14   lift and, you know --
15   Q.   And sitting here today, you're back to work
16   full-duty?
17   A.   Yes.  I mean, I don't -- ask my uncle.  I
18   mean, I don't work as hard as what I used to
19   because I will pay for it.  I mean -- I mean,
20   I'm no doctor by no means, but I know what it
21   feels like after I've --
22   Q.   Put in a hard day?
23   A.   Yes.

11 (Pages 41 to 44)

# FREEDOM COURT REPORTING

Page 45

1  Q.  But you're able to satisfactorily complete all
2      of the requirements for your job? I would
3      assume if I were to depose your uncle or get
4      your employment records --
5  A.  Yes.
6  Q.  -- they're going to show that you are
7      completing all of your job requirements.
8  A.  Yes.
9  Q.  Did Dr. Boyington ever give you what's known
10     as an impairment rating? Does that ring a
11     bell? Tell you that you lost any sort of
12     percentage loss of use of your body or
13     anything like that?
14 A.  I really -- I don't remember if he did or
15     didn't. I mean --
16 Q.  He's never told you that you're a surgical
17     candidate, has he?
18 A.  No, sir.
19 Q.  Has he ever told you if he thought you were
20     going to have a permanent problem as a result
21     of this accident or if it will get
22     progressively better? Have you got any sort
23     of prognosis, I guess is a better way to ask

Page 46

1      that?
2  A.  I can't -- I can't remember. Like I said,
3      it's been -- it's been awhile. I'm trying to
4      remember. I mean, I --
5  Q.  Well, you haven't been back to see him since
6      May, right?
7  A.  No, sir.
8  Q.  And would you agree with me, it seems like
9      from what I'm hearing from you that as time
10     passes, the pain has gotten better?
11 A.  Yes. I mean, some. I mean, now like as long
12     as I don't do nothing stupid like get outside
13     and jump on the trampoline with my boys.
14 Q.  Have you had any accidents or injuries, acute
15     events with your back since this accident
16     that's caused you some back pain?
17 A.  Such as? I mean, just -- what are you talking
18     about, like another accident or --
19 Q.  Another incident that caused you some acute,
20     whoa, I hurt my back, that's a lot worse now,
21     and you'd go back in to see Dr. Boyington.
22 A.  Nothing in general, work. I mean --
23 Q.  What about changing a tire?

Page 47

1  A.  Yeah. That -- that --
2  Q.  You know what I'm about now?
3  A.  Yeah. I remember that. Yes. I mean, nothing
4      maybe more than work, something like that.
5  Q.  Did you tell Dr. Boyington after that event
6      that you felt something pop in your back --
7  A.  Yes.
8  Q.  -- while you were changing a tire?
9  A.  Yes.
10 Q.  And was that pain a lot different than the
11     pain you felt immediately following the
12     accident?
13 A.  It was the same -- same spot, same area. I
14     mean --
15 Q.  Was it more or less intense? How would you
16     describe it?
17 A.  It was about the same as the -- as the couple
18     of days or the day after the wreck. I mean,
19     because it set me back. I mean, I'm no
20     doctor. So --
21 Q.  Did you miss any work following that event?
22 A.  I think I went -- I'm not sure, but I think he
23     put me back on light duty again. I'm not

Page 48

1      sure.
2  Q.  Have you ever given a deposition like this
3      before?
4  A.  No, sir.
5  Q.  Have you ever been involved in any lawsuits?
6  A.  No, sir.
7  Q.  Have you ever given any sworn testimony in
8      court?
9  A.  No, sir.
10 Q.  Have you ever seen -- when I ask you this
11     question, I don't want to know the substance
12     of any communications that you might have with
13     this type of health care provider, but I do
14     want to know if you've treated with a
15     psychologist or psychiatrist.
16 A.  No, sir.
17 Q.  Do you smoke?
18 A.  Yes, sir.
19 Q.  Did you smoke at the time of this accident?
20 A.  Yes.
21 Q.  Do you drink alcohol?
22 A.  On occasion.
23 Q.  Had you had any alcohol to drink in the 24

12  (Pages 45 to 48)

# FREEDOM COURT REPORTING

Page 49

1    hours preceding this accident?
2  A.  No, sir.
3  Q.  Had you ingested any drugs --
4  A.  No, sir.
5  Q.  -- with 24 hours preceding this accident?
6  A.  No, sir.
7  Q.  Have you ever been involved in any other motor
8      vehicle accidents, other than the one we're
9      here about today?
10  A.  No, sir.
11  Q.  This is your only accident?
12  A.  Yes, sir.
13  Q.  Let's take a quick break and then come back
14      and talk about the accident.
15          (Brief recess)
16  Q.  Are you ready, Mr. Lawson?
17  A.  Yes, sir.
18  Q.  We're not going to be too much longer.
19          I wanted to discuss the accident with
20      you.  And what I'd look to do, Mr. Lawson, you
21      can tell me as much detail -- everything you
22      did on the day of the accident, starting with
23      where you woke up that morning, what time it

Page 50

1      was; and just sort of walk me through the
2      events of your day, as best you remember, who
3      you were with, and what you did.  And I may
4      periodically interrupt you just to get a few
5      details as you lay this all out for me.
6          But what time did you get up that morning?
7  A.  Probably around six because I think it was on
8      a weekday.  And, so, I went to work.  Got off
9      around -- I want to say five that day.  Got
10      home around five that day.
11  Q.  Let me ask you this:  Do you remember the work
12      site that you went to?
13  A.  No, sir.
14  Q.  Do you remember how you got to work; did you
15      drive the Chevy to work?
16  A.  My girlfriend dropped me off at work.
17  Q.  And you worked a full day?
18  A.  Yes, sir.
19  Q.  How did you get from work to home; do you
20      remember?
21  A.  I rode with Frankie, my cousin.  I rode with
22      him.
23  Q.  And he works with you at Jordan Electric?

Page 51

1  A.  Yes, sir.
2  Q.  And he gave you a ride home?
3  A.  Yes, sir.
4  Q.  And home, the address then was what?
5  A.  19140 Mims Lane.
6  Q.  19 --
7  A.  140 Mims, M-I-M-S, Mims Lane.
8  Q.  Is that Andalusia, Alabama?
9  A.  Yes, sir.
10  Q.  What is the zip down here?
11  A.  36420.
12  Q.  And is that your current address?
13  A.  Yes, sir.
14  Q.  And I didn't run through all this earlier, but
15      let me ask you this in the interest of time.
16      Have you ever lived anywhere outside the state
17      of Alabama?
18  A.  No, sir.
19  Q.  Have you ever lived anywhere outside of
20      Andalusia?
21  A.  No, sir.
22  Q.  So you were born and raised and lived your
23      entire life in the Andalusia area?

Page 52

1  A.  Andalusia, yes, sir.  Well, I was -- I was
2      actually born in Opp.  But, you know --
3  Q.  I'm just trying to get a feel if you ever
4      lived in any other different parts of the
5      state --
6  A.  No, sir.
7  Q.  -- in your 32 years?
8  A.  No, sir.
9  Q.  You don't remember exactly where the work site
10      was?
11  A.  No, sir.
12  Q.  Do you punch in and out or keep any sort of
13      time cards at work?
14  A.  We keep time cards.
15  Q.  Did you write down the time in and time out?
16  A.  Write down the time in, time out.
17  Q.  Keep track of the hours that you actually
18      work?
19  A.  Yes, sir.
20  Q.  And you would have done that on that day?
21  A.  Yes, sir.
22  Q.  Do you remember if you and Frankie made any
23      stops anywhere from the time you left work

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 53

1  until the time you got home?
2  A.  No stops.  Straight from the shop to my house.
3  Q.  And how would you go from the shop?  Describe
4     the route that you go from the shop to your
5     house?
6  A.  At the time, the shop was on Academy Drive.
7     Leave Academy Drive, onto Sanford Road, take
8     Highway 84.  From 84 straight till you get to
9     Leon Griggs Road, turn on Cotton House to my
10    driveway.
11 Q.  About how long a drive is that, assuming
12    normal weather, normal traffic conditions?
13 A.  Ten minutes, if that.
14 Q.  So by virtue of living in this area and I
15    assume by traveling 84 to and from work,
16    you're familiar with the stretch of highway
17    where this accident happened?
18 A.  Yes, sir.
19 Q.  You drive over it all the time?
20 A.  Yes, sir.
21 Q.  Did you have a cell phone at the time of this
22    accident?
23 A.  Yes, sir.

Page 54

1  Q.  What was that number?
2  A.  804-8527.
3  Q.  Is that area code --
4  A.  334.
5  Q.  334.  Now, who's the service with or who was
6     it with?
7  A.  Alltel.
8  Q.  And that's issued to you by Jordan Electric,
9     or is it in your name?
10 A.  It was mine, my name.
11 Q.  And do you still have the same number?
12 A.  No, sir.
13 Q.  Okay.  What's your current one?
14 A.  Current phone number?
15 Q.  Yes, cell phone.
16 A.  I don't have a cell.  I've got a LINC now.
17    So --
18 Q.  You've got a LINC now.  But this would have
19    been your cell phone and service provider
20    billed in your name at the time of the
21    accident?
22 A.  Yes.
23 Q.  Were you on your phone when the accident

Page 55

1  happened?
2  A.  No, sir.  The phone was laying on the console,
3     charging.  I remember that.
4  Q.  Do you remember about what time Frankie
5     dropped you off at home?  Or if he dropped you
6     off, he may have come inside with you.
7  A.  He dropped me off between 4:30 and 5:30.  I'm
8     not sure.
9  Q.  Was it dark out yet?
10 A.  No, sir, it wasn't dark out.
11 Q.  What was the weather like?
12 A.  I'm not sure.  I believe everything was
13    overcast about like it is now.
14 Q.  Was anybody home when you got home?
15 A.  Yes, sir.
16 Q.  Who was there?
17 A.  My girlfriend was there and her kids.
18 Q.  And what is her name?
19 A.  Melissa Morrow.
20 Q.  Melissa Morrow.  And you're still with
21    Melissa?
22 A.  Yes, sir.
23 Q.  And how many children does she have?

Page 56

1  A.  Three.
2  Q.  And what are their names?
3  A.  Dillon Morrow, Tyler Morrow, and Melanie
4     Morrow.
5  Q.  Melanie?
6  A.  Uh-huh (positive response).
7  Q.  And they all still live with you?
8  A.  Yes.
9  Q.  Are they financially dependent upon you?
10 A.  Yes.
11 Q.  Does anybody else live at that address with
12    you right now?
13 A.  That's it.
14 Q.  Did anybody else live at that address at the
15    time of the accident?
16 A.  Just us.
17 Q.  Okay.  So when you got home after work that
18    day, was Melissa and your three step children?
19 A.  Yes.
20 Q.  Then what did you do when you got home?
21 A.  Decided to go to town to get something to eat
22    because she didn't feel like cooking that
23    night.  Went by my mom's where my brother was

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

Page 57

1      at.
2    Q.  Where was your mother?
3    A.  On Loop Road.
4    Q.  What's the address?
5    A.  21123.
6    Q.  21123 Loop Road?
7    A.  Andalusia, Alabama, which is right across the
8         highway from where I live.
9    Q.  Just a matter of minutes?
10   A.  Yeah.
11   Q.  Walking distance if need be?
12   A.  Well, it's about four miles.  So --
13   Q.  And did your brother live at this address at
14        the time of this accident?
15   A.  Yes, sir, I believe so.  I'm not sure.
16   Q.  Did you call your brother before you went over
17        there?
18   A.  I can't remember.
19   Q.  Do you remember if you called anyone before
20        you went over there?
21   A.  I can't remember.
22   Q.  You drove the Chevy over to pick up your
23        brother I assume?

Page 58

1    A.  Yes, sir.
2    Q.  Where did y'all go from there?
3    A.  We went from there.  I believe we stopped by
4         Friendly's Gas Station.
5    Q.  Friendly's Gas Station?
6    A.  Yes.
7    Q.  Where is that located?
8    A.  On Highway 84.
9    Q.  And did you stop for gas?
10   A.  I believe I stopped and got me a pack of
11        cigarettes and a drink, and I think he might
12        have got the same.  I'm not sure.  From there
13        we went to Crispy Chick and bought the food.
14   Q.  Where is Crispy Chick?
15   A.  What is this, Three Notch?  East Three Notch
16        is where it's located.
17   Q.  It's called Crispy Chick, or is it Church's
18        Chicken?
19   A.  It might be Church's.  Now might be Church's.
20   Q.  Would it be that one that's down the road
21        here?
22   A.  Yes, that's it.
23   Q.  All right.  And you would have taken 84 almost

Page 59

1       all the way up to the Church's Chicken?
2    A.  Yes.
3    Q.  And didn't make any other stops?
4    A.  No.
5    Q.  Did you pay cash for the chicken?
6    A.  Just -- I believe so.
7    Q.  All right.  Do you know about what time you
8         would have left Church's Chicken or Crispy
9         Chick?
10   A.  I can't remember what time it was.
11   Q.  Did you make any stops from the time you left
12        Church's Chicken up until the time of the
13        accident?
14   A.  No, sir.
15   Q.  Did you go into Church's Chicken or did you go
16        through the drive-thru?
17   A.  I went inside.
18   Q.  He waited in the car?
19   A.  Yes, sir, I believe so.
20   Q.  Do you remember what you bought, chicken for
21        your family?
22   A.  Yeah.  As a matter of fact, I know what I
23        bought because it was rotting inside the car

Page 60

1       when I got it back.  Four CODs and a chicken
2        strip basket.
3    Q.  Would you have made any of these purchases
4         with a debit card or a credit card?
5    A.  I don't think so.  I don't remember.  I
6         believe it was cash.
7    Q.  You think you paid cash both at the gas
8         station and at the restaurant?
9    A.  Yes, sir.
10   Q.  You're fairly certain?
11   A.  Pretty sure it was cash.  Pretty sure.
12   Q.  Did you have charge cards or debit cards at
13        the time of this accident?
14   A.  I don't think so.
15   Q.  Did you make any phone calls from the time you
16        left the Crispy Chick up until the time of the
17        accident?
18   A.  I don't believe I did.  I don't think so.
19   Q.  Tell me in your words what happened as you
20        left Church's Chicken?
21   A.  We left Church's.
22   Q.  Was it raining?
23   A.  It was misting, overcast, nasty, getting dark.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 61

1  Q.  About what time, in your best judgment?
2  A.  Seven.
3  Q.  Go ahead.  I'm sorry.
4  A.  Had to be around close to seven.  I left.  I
5      crossed the bridge, started up the hill on 84.
6  Q.  What lane were you in?
7  A.  I was in the right lane.
8  Q.  Did you stay in the right lane from the time
9      you got on 84 up until the time of the
10     accident?
11 A.  I -- I'm not certain, but I believe so.
12 Q.  What was the traffic like?
13 A.  It was light traffic I believe.
14 Q.  I'm sorry.  Go ahead.
15 A.  Started up the hill.  Seen the truck.
16     Signaled to change lanes.  Doing maybe 43, 44
17     miles an hour.  Started up the hill.  And he
18     turned across the road in front of us.
19     Nowhere to go.
20 Q.  And you aren't on the cell phone?
21 A.  No, sir.
22 Q.  Did you have a window down?
23 A.  No, sir.

Page 62

1  Q.  Do you remember if you were smoking?
2  A.  I don't remember if I was smoking, but I don't
3      think we were because it was raining, misting.
4  Q.  Were you talking with your brother about
5      anything particular that you remember?
6  A.  Not anything I remember, no.
7  Q.  You weren't in a hurry for any reason?
8  A.  No, sir.
9  Q.  You think you were going somewhere between 40
10     and 45 miles an hour?
11 A.  Yes, sir.
12 Q.  Do you know what the speed limit is out there?
13 A.  Forty-five at that time.
14 Q.  Now, if I understand you right, when you first
15     saw that tractor that you eventually collided
16     with, you were in the right-hand lane?
17 A.  Yes, sir.
18 Q.  Do you have a judgment as to how far back you
19     were from the tractor trailer when you first
20     saw it?
21 A.  Not right offhand.
22 Q.  Could you see the lights on the trailer?
23 A.  I don't -- I don't remember if he had lights

Page 63

1      on or if it was the reflectors that the
2      headlights -- I really don't remember.
3  Q.  Was there any traffic between you and the
4      tractor trailer when you first saw it?
5  A.  No, sir.
6  Q.  In either lane?
7  A.  No, sir.
8  Q.  Could you see any other cars in your field of
9      vision, other than the tractor trailer when
10     you first saw it?
11 A.  No, sir.
12 Q.  And you don't have any judgment in terms of
13     feet, do you, of how far away it was?
14 A.  No, sir.
15 Q.  What about yards?  Are you a football fan?
16 A.  Oh, yeah.
17 Q.  Could you give me any sort of judgment?
18 A.  I --
19 Q.  Was it closer to a hundred yards away or 50
20     yards away?
21 A.  It was closer to a hundred yards away.  I
22     mean, maybe a little farther.  I think --
23     don't really know.  I mean, I can't remember.

Page 64

1  Q.  Closer to a hundred, maybe a little further.
2      That's fair enough.
3  A.  Maybe.
4  Q.  What did you do as soon as you saw it?
5  A.  I signaled, got into --
6  Q.  I'm sorry.  Here's one of the things, and I
7      interrupt.  I've got another question for
8      you:  How much time passed from when you first
9      saw that tractor trailer when you signaled;
10     was it immediate or just a few seconds?
11 A.  It was -- it was immediate because I noticed
12     he wasn't moving.  And like I said, it was
13     dark, misting rain.  Couldn't tell -- kind of
14     noticed he was in the lane.  Didn't look like
15     he was moving.
16 Q.  He seemed to be stopped to you in the --
17 A.  Yes.
18 Q.  -- right-hand lane?
19 A.  Yes.  I'm mean, I'm not for sure on that.
20     But, I mean, if he was moving, he wasn't
21     moving over one mile an hour.  I mean, but,
22     you know, he seemed stopped to me.
23 Q.  And then you engaged your signal?

16  (Pages 61 to 64)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 65

1   A.  Yes, sir.
2   Q.  Did you check in your mirrors before you
3       dropped over in the left lane?
4   A.  Yes, sir.
5   Q.  And did you jerk it over in the left lane, or
6       was it just a slow, gradual -- just to ease
7       over?
8   A.  Slow, gradual move over.
9   Q.  And once you got into the left lane, how far
10      back from that tractor trailer do you think
11      you were?  Were you closer to 50 yards now or
12      closer than that?
13  A.  Fifty yards, maybe a little closer.
14  Q.  And during this entire time, was that tractor
15      trailer doing anything?  Did you see any
16      signals?
17  A.  No, sir, no signals.  The best I can remember,
18      he started moving across the highway when we
19      were right beside him, I do believe.
20  Q.  And that's my next question, is that he
21      started -- at some point, he made a left-hand
22      maneuver?
23  A.  Yes, sir.

Page 66

1   Q.  Were you still behind the trailer when he
2       started to make that maneuver?
3   A.  No, sir.
4   Q.  So you think you were -- the front end of your
5       car was at least -- was it even with the
6       tandems on the trailer.  Were you halfway up
7       the trailer?  How far up do you think you
8       were?
9   A.  Had to be at least half way -- quarter, half
10      way.  I mean --
11  Q.  You never saw the signal?
12  A.  Never saw a signal.
13  Q.  How would you describe that maneuver; did he
14      gradually come over in front of you?
15  A.  No.  He gunned it.
16  Q.  He gunned it?
17  A.  Yes, sir.
18  Q.  And how long did -- did his tractor get all
19      the way in front of you, like past you?
20  A.  The tractor was past me.  I collided with the
21      trailer.
22  Q.  With the trailer.  At what point on that
23      trailer did you hit?

Page 67

1   A.  I hit probably three-quarters of the way, if
2       that, is where we went under the trailer.
3       When he stopped, we was, I want to say, almost
4       at the rear tires, from the best I remember.
5       I mean --
6   Q.  Do you remember where you were, Mr. Lawson, on
7       the roadway when you came in contact with that
8       trailer?
9   A.  Almost at the -- I'm not really sure.  It
10      happened so quick.  I mean --
11  Q.  Did you hear your brother say anything?
12  A.  Yeah.  Turn.
13  Q.  As that tractor trailer made its left-hand
14      turn in front of you, did you do anything?
15  A.  I turned the wheel and hit the brakes.
16  Q.  To the wheel to the left?
17  A.  And hit the brakes.
18  Q.  And did you lock up?
19  A.  Yes, I did.
20  Q.  And you skidded?
21  A.  Slid.
22  Q.  And then you made the impact?
23  A.  Yes.

Page 68

1   Q.  Did your vehicle move after impact?
2   A.  Just with him dragging us underneath the
3       trailer.
4   Q.  Do you have any judgment as to how far?
5   A.  Probably 40 feet, 30 feet, 40 feet.  He showed
6       no signs of -- I'm not sure if he even knew we
7       were under there at that point.  I mean --
8   Q.  What part of your vehicle contacted the
9       trailer?
10  A.  Passenger side, front quarter panel, passenger
11      side door, roof line of the passenger side,
12      the rear passenger door, the hood, front
13      bumper, front windshield.
14  Q.  And your girlfriend has been compensated for
15      the loss of the property to her vehicle?
16  A.  Yes, sir.
17  Q.  And your first reaction when you saw that
18      tractor trailer -- and you think you were
19      about at least halfway up alongside the
20      trailer when it started to turn -- was to
21      brake and steer left, right?
22  A.  Yes.
23  Q.  And if I'm hearing your correctly, from the

17 (Pages 65 to 68)

# FREEDOM COURT REPORTING

Page 69

1  time you perceived of a hundred yards away up
2  until the time that it started the left-hand
3  time, you never hit your bakes?
4  A. No, sir.
5  Q. Was there any traffic behind you?
6  A. No, sir, not that I remember.
7  Q. When you first saw that tractor
8  trailer-- well, strike that. I think you
9  answered that already.
10     Tell me what you remember as soon as
11  everything came to rest.
12  A. As soon as everything stopped?
13  Q. Yes.
14  A. Is that -- I wanted to get out of the car.
15  I'm underneath the --
16  Q. Did you say anything to your brother?
17  A. I asked him if he was okay.
18  Q. Did he respond?
19  A. Yes. Said he was fine.
20  Q. Said he was --
21  A. Said he thought he was okay.
22  Q. All right.
23  A. And then when I asked him was he okay, I was

Page 70

1  wondering if he was dead. Just trying to get
2  out of the car, see what the damage was.
3  Q. And you were able to get out, I believe we
4  talked about earlier.
5     (Brief interruption)
6  Q. I apologize.
7     You got out of the passenger's side?
8  Excuse me. Strike that. You got out of the
9  driver's side door?
10  A. Yes.
11  Q. And did you help your brother get out?
12  A. Yes.
13  Q. And was he able to walk around the scene?
14  A. Yes.
15  Q. Did he appear to be seriously injured, any
16  bleeding, things of that nature?
17  A. You could tell his hand -- hand was broke.
18  Q. His hand was broken?
19  A. Yeah.
20  Q. Any other injuries that you noted with regard
21  to your brother?
22  A. I believe his -- his nose was cut. I'm not
23  sure of anything else. I really

Page 71

1  don't remember.
2  Q. Who was the first person that arrived on the
3  scene; was it the officer?
4  A. As far as?
5  Q. People responding to the scene.
6  A. Officer McGowin was first on the scene.
7  Q. Did you know Officer McGowin before this
8  accident?
9  A. No, sir.
10  Q. Did your brother?
11  A. No, sir.
12  Q. Did you speak with the driver of the tractor
13  trailer before Officer McGowin arrived?
14  A. No, sir. I mean, he asked me, you know, where
15  did we come from and if we was okay. And that
16  was about it.
17  Q. What did you tell him?
18  A. I said I think -- I really don't remember. I
19  think I said, I'm fine. I mean, I was upset
20  about my car. I remember that.
21  Q. Did you hear any conversations between your
22  brother and the driver of the tractor trailer?
23  A. I don't think he ever said anything to him.

Page 72

1  Q. Did you have any sort of confrontation with
2  the driver of the tractor trailer? Did y'all
3  exchange any heated words?
4  A. No, sir.
5  Q. Was the driver of the tractor trailer nice to
6  you?
7  A. We didn't really exchange any words I don't
8  think.
9  Q. Was the first thing that he asked you, whether
10  or not you were okay?
11  A. Where we came from.
12  Q. And then he asked you if you were all right?
13  A. Yeah.
14  Q. Did you call 911?
15  A. No, sir.
16  Q. Did your brother call 911?
17  A. No, sir.
18  Q. Do you know if anyone did?
19  A. Somebody who lives down on Padgett Road across
20  from -- to my understanding now -- across from
21  where the accident happened heard the accident
22  and called 911 I believe. I'm not sure.
23  Q. Are you aware of anybody that purportedly saw

18  (Pages 69 to 72)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 73

1    the accident happen?
2    A.  I'm not aware of anybody.
3    Q.  No witnesses?
4    A.  No, sir.
5    Q.  Have you ever heard your brother talk about
6    any witnesses to the accident?
7    A.  No, sir.
8    Q.  All right.  After Officer McGowin -- when
9    Officer McGowin got on the scene, did he speak
10   with you?
11   A.  I really can't remember what all was said.
12   I -- like I said, I was upset.  I -- you know,
13   other than asking me maybe if I was all right,
14   I really don't remember.
15   Q.  Did you speak with anyone other than my client
16   and Officer McGowin while you were on the
17   scene and your brother and the paramedics.
18   We've covered them.
19   A.  Yes, the paramedics.  The -- my cousin, he
20   showed -- he showed up to --
21   Q.  And that's --
22   A.  -- take me to the hospital.
23   Q.  -- Frankie, right?

Page 74

1    A.  Frankie.  I don't think I said too much to
2    him.
3    Q.  Did he take you directly from the scene to the
4    hospital, or did you go somewhere else first?
5    A.  From the scene to the hospital.
6    Q.  And did he take your brother as well?
7    A.  No, sir.
8    Q.  Did your brother go to the hospital that
9    night?
10   A.  Yes, sir.
11   Q.  How did he get there?
12   A.  I believe he rode with his ex-girlfriend --
13   ex-wife.  I'm not for sure.
14   Q.  Did anybody else come to the scene of the
15   accident, on the scene that we haven't
16   discussed?  And I understand that there may be
17   some people with the Andalusia PD and you
18   didn't speak with them, you don't know who
19   they were.  There may have been fire and
20   rescue people.
21   A.  The fire department was there, rescue, county
22   sheriff, Andalusia police.
23   Q.  Did you speak with any of those folks other

Page 75

1    than Officer McGowin about how the accident
2    happened?
3    A.  No, sir.
4    Q.  Any other friends or relatives of yours or
5    your brother's that arrived on the scene?
6    A.  No, sir.  I -- no, sir, not that -- not that
7    I'm aware of.
8    Q.  When you locked your brakes up right before
9    the collision, were you sliding in any
10   particular direction?
11   A.  Before I locked my brakes up?
12   Q.  Well, as you locked your brakes up, while they
13   were locked?
14   A.  When I locked my brakes up, I turned my wheel
15   to the left to keep from hitting under that
16   trailer head-on and shearing the top of that
17   car off.
18   Q.  And do you remember kind of traveling to the
19   left a little before --
20   A.  I slid left because --
21   Q.  Slid.  Okay.
22   A.  It stayed in a straight line with the car
23   just -- because of the highway being wet.

Page 76

1    Q.  Did the driver of the tractor trailer say
2    anything else to you about how the accident
3    happened, anything else?
4    A.  Not that I remember.
5    Q.  All right.  This is your opportunity to tell
6    me how this accident has affected you.
7    A.  How it's affected me?
8    Q.  And by that I should -- that's a poor
9    question.  Are there any things that you used
10   to do before the accident that you don't do
11   anymore, hobbies, sports?  Anything that this
12   accident has changed about your life, I want
13   to hear about it now as opposed to hearing
14   about for the first time at trial.
15   A.  I don't play with my step boys like I did,
16   wrestle with them, stuff like that.  I don't
17   drive next to an 18-wheeler on the highway,
18   you know.  I mean --
19   Q.  Is there anything else?  I mean, some people,
20   you know, work on cars or hunt or fish, and
21   then they have an accident and they don't do
22   that type of stuff anymore.  Is there anything
23   like that?  Any hobbies or regular activities

19 (Pages 73 to 76)

# FREEDOM COURT REPORTING

Page 77

1   that you used to do on a regular basis that
2   you don't do anymore?
3   A.   Just, you know, as far as playing with my step
4       kids, roughhousing with them.  I mean, you
5       know, I don't do that.
6   Q.   Well, do you have any physical limitations?
7   A.   Such as?
8   Q.   Can you jog if you wanted to?
9   A.   I wouldn't but, you know --
10  Q.   I mean, is there a certain amount that you
11      don't think you can lift?
12  A.   Well, now, I haven't lifted nothing over 50
13      pounds since it happened.  I'm not going to.
14  Q.   Lift over 50 pounds?
15  A.   Yeah.  I'm not going to.  I was --
16  Q.   And you can still drive, right?
17  A.   Oh, yeah.
18  Q.   Have you taken any vacations or trips?  Have
19      you missed out on anything?
20  A.   No vacations, no trips.  We had just come back
21      from one.
22  Q.   And I'm not trying to nitpick.  I want you to
23      think about it and be thorough.  Because,

Page 78

1   again, I really want to know and what I want
2   you to describe to me is how all this has
3   affected you.  I need to know about it now.
4   A.   I didn't sleep real good for --
5   Q.   Right.
6   A.   -- about four weeks after the accident.  I
7       mean, between the back pain and seeing the
8       side of that 18-wheeler come over the top of
9       me.  You know, I sure won't drive beside one
10      on the highway anymore.  I mean--
11  Q.   I can appreciate that.
12  A.   I don't -- I'm not going to overdo my back
13      anymore.  I mean, seem like -- you got it
14      right there where I had to go back, after
15      changing a tire, to the doctor.  You know,
16      now, even I can tell it.  Everybody I've
17      worked with can tell it, that if I've worked
18      too hard that day, I mean, like I used to, I
19      pay for it that night.
20  Q.   Okay.  And I've got just a few more
21      questions.  We're about done.
22         Have you ever sought any medical treatment
23      for your lower back before this accident?

Page 79

1   A.   I had a few problems with it when I worked at
2       Shaw.  Nothing major that I remember.
3   Q.   Have you ever had an on-the-job injury?
4   A.   Not that I can remember.
5   Q.   Did you ever have a workers' compensation
6       claim?
7   A.   Not that I -- I'm not sure.
8   Q.   Sometimes people need clarification as to what
9       that can entail.
10         Have you ever gone to the doctor for an
11      injury or bodily pain, what have you, and your
12      employer paid for it because you thought it
13      was related to your job?
14  A.   Like I said, I'm trying to remember.  It's
15      been awhile since I worked, you know, at Shaw.
16  Q.   Tell me what kind of problems you were having
17      with your back when you were at Shaw?
18  A.   I think it was -- not sure -- pulled -- I
19      believe I pulled a muscle in it a couple of
20      times.
21  Q.   What area of your -- was it your lower back?
22  A.   Yes, sir.
23  Q.   Same area that you believe was hurt in this

Page 80

1   accident?
2   A.   Yes, sir, that same area.
3   Q.   Did you treat with any physicians for that?
4   A.   Dr. Boyington I believe was the one who looked
5       at me.
6   Q.   Did he prescribe you any pain medication for
7       it?
8   A.   I really don't remember.  It's been so long
9       ago.
10  Q.   Did he do any tests on you?
11  A.   I believe he took x-rays.  I know I took an
12      MRI one time.
13  Q.   For your lower back?
14  A.   I'm not sure if it was the lower back or not.
15  Q.   Did he hold you out of work, or did you ever
16      miss any work for this treatment?
17  A.   I really can't remember.  I mean, it's been so
18      long ago.
19  Q.   You don't remember when it was?
20  A.   No, sir.
21  Q.   Do you remember what years you worked for
22      Shaw?  I don't think I've asked you that.
23  A.   I started in 11/6 of '96 because it was on my

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 81

1    badge. I remember my hire date. And I work
2    from '96 to 2003, something
3    like -- no -- yeah. I think. I'm not sure.
4    Q.  Prior to this accident, have you treated with
5        any other health care providers, other than
6        Dr. Boyington, for your lower back?
7    A.  No, sir. He should be --
8    Q.  Prior to this accident, have you ever treated
9        with any health care providers for your neck
10       or your knee?
11   A.  Dr. Boyington pretty much handles everything.
12       So if --
13   Q.  Do you recall going to see him before this
14       accident specifically for neck pain or knee
15       pain?
16   A.  I hadn't been to see Dr. Boyington in a
17       while. It's been a couple of years since I
18       saw him.
19   Q.  What were you doing out at Shaw that you think
20       might have aggravated your back?
21   A.  Have you ever been in a carpet
22       manufacturing --
23   Q.  No. But I can imagine. Is it just a lot of

Page 82

1    heavy lifting?
2    A.  It's 12 hours of bending over, doing the job I
3        done. Twelve hours of bending over, picking
4        up 10-pound packages every seven minutes.
5    Q.  For 12 straight hours?
6    A.  Yes, I believe so. It's been awhile since
7        I've done it.
8    Q.  And how long did you do that?
9    A.  I done that for seven -- seven years, six
10       years. Six years.
11   Q.  And how long had it been --
12   A.  Instructed in the same department for three
13       years, then transferred to a new department.
14   Q.  And how long had it been since you had done
15       that type of work when this accident happened?
16   A.  A year.
17   Q.  How long had it been since your back bothered
18       from Shaw?
19   A.  Let's see. My back hadn't bothered me -- I
20       know the whole time I was in my new department
21       it didn't bother me. It had been awhile since
22       I had seen Dr. Boyington. I -- two -- two and
23       a half, three years, something like that.

Page 83

1    Q.  All right. Mr. Lawson, tell me each and every
2        thing you believe my client did or failed to
3        do that caused this accident? The driver of
4        the tractor trailer.
5    A.  What he did that caused the accident?
6    Q.  If you believe that he did cause it.
7    A.  He made a left-hand turn from the right-hand
8        lane across the highway.
9    Q.  Anything else?
10   A.  As far as I know, he didn't give a signal. I
11       really don't remember that part, but I
12       remember -- specifically remember him making
13       the left-hand turn.
14   Q.  Is it possible that he could have signaled and
15       you didn't see it? Is that possible?
16   A.  I'm not sure. I mean, I really don't know if
17       he did. I mean, I don't recall seeing a
18       signal.
19   Q.  Fair enough. You've told me about all your
20       past employers?
21   A.  Yes, sir.
22   Q.  You've told me about all the medical providers
23       that you've treated with in the past ten

Page 84

1    years --
2    A.  Yes, sir.
3    Q.  -- to the best of your memory?
4    A.  Yes, sir.
5    Q.  You've told me about all the expenses you've
6        got out of pocket following this accident?
7    A.  Best I can remember, yes.
8    Q.  Then tell me what you want out of this
9        lawsuit?
10           MR. HAYES:  Object to the form.
11   A.  I really --
12           MR. JONES:  Let me say -- Lea, are you
13       talking about financially? I mean,
14       that's kind of an unusual question, I
15       thought, to ask.
16           MR. RICHMOND:  Yeah. I mean, he's filed
17       this lawsuit against my clients. It's
18       his lawsuit. I just want to know what
19       he's seeking.
20   A.  I really --
21           MR. JONES:  Well, let me say this. Has
22       Matt given you a demand?
23           MR. RICHMOND:  He has.

21 (Pages 81 to 84)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 85

1        MR. JONES: What was that demand?
2        MR. RICHMOND: Well, let's keep that off
3            the Record. But, yeah, he has given
4            me a demand.
5        MR. HAYES: We're going to take a break
6            for a minute.
7            (Brief recess)
8    Q.  We're just about done, Mr. Lawson. Just
9        before we took a break, I asked you what
10       you're seeking or you are looking for from my
11       clients in this lawsuit.
12   A.  I've never been through anything like this
13       before. My understanding is, a jury decides
14       that. I mean, I really -- really couldn't
15       tell you. I mean, I don't know.
16   Q.  Well, you personally, are there particular
17       things or items, sums of money, or
18       communication that you're seeking from my
19       clients? Can you be more specific?
20   A.  I mean, like I said, that's -- never been
21       through anything like this before. I mean,
22       like I said, I -- I was under the assumption
23       that a jury decided, you know, how the outcome

Page 86

1        of it, you know. I mean --
2    Q.  All right. Is there anything I didn't ask
3        you that -- just kidding.
4            Thank you.
5            (Deposition concluded at 2:50 p.m.)
6            * * * * * * * * * *
7        FURTHER DEPONENT SAITH NOT
8            * * * * * * * * * *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          MIDDLE DISTRICT OF ALABAMA
 3               NORTHERN DIVISION
 4
 5
 6   SCOTT D. LAWSON and
     STEVEN LAWSON,
 7
          Plaintiffs,
 8
     vs.         CASE NO. 2:07cv356-MHT
 9
10   SWIFT TRANSPORTATION
     CO., INC., and
11   FREDRICK S. MARTIN, JR.,
12        Defendants.
13
14
         * * * * * * * * * * *
15
         DEPOSITION OF STEVEN WILSON LAWSON, taken
16
     pursuant to stipulation and agreement before Sherry
17
     McCaskey, Certified Court Reporter and Commissioner
18
     for the State of Alabama at Large, in the Law
19
     Offices of Jones & Jones, 530 East Three Notch
20
     Street, Andalusia, Alabama, on Tuesday, October 23,
21
     2007, commencing at approximately 3:00 p.m.
22
         * * * * * * * * * * *
23
```

Page 2

```
 1             APPEARANCES
 2   FOR THE PLAINTIFFS:
 3   JOSHUA P. HAYES, ESQUIRE
     Prince Glover Law
 4   Attorneys at Law
     1 Cypress Point
 5   701 Rice Mine Road N.
     Tuscaloosa, Alabama 35406
 6
     JOHN F. JONES, JR., ESQUIRE
 7   Jones & Jones, P.C.
     Attorneys at Law
 8   530 East Three Notch Street
     Andalusia, Alabama 36420
 9
     FOR THE DEFENDANTS:
10
     LEA RICHMOND, IV, ESQUIRE
11   Carr, Allison, Pugh,
     Howard,Oliver & Sisson, P.C.
12   Attorneys at Law
     100 Vestavia Parkway
13   Birmingham, Alabama 35216
14       * * * * * * * * * * *
15            STIPULATIONS
16       It is hereby stipulated and agreed by and
17   between counsel representing the parties that the
18   deposition of STEVEN WILSON LAWSON is taken pursuant
19   to stipulation and agreement; that all formalities
20   with respect to procedural requirements are waived;
21   that said deposition may be taken before Sherry
22   McCaskey, Certified Court Reporter and Commissioner
23   for the State of Alabama at Large, without the
```

Page 3

```
 1   formality of a commission; that objections to
 2   questions other than objections as to the form of
 3   the questions need not be made at this time but may
 4   be reserved for a ruling at such time as the
 5   deposition may be offered in evidence or used for
 6   any other purpose as provided for by the Alabama
 7   Rules of Civil Procedure.
 8       It is further stipulated and agreed by and
 9   between counsel representing the parties that the
10   filing of the deposition is hereby waived and that
11   the deposition may be introduced at the trial of
12   this case or used in any manner by either party
13   hereto provided for by the Statute.
14       It is further stipulated and agreed by and
15   between the parties hereto and the witness that the
16   signature of the witness to this Deposition is
17   hereby waived.
18       * * * * * * * * * * *
19
20
21
22
23
```

Page 4

```
 1        STEVEN WILSON LAWSON
 2       The witness, having first been duly sworn to
 3   speak the truth, the whole truth and nothing but the
 4   truth, testified as follows:
 5            EXAMINATION
 6   BY MR. RICHMOND:
 7   Q.  Would you please state your full name for the
 8       record, sir?
 9   A.  Steven Wilson Lawson.
10   Q.  Mr. Lawson, my name is Lea Richmond.  I
11       represent Swift Transportation Company,
12       Incorporated and Mr. Fredrick Martin in a
13       lawsuit that you filed against that company
14       and that individual.
15          You were present for your brother's
16       deposition, correct?
17   A.  Yes, sir.
18   Q.  So you heard me go over the ground rules about
19       how to proceed in the deposition, always give
20       a verbal response.
21   A.  Yes.
22   Q.  Always let me finish my question before you
23       answer.
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 5

1  A.  Yes, sir.
2  Q.  Always let me know if you don't understand my
3     question.
4  A.  Yes, sir.
5  Q.  But if you do answer it, you're under oath, no
6     different than if we were in the courthouse.
7  A.  Yes, sir.
8  Q.  We're good to go there.
9  A.  Yes, sir.
10  Q.  What's your date of birth, sir?
11  A.  6/15/81.
12  Q.  What's your driver's license number?
13  A.  One second.  I hadn't got it memorized.
14  Q.  I don't either.
15  A.  6780511.
16  Q.  6780511?
17  A.  Yes, sir.
18  Q.  It's an Alabama license?
19  A.  Yes, sir.
20  Q.  Never had license in any other state, have
21     you?
22  A.  No, sir.
23  Q.  Have you ever had a commercial driver's

Page 6

1     license?
2  A.  No, sir.
3  Q.  Has your license ever been suspended in the
4     past for any reason?
5  A.  No, sir.
6  Q.  Ever been revoked in the past for any reason?
7  A.  No, sir.
8  Q.  Do you have any restrictions on that license?
9  A.  Eyeglasses.  That's it.
10  Q.  Did you have any restrictions at the time of
11     this accident?
12  A.  No.  Glasses.
13  Q.  What's your Social Security number?
14  A.  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.
15  Q.  What was your address at the time of this
16     accident?
17  A.  21123 Loop Road, Andalusia, Alabama.
18  Q.  I understand your mother resided at that
19     address?
20  A.  Yes, sir.
21  Q.  Anybody else live at that address?
22  A.  My father and my two children.
23  Q.  Are you married?

Page 7

1  A.  Separated.
2  Q.  Who were you married to -- or are you married
3     to and separated from?
4  A.  Not married but separated.  It's Donna Yvonne
5     Donaldson.
6  Q.  Have you ever been legally married to Donna?
7  A.  No.
8  Q.  How long have you and Donna been together or
9     were together?
10  A.  Ten years.
11  Q.  And did she live with you at the time of this
12     accident?
13  A.  No, sir.
14  Q.  You were separated at the time of the
15     accident?
16  A.  Yes, sir.
17  Q.  And what are the names of your two children?
18  A.  Gracie Yvonne Lawson.
19  Q.  And how old is she?
20  A.  Four.  And Ripley Nicole Lawson.
21  Q.  First name is Ripley?
22  A.  Ripley, R-I-P-L-E-Y.
23  Q.  Nicole Lawson.  And their ages?

Page 8

1  A.  Four and two.
2  Q.  And they live with Donna?
3  A.  No, sir.
4  Q.  Who do they live with?
5  A.  They live with me.
6  Q.  They live with you.  And do you have custody
7     of them?
8  A.  Joint custody with her.
9  Q.  And I assume they're financially dependent
10     upon you?
11  A.  Yes, sir.
12  Q.  And do you still live at the Loop Road
13     address?
14  A.  Yes, sir.
15  Q.  And does your mother still there?
16  A.  Yes.
17  Q.  Does your father still live there?
18  A.  Yes, sir.
19  Q.  Anyone else?
20  A.  No, sir.
21  Q.  No other children?
22  A.  No, sir.
23  Q.  No other spouses in the past?

2  (Pages 5 to 8)

# FREEDOM COURT REPORTING

Page 9

1   A.  No, sir.
2   Q.  Have you ever been in the military?
3   A.  No, sir.
4   Q.  Born and raised in Andalusia, Alabama?
5   A.  Yes, sir.
6   Q.  Have you ever lived outside the state of
7       Alabama?
8   A.  No, sir.
9   Q.  Have you ever lived in any other part of the
10      state other than the Andalusia area?
11  A.  No, sir.
12      MR. RICHMOND:  And, Josh, I didn't go
13          through all this, but can we agree to
14          get a list, just swap a list?
15      MR. HAYES:  Of family?
16      MR. RICHMOND:  Families in the Middle
17          District.
18      MR. HAYES:  Sure.
19  Q.  Tell me about your educational background?
20  A.  Straughn -- Straughn High School.  I didn't
21      graduate.  The last grade I completed was the
22      11th.  I quit and went to work the next day.
23  Q.  Did you go back and get your GED?

Page 10

1   A.  No, sir.
2   Q.  Ever return to the classroom setting after the
3       11th grade?
4   A.  MacArthur Vocational College.  Took welding
5       for three semesters.
6   Q.  And did you obtain the certificate?
7   A.  No, sir.
8   Q.  How many semesters did you lack?
9   A.  A semester and a half.
10  Q.  Do you have any intention of going back?
11  A.  One day maybe.
12  Q.  I understand there's pretty good money in
13      welding?
14  A.  Right.
15  Q.  Why did you stop?
16  A.  Domestic problems between me and --
17  Q.  Donna?
18  A.  -- my spouse.  Yes.
19  Q.  Have you ever filed for bankruptcy?
20  A.  No, sir.
21  Q.  Have you ever filed for unemployment
22      compensation?
23  A.  No, sir.

Page 11

1   Q.  Have you ever filed for disability benefits of
2       any kind?
3   A.  No, sir.
4   Q.  Have you filed for any Social Security
5       benefits?
6   A.  No, sir.
7   Q.  Have you ever been arrested?
8   A.  No, sir.
9   Q.  Have you ever been involved in any motor
10      vehicle accidents other than the accident
11      we're here about today?
12  A.  No, sir.
13  Q.  You're positive?
14  A.  I think one fender bender, and that was it.
15      That's been years ago.
16  Q.  Did you go to the emergency room after that
17      accident?
18  A.  No, sir.  No, sir.
19  Q.  Was anybody injured in that accident?
20  A.  No, sir.
21  Q.  Were the police called for that accident?
22  A.  Yes, sir.
23  Q.  Was there a report filled out?

Page 12

1   A.  Yes, sir.
2   Q.  Were there any insurance claims made that
3       you're aware of?
4   A.  I'm not aware of.  It wasn't my car.
5   Q.  Have you ever treated with a psychiatrist or
6       psychologist?
7   A.  No, sir.
8   Q.  Do you drink alcohol?
9   A.  No, sir.
10  Q.  Did you at the time of this accident?
11  A.  No, sir.
12  Q.  Had you consumed any alcohol in the 24 hours
13      before this accident?
14  A.  No, sir.
15  Q.  Had you ingested any drugs of any type within
16      24 hours before the accident?
17  A.  No, sir.
18  Q.  Have you ever been involved in any other
19      lawsuits?
20  A.  No, sir.
21  Q.  Have you ever had a workers' compensation
22      claim?
23  A.  No, sir.

3  (Pages 9 to 12)

# FREEDOM COURT REPORTING

Page 13

1  Q. Have you ever been injured on the job?
2  A. No, sir.
3  Q. Have you ever been hospitalized?
4  A. No, sir.
5  Q. Have you ever had surgery?
6  A. No, sir.
7  Q. Have you ever had any outpatient treatment
8     done?
9  A. No, sir.
10 Q. And you told me you've never been in the
11    military?
12 A. No, sir, I haven't been in the military.
13 Q. Were you taking any prescription medication --
14    and I mean anything, not just pain
15    medication. Sometimes people equate that to
16    pain medication. For acid reflux, any type of
17    medication at the time of this accident?
18 A. No, sir.
19 Q. Are you claiming any lost earning capacity,
20    ability to make a living as the component of
21    damages in this case?
22 A. I don't understand the question.
23 Q. Okay. Are you claiming that the injuries you

Page 14

1     received as a result of this accident have
2     hindered or impaired your ability to earn a
3     living in the future? Not time that you've
4     missed from work in the past.
5  A. Right.
6  Q. That's lost wages. But I'm talking about your
7     ability to earn a living in the future.
8  A. I will be out of work for 12 weeks when I go
9     have my surgery on my hand.
10 Q. Okay. Have you made a decision to have that
11    surgery?
12 A. Yes, sir.
13 Q. Has a physician recommended that surgery?
14 A. Yes, sir.
15    MR. RICHMOND: Josh, can we agree to come
16    back and revisit that issue if it's
17    relevant after he has the surgery if
18    he does have the surgery.
19    MR. HAYES: Yeah, for that limited
20    purpose, we'll put him up for a second
21    deposition.
22    MR. RICHMOND: For permanent impairment
23    and lost earning capacity?

Page 15

1     MR. HAYES: Yes.
2     MR. RICHMOND: If those claims are made.
3     MR. HAYES: That's right.
4     MR. RICHMOND: Fair enough.
5  Q. Same type question you heard me ask your
6     brother, I want you to walk me through your
7     recollection of the date of the accident,
8     starting with the morning of the accident,
9     where you woke up, what you did throughout the
10    day, who you were with.
11 A. Well, it was raining about like today. So I
12    roof for a living, so you can't work in the
13    rain. So I was off work that day.
14    MR. HAYES: Will you speak up a little
15    bit? She's having a hard time hearing
16    you.
17 A. It was raining that day. I couldn't work
18    because I roof. And I was my mother's because
19    I had separated from my girlfriend. And my
20    brother come by that afternoon about an hour
21    or so before dark, wanted me to ride with him
22    in town so he could get something to eat. So
23    okay. You know, that's fine. I had to go by

Page 16

1     the store anyway. So I rode with him. We
2     stopped by the store, got a drink and pack of
3     cigarettes. We left from there.
4  Q. Do you remember what store that was?
5  A. Friendly's.
6  Q. That's a convenience store on 84?
7  A. Yes, sir.
8  Q. Did you go into the store?
9  A. Yes, sir.
10 Q. Did you pay cash for your cigarettes and
11    drink?
12 A. Yes, sir.
13 Q. Do you remember if your brother paid cash?
14 A. I believe so.
15 Q. Would that be habit and practice to pay for
16    items such as that with cash?
17 A. Yes, sir.
18 Q. Go ahead. I'm sorry.
19 A. And went from there to Church's, got food.
20    Left from there. I sat in the car; he went in
21    and got it.
22 Q. Let me interrupt you again real quick, and I'm
23    not prying here. I just need to get some

4 (Pages 13 to 16)

# FREEDOM COURT REPORTING

Page 17

1  specifics, if you remember about what time it
2  was when you left Church's?
3  A.  It was getting dark, so that time of year, I
4  would have to guess about seven o'clock or so
5  maybe a little after that.
6  Q.  Did you have a cell phone at the time of the
7  accident?
8  A.  Yes, sir, I did.
9  Q.  And what was your cell phone number?
10  A.  I really can't remember at this point.
11  Q.  Do you remember who you have service with?
12  A.  SouthernLINC.
13  Q.  SouthernLINC.  Do you have a cell phone now?
14  A.  No, sir.
15  Q.  You no longer have the phone that you had then
16  with SouthernLINC?
17  A.  Yes.
18  Q.  Were the bills in your name?
19  A.  No.
20  Q.  Whose --
21  A.  Emily Norris.
22  Q.  And Emily Norris was who?
23  A.  Friend of my ex.

Page 18

1  Q.  Why was your cell phone in her name?
2  A.  Because she was on a contract and had three
3  phones, and she asked me because she would
4  have a $200 cancellation fee if she cancelled
5  that line.  So I told her I would pay the
6  bill, and I took the phone.
7  Q.  And so you received the bills from her, or did
8  you get the bills from -- sent to your address
9  at Loop Road?
10  A.  I received the bills from her.
11  Q.  All right.  Do you have a phone number for
12  Emily now?
13  A.  No.
14  Q.  Do you know the address for Emily?
15  A.  No.
16  Q.  If you wanted to find Emily, how would you go
17  about doing that?
18  A.  I really have no idea at this point.
19  Q.  She's a friend of your --
20  A.  Ex.
21  Q.  Donna?
22  A.  Right.
23  Q.  And where is Donna right now?

Page 19

1  A.  She is at work at the Opp Nursing Home.
2  Q.  She works at the Opp Nursing Home?
3  A.  Yes.
4  Q.  Tell me Donna's last name again?.
5  A.  Donaldson.
6  Q.  Donaldson.  Do you know what her residential
7  address is?
8  A.  I can't remember it right off.  I know at this
9  time US 331, Opp, something.
10  Q.  Have you got a telephone number for her?
11  A.  493-7270.
12  Q.  Is that a cell phone?
13  A.  No, sir.
14  Q.  That's her home phone?
15  A.  Yes, sir.
16  Q.  Area code 334?
17  A.  Yes, sir.
18  Q.  All right.  Proceed with what happened after
19  you left Church's Chicken that night?
20  A.  As we pulled out of the parking lot of
21  Church's Chicken, like I say, it was getting
22  dark.  We proceeded to go through the red
23  light there at the by -- by Hardee's and all

Page 20

1  at that intersection.  Turned right.  Started
2  going down 84.  As we come across the bridge,
3  going up the hill --
4  Q.  What was the weather like; was it raining
5  still?
6  A.  Yeah, it was misting rain.
7      Come up over the hill.  The truck was
8  sitting still in the right-hand lane.  So we
9  put on our blinker to get over to the
10  left-hand lane, then he proceeded to turn in
11  front of us and block both lanes of traffic.
12  We had nowhere to go except under the truck.
13  And that's really all I remember, to tell you
14  the truth.  I don't remember seeing him give a
15  blinker.  All I remember seeing is his
16  taillights.
17  Q.  As you were going down 84 before you saw the
18  tractor trailer, was your window down?
19  A.  No, sir.
20  Q.  You weren't smoking?
21  A.  No, sir.
22  Q.  Your brother wasn't smoking?
23  A.  No, sir.

5 (Pages 17 to 20)

# FREEDOM COURT REPORTING

Page 21

1   Q.  Did y'all have the radio on?
2   A.  No, sir.
3   Q.  We y'all eating the chicken?
4   A.  No, sir.
5   Q.  No one was eating anything in the car?
6   A.  No, sir.
7   Q.  Were his windshield wipers on?
8   A.  Yes, sir.
9   Q.  Were his headlights on?
10  A.  Yes, sir.
11  Q.  You have a specific memory of the windshield
12      wipers and the headlights?
13  A.  Yes, sir.
14  Q.  Who noticed the tractor trailer first, if you
15      know?  Was it you or your brother?
16  A.  I can't recall.
17  Q.  You did see the tractor trailer at some point?
18  A.  Yes, sir.
19  Q.  And you heard me ask your brother questions
20      about distance.  Do you have any judgment as
21      to how far back you were from the tractor
22      trailer when you first saw it?
23  A.  It was dark.  I really couldn't give you a

Page 22

1       distance.  I couldn't.  I mean, there is no
2       way to judge it.
3   Q.  Now, you heard your brother say that it was
4       closer to a hundred yards than it was to 50.
5       Is your memory consistent?
6   A.  It might have been.  Like I say, I couldn't
7       judge it.  I don't know.  It was dark,
8       raining.  It could have been closer.
9   Q.  What drew your attention to the tractor
10      trailer?
11  A.  He was sitting still, barely moving, one of
12      the two.  It was dark.  Like I say, you
13      couldn't tell.  He might have been moving, but
14      he wasn't moving very fast.
15  Q.  Could you see the lights on the trailer?
16  A.  The taillights.
17  Q.  Could you see brake lights?
18  A.  No.
19  Q.  Did you see a blinker?
20  A.  No.
21  Q.  Did you see his blinker or turn signal engaged
22      at any time --
23  A.  No.

Page 23

1   Q.  -- from the point in time you saw it up until
2       the time of the impact?
3   A.  No.
4   Q.  Did your brother say anything about the
5       tractor trailer before he moved into the
6       left-hand lane?
7   A.  No, not that I remember.
8   Q.  Do you remember how much time passed from the
9       point in time that you saw the tractor trailer
10      and then your brother moved over into the
11      left-hand lane?
12  A.  Maybe two, three seconds.
13  Q.  Do you have a judgment or recollection as to
14      how fast you were going after you got into the
15      left-hand lane?
16  A.  I have no idea.  I was on the passenger's
17      side.  I couldn't tell you.
18  Q.  Do you have a judgment as to how much time
19      passed from the point that your brother got in
20      the left-hand lane until you caught the
21      tractor trailer?
22  A.  Seconds.
23  Q.  More or less than five seconds, if you had to

Page 24

1       give a judgment?
2   A.  Probably five seconds.
3   Q.  About five seconds.
4           Could you tell if your brother was braking
5       at all during that time period?
6   A.  He turned the wheel to the left and stomped
7       the brakes.
8   Q.  Now, this is before -- my frame of question
9       is -- is this is why I'm saying we've got to
10      make sure we're on the same page, and it's my
11      job to make sure we're doing that.
12          Is it before you caught the tractor
13      trailer?  Do know if he ever got on the brakes
14      before you reached the trailer?
15  A.  Yes, sir.  We was -- as far as I know, he hit
16      the brakes and turned to the left before
17      impact.
18  Q.  Before impact.  But my question is, you would
19      have had to have reached the trailer or maybe
20      you didn't.  Strike that.
21          Where were you in relation to the trailer
22      when that tractor started to turn?  Had you
23      caught the trailer yet?

6 (Pages 21 to 24)

# FREEDOM COURT REPORTING

Page 25

1  A.  Not yet.  He turned.  We had nowhere to go
2      except under the trailer.  That's really all I
3      remember about it.
4  Q.  Right.  But my question is, here's the
5      trailer -- and I'm no artist -- and here's the
6      tractor.  And you guys are proceeding, having
7      moved over into the left-hand lane.  And did
8      that trailer -- strike that.  Did that tractor
9      start to turn left before you got even with
10     the end of the trailer?
11 A.  Yes.
12 Q.  It did?  Do you have a judgment as to how far
13     back you were from the end of that trailer
14     when that tractor started its left-hand turn?
15 A.  I have no idea.
16 Q.  Ten yards, twenty yards?
17 A.  I could guess.
18     MR. HAYES:  Don't guess.  Nobody wants
19     your guesses.
20 Q.  No, I don't want you to guess to it.  If you
21     have any sort of judgment at all --
22 A.  I really have no idea.
23 Q.  Were you close enough to where you could have

Page 26

1      read the license plate on that trailer if you
2      had wanted to?
3  A.  I really can't remember, to tell you the
4      truth.
5  Q.  But you don't think you saw a blinker?
6  A.  No.
7  Q.  And you do know that you were still behind the
8      trailer to a certain distance with that
9      tractor started its left-hand turn?
10 A.  Yes.
11 Q.  At what point did your brother apply the
12     brakes, if you have a judgment?
13 A.  I really couldn't tell you, when he took up
14     both lanes of the road.
15 Q.  Did he brake and steer simultaneously?
16 A.  Yes, sir.
17 Q.  Do you have a judgment as to how far that
18     tractor was into its turn when he started to
19     brake and steer?
20 A.  I really can't remember.
21 Q.  Do you remember if that tractor was completely
22     out of the left-hand lane by the time your
23     brother braked and steered?

Page 27

1  A.  No, sir.  He was all the way across in both
2      lanes.
3  Q.  So that tractor was all the way over here into
4      the median when your brother started to brake
5      and steer?
6  A.  He was like this (indicating).  Here is both
7      lanes of traffic.  We were here (indicating).
8      He was all the way across.  That's what I
9      remember.  He took up both lanes of the road.
10     We had nowhere to go except under him.
11 Q.  Right.  Now, are you referring to the point of
12     impact or when your brother started to brake
13     and steer?
14 A.  When we started to brake and steer.
15 Q.  Okay.  Do you have any judgment as to how far
16     you slid once your brother --
17 A.  I have no idea.
18 Q.  You don't have any judgment as to how much
19     time passed from the point in time you
20     realized this tractor was coming over and the
21     impact occurred?
22 A.  No.
23 Q.  Do you know what portion of your vehicle

Page 28

1      struck the trailer?
2  A.  My side of the car was up under the trailer.
3  Q.  Do you know what part of the trailer?  Was it
4      the front end toward the pull tires or back
5      towards the tandems?
6  A.  It was close to the tires is all I can tell,
7      is where we hit.
8  Q.  Do you remember if your vehicle moved at all
9      after the impact?
10 A.  Yes, sir.  We hit about probably center ways,
11     a little farther back.  And then he drug us up
12     into the median.
13 Q.  Did any part of your body strike the interior
14     of the Chevy at impact?
15 A.  I can't remember.
16 Q.  Tell me what the first thing you do remember
17     is after the vehicles came to rest.
18 A.  After the vehicles came to rest, there was
19     blood on my shirt from where my nose was
20     bleeding --
21 Q.  Did your air bag deploy?
22 A.  -- I guess from the air bag.  Yes, sir.  And
23     my hand was broke.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 29

1  Q.  Did you say anything to your brother?
2  A.  Told him, help me out the car.
3  Q.  Did you hear him ask you if you were all
4      right?
5  A.  Yes, sir, he asked me if I was all right.
6  Q.  And what did you say?
7  A.  I said, yeah, I think.
8  Q.  And did you ask him if he was okay?
9  A.  I -- not at that point.
10 Q.  Did you ever ask him if he was all right at
11     the scene?
12 A.  Yes, sir.
13 Q.  And what did he say?
14 A.  He said, as far as I know right now.
15 Q.  Did your brother help you out of the car?
16 A.  Somewhat.  I mean, I had to get myself out of
17     the car because I was up under the trailer.
18     The was really no way he could help me get out
19     besides put his hand in.  I grabbed his hand,
20     and he helped me come through the car.
21 Q.  And he grabbed your hand and guided you
22     through the car?
23 A.  Yes, sir, my left hand.

Page 30

1  Q.  And then once you got out on the pavement,
2      were you able to stand and walk around the
3      scene on your own?
4  A.  Yes, sir.
5  Q.  And I appreciate the fact that you were shaken
6      up, but you didn't have any bodily injuries
7      that prevented you from ambulating around the
8      scene?
9  A.  No, sir.
10 Q.  Was the officer already there by the time you
11     got out of the car?
12 A.  No, sir.
13 Q.  Did you ever speak with the driver of the
14     tractor trailer?
15 A.  No, sir.
16 Q.  Did you ever speak with someone that you
17     understood to be a passenger in the tractor
18     trailer?
19 A.  Really can't remember.
20 Q.  Do you ever remember seeing your brother talk
21     to the driver of the tractor trailer?
22 A.  Can't remember.
23 Q.  The same question relative to someone that you

Page 31

1      understood to be the passenger of the tractor
2      trailer.  Did you ever see your brother
3      conversing with that person?
4  A.  Can't remember.
5  Q.  Did you make any phone calls from your cell
6      phone while you were on the scene?
7  A.  Yes, sir.
8  Q.  How many phone calls did you make?
9  A.  I made one.
10 Q.  Who did you call?
11 A.  My ex.
12 Q.  Donna?
13 A.  Yes, sir.
14 Q.  And what did you tell her?
15 A.  I told her that I had just gotten in a wreck.
16 Q.  Did you tell her anything else?
17 A.  I told her that my hand was broke, and she
18     said she'd be there in a minute.
19 Q.  Did she come to the scene?
20 A.  Yes, sir.
21 Q.  Did any other friends or relatives come to
22     scene?
23 A.  No, sir.

Page 32

1  Q.  Did you make any other phone calls?
2  A.  No, sir.
3  Q.  Did you speak with Officer McGowin on the
4      scene?
5  A.  Best I can remember, he got my personal
6      information, and that was it.
7  Q.  He didn't ask you about how the accident
8      happened?
9  A.  No, sir.
10 Q.  Did you ever speak with him again after the
11     accident?
12 A.  No, sir.
13 Q.  Did you go to the hospital that night?
14 A.  Yes, sir.
15 Q.  Who took you to the hospital?
16 A.  My ex.
17 Q.  Did you speak with the paramedics or EMTs on
18     the scene?
19 A.  Yes, sir.
20 Q.  Did they offer you medical treatment?
21 A.  Yes, sir.
22 Q.  Did you decline medical treatment?
23 A.  No, sir.  They had nothing to put on my hand,

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 33

1 any splint or anything like that. So they
2 offered me a ride to the emergency room, but I
3 told them I had somebody coming because I
4 could not afford the bill for the emergency --
5 for the ambulance ride.
6 Q. Did you sign their waiver of treatment form?
7 Do you remember doing that?
8 A. I don't remember if I did or not.
9 Q. Do you remember telling the officer that you
10 weren't hurt?
11 A. No, sir.
12 Q. You don't remember telling him that?
13 A. I think I told him, my hand is broke.
14 Q. Was your hand bleeding?
15 A. No, sir.
16 Q. Tell me about your hand injury as it was out
17 there on the scene that night. I'm trying to
18 get a picture.
19 A. I couldn't move these two fingers
20 (indicating). I mean, they were -- couldn't
21 move them. They wouldn't respond. So -- but
22 other than that, I really cannot tell you much
23 about that night.

Page 34

1 Q. And you heard me asking your brother questions
2 about his bodily injuries. I need to know all
3 the parts of your body that you're claiming
4 were injured in this accident. Obviously,
5 your right hand, the two -- pinky finger and
6 then the ring finger on your right hand. Any
7 other body parts?
8 A. No, sir.
9 Q. That's the only body injury you're claiming in
10 this accident?
11 A. Yes, sir.
12 Q. Are you aware of any witnesses to the
13 accident?
14 A. No, sir.
15 Q. Did you speak with Officer McGowin at any time
16 after the accident occurred --
17 A. No.
18 Q. -- after you'd left the accident scene?
19 A. No, sir.
20 Q. Do you know if your brother ever did?
21 A. No, sir.
22 Q. Who is your family physician?
23 A. Dr. Steven Davis.

Page 35

1 Q. Where is Dr. Davis's practice?
2 A. Opp.
3 Q. Opp, Alabama? Do you know an address?
4 A. Brantley Street. That's about all I know.
5 Q. Have you treated with any other health care
6 providers in the last ten years other than
7 Dr. Davis?
8 A. No, sir.
9 Q. He's your primary care physician?
10 A. Yes, sir.
11 Q. Never treated with a chiropractor in the past?
12 A. No, sir.
13 Q. Where do you get your prescriptions filled?
14 A. Pharmacare and Rite Aid.
15 Q. And that's Pharmacare, the same one that your
16 brother was telling me about, right?
17 A. Yes, sir.
18 Q. And what Rite Aid; that one on 84?
19 A. Yes, sir.
20 Q. And you've never been to the emergency room
21 for any reason?
22 A. No, sir.
23 Q. Prior to this accident, had you ever had any

Page 36

1 problems with your right hand?
2 A. No, sir.
3 Q. Have you ever sought any medical treatment for
4 your right hand?
5 A. No, sir.
6 Q. So you went to the hospital that night,
7 correct?
8 A. Yes, sir.
9 Q. What did you tell them was wrong at the
10 hospital when you got there?
11 A. That my hand was broke -- that I thought it
12 was broke.
13 Q. Then what did they do for you?
14 A. They took me back to the waiting room. I
15 waited back there, seemed like forever. Then
16 they took -- give me x-rays. Then they put a
17 splint on it until I get to see Dr. Holland,
18 and they gave me one Lortab 7.5 and sent me
19 home.
20 Q. And when did you treat next for your hand?
21 A. I really can't remember an exact time, but I
22 believe it was four to five days before I got
23 to see Dr. Holland.

9 (Pages 33 to 36)

# FREEDOM COURT REPORTING

Page 37

1  Q.  And when you got in to see Dr. Holland, what
2      did he do for you?
3  A.  He put it in a cast.
4  Q.  How long were you in a cast?
5  A.  I really can't remember an exact time frame,
6      but I believe it was three to four weeks I had
7      to wear a cast.
8  Q.  Did you take any pain medication during that
9      time?
10 A.  Yes, sir.
11 Q.  Have you taken any pain medication today?
12 A.  No, sir.
13 Q.  So as of today's date, you don't have an
14     outstanding prescription for pain relative to
15     your right hand?
16 A.  No, sir.
17 Q.  Does your hand cause you pain?
18 A.  Yes, sir.
19 Q.  What do you do to alleviate the pain?
20 A.  Goody Powders.
21 Q.  Does that cut it?
22 A.  Not really.  It helps but that's about it.
23 Q.  It reduces it?

Page 38

1  A.  Makes it bearable.
2  Q.  After this accident, immediately after it
3      happened, on a scale of one to ten, how would
4      you rate your pain in your hand?
5  A.  Depending on what I'm doing.  If I'm working,
6      using a nail gun, some days it's about a
7      five.  And then if I bump it on something or
8      hit it, it's about a ten.
9  Q.  Has your pain gotten progressively better as
10     your hand was put into a cast and as time has
11     passed?
12 A.  Yes, sir, some.
13 Q.  Has Dr. Holland recommended the surgery?
14 A.  Yes, sir.
15 Q.  And do you intend to have that surgery?
16 A.  Yes, sir.
17 Q.  Have you been recommended a particular
18     physician or surgeon that you consult?
19 A.  University of Alabama is all I know.  Some
20     doctor up there.  I can't remember his name.
21 Q.  In Birmingham?
22 A.  Yes, sir.
23 Q.  Did he make you an appointment?

Page 39

1  A.  No, sir.
2  Q.  Did he tell you to do so in the near future?
3  A.  Yes, sir.
4  Q.  You don't have problems, if you elect to have
5      that surgery, coming back and telling me how
6      it went?
7  A.  No, sir.
8  Q.  That would be okay?
9  A.  Yes, sir.
10 Q.  All right.  Well, let me ask you this:  Where
11     did you work at time of this accident?
12 A.  Neal's Roofing and Construction.
13     MR. HAYES:  Can we go off the Record for a
14     second?
15     MR. RICHMOND:  Yes.
16     (Off-the-Record discussion)
17     MR. RICHMOND:  Let's go back on the
18     Record.
19 Q.  At the time of the accident, what did you do
20     at Neal's Roofing?  I assume you're out in the
21     field?
22 A.  I'm a roofer.
23 Q.  How many hours a week would you work?

Page 40

1  A.  Forty to fifty.
2  Q.  Did you get paid per hour?
3  A.  Day.
4  Q.  Paid by the day?
5  A.  By the hour or by the day.
6  Q.  You were paid sometimes by the hour and
7      sometimes you were paid for just a day's work?
8  A.  I get a hundred dollars a day.
9  Q.  Okay.  And that was true at time of the
10     accident?
11 A.  Yes, sir.
12 Q.  How many days of work did you miss following
13     the accident?
14 A.  I probably couldn't put it in exact days for
15     you, but from March 15th to the end of June.
16     I think it was June 25th, 28th, somewhere up
17     in there.
18 Q.  So you think you missed somewhere between
19     three to four months worth of work?
20 A.  Yes, sir.
21 Q.  And you didn't work any days during that three
22     to four month's time?
23 A.  No, sir.  I couldn't.  I was not released from

10 (Pages 37 to 40)

# FREEDOM COURT REPORTING

## Page 41

1  the doctor.
2  Q.  And what physician had held you out of work?
3  A.  Dr. Holland.
4  Q.  And did he put you on light duty, or did he
5  tell you just not work at all?
6  A.  He told me not to work.
7  Q.  Were you in a cast that entire time?
8  A.  Excuse me?
9  Q.  Were you in a cast that entire time or --
10  A.  Not the entire time.
11  Q.  You were in a cast, did you tell me, about two
12  weeks?
13  A.  Close to a month.
14  Q.  Close to a month.
15    Did you receive any pay at all from Neal's
16  Roofing?
17  A.  No, sir.
18  Q.  Did you have any insurance while you were
19  working at Neal's Roofing?
20  A.  No, sir.
21  Q.  Do you still have a job out at Neal's Roofing?
22  A.  Yes, sir.
23  Q.  They're ready to take you back as soon as you

## Page 42

1  can work?
2  A.  Yes, sir.
3  Q.  What are you doing for income right now?
4  A.  I work with Neal's Roofing.
5  Q.  Does he have you doing other things other
6  than -- are you out roofing right now?
7  A.  Yes, sir.
8  Q.  But you didn't work at all.  You didn't do any
9  office work.  You didn't do anything for them
10  for the three to four months following the
11  accident?
12  A.  No, sir.
13  Q.  You had no income whatsoever?
14  A.  No, sir.
15  Q.  And you had no employment other than Neal's
16  Roofing since the accident?
17  A.  Yes, sir.
18  Q.  You had no other sources of income?
19  A.  No, sir.
20  Q.  Did you ever ask Neal's Roofing if they had
21  any sort of light duty available?
22  A.  No, sir.
23  Q.  Did they have those types of positions or are

## Page 43

1  all the men in the field working?
2  A.  Everybody is in the field working.  There is
3  no light duty.
4  Q.  All the way up to the owner?
5  A.  Yes, sir.
6  Q.  During the -- let's say three months before
7  the accident, were you working a steady 40 to
8  50 hours a week every single week?
9  A.  Yes, sir.
10  Q.  Because this work sometimes can be seasonal.
11  And I'm just curious if you typically had,
12  leading up to this accident, a solid 40 to 50
13  hours available to you.
14  A.  Yes, sir, we worked year round unless it
15  rains.
16  Q.  Prior to Neal's Roofing where did you work?
17  A.  Chris Salter's Construction.
18  Q.  Were you doing roofing work?
19  A.  Yes, sir.
20  Q.  Is that based out of Andalusia?
21  A.  Opp.
22  Q.  Opp.  Who was your supervisor?
23  A.  Chris Salter.

## Page 44

1  Q.  Who's your supervisor at Neal's Roofing?
2  A.  Michael Neal, the owner.
3  Q.  And that would have been true at the time of
4  the accident?
5  A.  Yes, sir.
6  Q.  And where is Neal's Roofing and Construction
7  located?  What's the business address?
8  A.  I believe its Whatley Road, Loango, Alabama.
9  I don't know it right off.  I ain't got it
10  memorized.
11  Q.  Whatley Road in --
12  A.  Loango, L-O-A-N-G-O.
13  Q.  L-O-A-N-G-O, Loango, Alabama.  Do you know the
14  zip for that?
15  A.  No, sir.
16  Q.  Do you have a phone number for either Neal's
17  Roofing and Construction as a business or Mike
18  Neal?
19  A.  488-1091.
20  Q.  Area code 334?
21  A.  Yes, sir.
22  Q.  Is that Mike's cell?
23  A.  Yes, sir.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 45

1  Q.  Did you do anything other than roofing while
2      you were at Chris Salter's Construction?
3  A.  Framing.
4  Q.  Framing work.  Anything else?
5  A.  That's it.
6  Q.  Where did you work prior to Chris Salter's
7      Construction?
8  A.  Ted Donaldson Construction.
9  Q.  Roofing work for Ted Donaldson Construction?
10 A.  Framing.
11 Q.  Framing.  Prior to that?
12 A.  Prior to that.  You have to give me a minute.
13     Let's see.  Mike Anderson Floor Covering.
14 Q.  Where is that located?
15 A.  Opp.
16 Q.  Do you remember prior to that?
17 A.  I think I might have did Doug's Roofing, but I
18     wasn't there for very long, maybe eight
19     months.
20 Q.  Where are they located?
21 A.  Sanford.
22 Q.  Sanford, Alabama?
23 A.  Uh-huh (positive response).

Page 46

1  Q.  And Ted Donaldson Construction, was that Opp,
2      Alabama?
3  A.  Yes, sir.
4  Q.  Do you remember addresses for any of these?
5  A.  No.
6  Q.  Do you remember your supervisor's name?  I
7      assume it was Ted?
8  A.  Yes.
9  Q.  And at Mike Anderson, it would been Mike
10     Anderson?
11 A.  Yes.
12 Q.  And Doug's roofing, what is Doug's last name?
13 A.  Mackoff.
14 Q.  Mackoff?  Can you spell that.
15 A.  M-A-C-K-O-F-F.
16 Q.  Have we discussed all your prior employers
17     that you can recall?
18 A.  Yes.
19 Q.  And have we discussed all the medical
20     providers that you treated with in the last
21     ten years --
22 A.  Yes.
23 Q.  -- that you can recall?

Page 47

1      Have any of these employers ever
2      terminated you?
3  A.  No.
4  Q.  Have you ever had health insurance with any of
5      these?
6  A.  No.
7  Q.  And you don't have health insurance now?
8  A.  No.
9  Q.  Does anyone at Neal's Roofing qualify for
10     health insurance?
11 A.  No.
12 Q.  Have you ever been qualified for Medicare or
13     Medicaid coverage?
14 A.  No.
15 Q.  Have you calculated all the expenses that
16     you're out of pocket to date?
17 A.  No.
18 Q.  You don't have any judgment as to what those
19     are?
20 A.  Besides prescriptions, no.
21 Q.  How often do you take Goody's Powder for your
22     hand?  Is that something you have to take
23     every day or is it --

Page 48

1  A.  No.
2  Q.  Just ever so often?  Do you have average of --
3      do you take it once a week, once a month?
4  A.  Maybe twice a week.
5      MR. RICHMOND:  Give me a minute to review
6      my notes.  I think, for purposes of
7      today, I'm about done.
8      (Brief recess)
9  Q.  Just a few more questions.  You said that -- I
10     believe Dr. Holland held you out of work?
11 A.  Yes sir.
12 Q.  Did he give you a slip or piece of paper to
13     take to your employer?
14 A.  Yes, sir.
15 Q.  And did you take that to your employer?
16 A.  I told him it wasn't necessary.  I didn't need
17     it.  I had already talked to my employer.
18 Q.  Do you recall Dr. Holland filling out that
19     slip?
20 A.  No, sir.
21 Q.  He just offered to do that?
22 A.  Yes, sir.
23 Q.  And you declined?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 49

1   A. Yes, sir.
2   Q. Because you had already made arrangements with
3       your employer?
4   A. Yes, sir.
5   Q. And that would be Mike Neal?
6   A. Yes, sir.
7   Q. And what had you told Mike?
8   A. That I could come back to work, that I was
9       released from the doctor.
10  Q. I think we might not be on the same page. I'm
11      not so much interested in when you actually
12      went back to work. I'm interested in the
13      first time you treated with Dr. Holland and he
14      told you not to go to work. I believe you
15      told me you missed about three or four months
16      worth of work because Dr. Holland withheld you
17      from work.
18  A. Right.
19  Q. Did Dr. Holland, when he first withheld you,
20      give you a slip to take to your employer as
21      proof that the physician was withholding you
22      from work?
23  A. No, sir.

Page 50

1   Q. Did he offer to do that?
2   A. I can't remember.
3   Q. But you don't have any recollection of him
4       filling out --
5   A. No, sir.
6   Q. -- that type of slip?
7   A. No, sir.
8   Q. And you certainly didn't give that type of
9       slip to Mr. Neal?
10  A. No, sir.
11  Q. Did you employer ask for any evidence from
12      your physician --
13  A. No, sir.
14  Q. -- that he withheld you from work?
15  A. No, sir.
16  Q. Mike took you at your word?
17  A. Yes, sir. He knew that I had a cast.
18  Q. You did eventually go back to work, though,
19      right?
20  A. Yes, sir.
21  Q. And as of today's date, are you working a full
22      40-hour week?
23  A. Yes, sir.

Page 51

1   Q. Are you getting full pay?
2   A. Yes, sir.
3   Q. Are you making about the same amount of money
4       that you made --
5   A. Yes, sir.
6   Q. -- before the accident?
7   A. Yes, sir.
8   Q. And I understand that your hand causes you
9       problems, but are you able to successfully
10      complete all the tasks that are assigned to
11      you at work?
12  A. Yes, sir.
13  Q. And I'm going to reserve the right to come
14      back if you do indeed have surgery and ask you
15      questions about any sort of permanent problems
16      you're having and how your injuries have
17      affected you, how this accident has affected
18      you, like I asked your brother.
19          And I'm also going to reserve the right to
20      ask you some more detailed questions about
21      your employment background if you're indeed
22      you're going to assert a lost earnings
23      capacity claim.

Page 52

1   A. Yes, sir.
2   Q. But outside of those areas, I believe I'm
3       done. Thank you for your time.
4   A. Thank you.
5           (Deposition concluded at 3:50 p.m.)
6           * * * * * * * * * *
7       FURTHER DEPONENT SAITH NOT
8           * * * * * * * * * *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

13 (Pages 49 to 52)

# Exhibit 2

